# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

CHANSELOR BELL,

       Plaintiff,

vs.                                     No. CIV 06-1137 JB/ACT

BOARD OF EDUCATION OF THE
ALBUQUERQUE PUBLIC SCHOOLS,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Motion for Summary Judgment on Statute of Limitations and Exhaustion Grounds, filed July 20, 2007 (Doc. 31). The Court held a hearing on the motion on October 4, 2007. The primary issues are: (i) whether Defendant Board of Education of the Albuquerque Public Schools ("APS") is entitled to summary judgment on Plaintiff Chanselor Bell's claims arising from events occurring on or before December 27, 2003 because the Individuals with Disabilities Education Act ("IDEA") has a two-year limitation period; and (ii) whether APS is entitled to summary judgment on Bell's claims arising from events occurring on or before December 27, 2003 because Bell failed to administratively exhaust those claims. Because IDEA's two-year limitation period applies to Bell's claims under the IDEA arising from events occurring on or before December 27, 2003, those claims are barred, because no common-law doctrines apply to allow Bell to escape that limitations period, and thus APS is entitled to summary judgment on those claims. Moreover, APS is entitled to summary judgment on Bell's non-IDEA claims arising from events occurring on or <u>before</u> December 27, 2003, because IDEA's two-year limitations period also applies to Bell's non-IDEA claims; they are educational in nature, seek relief

available under the IDEA, and are not pure discrimination claims.  The Court will, however, find that the Plaintiffs have exhausted their non-IDEA claims arising from events after December 27, 2003, and allow these claims to proceed.  Accordingly, the Court will grant Defendant's Motion for Summary Judgment on Statute of Limitations and Exhaustion Grounds in part and deny the motion in part.

## FACTUAL BACKGROUND

On or about April 18, 1996, Bell was referred for a special education evaluation because of academic concerns regarding his reading, mathematic, and writing skills.  See APS' Brief in Support of Motion for Summary Judgment on Statute of Limitations and Exhaustion Grounds ¶ 4, at 3, filed July 20, 2007 (Doc. 32)("APS' Memo."); Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment on Statute of Limitations and Exhaustion Grounds at 5, filed August 23, 2007 (Doc. 35)("Response").  APS contends that, on or about June 4, 1996, APS evaluation specialist Gail Adamson evaluated Bell's cognitive functioning using the Weschler Intelligence Scale for Children, Woodcock-Johnson Achievement Test, Revised, Bender Visual-Motor Gestalt Test and Vineland Adaptive Behavior Scales, as well as classroom observation of Bell.  See APS' Memo. ¶ 5, at 3 (citing to Exhibit 8 in the Administrative Record).[1]  Exhibit 8 contains the June 11, 1996 evaluation report by Gail Adamson and the June 27, 1996 Multidisciplinary Team Meeting evaluation summary.  See Administrative Record, Petitioner's Amended Exhibit List at 00065; Exhibit 8 at 00354-00361.

Bell objects to this contention on hearsay grounds:  "Plaintiff objects that Exhibit 8 is

---

[1]  The Administrative Record was submitted to the Court and is physically contained in the Records Department of the United States District Court Clerk.  See Certificate of Service at 1, filed July 10, 2007 (Doc. 22).

hearsay as to what Adamson did.  APS maintains records which purport to show what Adamson did, but APS has not established that Adamson 'evaluated Plaintiff's cognitive functioning' using the cited tests by its reference to Exhibit 8."  Response at 6.  APS responds that the June 11, 1996 evaluation report by Gail Adamson and the June 27, 1996 Multidisciplinary Team Meeting evaluation summary are not hearsay because they are: (i) not offered for the truth of the matter asserted "but to evidence the history of events giving rise to this lawsuit" and (ii) are school district records required to be prepared as a matter of law and permissible under rule 803(8) of the Federal Rules of Evidence.  Reply at 2.

Rule 803(8) provides:  "The following are not excluded by the hearsay rule, even though the declarant is available as a witness: . . . Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report."  APS is required to evaluate students with disabilities and prepare a written evaluation report.  See 20 U.S.C. § 1414(b)(4)(A) and (B)(stating that "upon completion of the administration of assessments and other evaluation measures -- (A) the determination of whether the child is a child with a disability as defined in section 1401(3) of this title and the educational needs of the child shall be made by a team of qualified professionals and the parent of the child in accordance with paragraph (5); and (B) a copy of the evaluation report and the documentation of determination of eligibility shall be given to the parent.").  The evaluations are excluded from the hearsay rule under rule 803(8) because it is a report of a public agency setting forth APS' activities and is a matter that APS is under a duty to report.  Moreover, to the extent that APS is offering these evaluations to show what occurred rather than the truth of the evaluations, they may not be hearsay at all.  In any case, it is

appropriate for the Court to consider these evaluations on summary judgment.

Moreover, Bell contends that an independent educational diagnostician, Dr. Laura Smith, found deficits in Adamson's evaluation.  See Response at 6 (citing Dr. Smith's report, Exhibit 1 to Response).  Bell contends that Dr. Smith found deficits including:

> [i] failure to research early development; [ii] failure to consider alternate explanations for poor performance on intelligence test; [iii] failure to document presumed deficits in adaptive behavior, particularly in the circumstance where [Bell] had just moved away from his biological mother and twin sister and his stepmother in Albuquerque reported good social skills; and [iv] academic function was not all below grade level.

Response at 6.

On or about June 11, 1996, Adamson summarized Bell's evaluation in a report.  See APS' Memo. ¶ 6, at 3.  Adamson noted that Bell scored 68 on the full I.Q. scale that tested his cognitive abilities.  See id.  According to the publishers of that test, Bell was "in the intellectually deficient range."  Id.  Bell was two and one-half years behind his third-grade placement in reading, math, and written language.  See id.

APS argues that Bell's academic skills "were significantly to moderately below those of his same-age peers, and his adaptive behavior skills were two to three years behind his same-aged peers."  Id. Bell counters that APS is paraphrasing Adamson's report.  See Response at 6.  Bell argues that Adamson's report is not properly supported "by a person with knowledge and is disputed in its observations and conclusions."  Response at 6.

APS represents that on June 27, 1996, "a multi-disciplinary team," including Adamson, Bell's stepmother, and his teacher, Judy Walker, reviewed his evaluation and determined that Bell was eligible for special-education services under the eligibility category of "intellectually disabled." APS' Memo. ¶ 7, at 3 (citing Administrative Record, Exhibit 8 at 00354-00361 (containing the June

11, 1996 evaluation report by Gail Adamson and the June 27, 1996 Multidisciplinary Team Meeting evaluation summary).  Bell objects that the information APS relies upon is based on hearsay.  See Response at 7.  Bell's objection is overruled, because, even if the evaluations are being used for the truth of the matter asserted, they come within the exception to the hearsay rule by way of rule 803(8) of the Federal Rules of Evidence.

Bell agrees that Exhibit 8 is an APS form indicating he was eligible as "intellectually disabled" but disputes that his stepmother was part of any "determination" because she was given insufficient or inaccurate information by APS employees regarding his testing results "or the operative definition of intellectually disabled."  Response at 7.  See id., Exhibit 1; id., Exhibit 2, Testimony of Gina Bell (taken May 10 and 11, 2006).  On the other hand, Bell and APS stipulated that he is an individual with disabilities and, therefore, eligible for receipt of special education services.  See Joint Status Report at 2, filed June 13, 2007 (Doc. 14).

Bell relocated back to Texas at the beginning of the 1996-1997 school year, and remained in Texas for the academic years of 1996-1997, 1997-1998, and 1998-1999.  See APS' Memo. ¶ 9, at 3; Response at 5.  Bell did not receive any special education services while in Texas.  See APS' Memo. ¶ 10, at 3; Response at 5.  While in Texas, Bell was held back in the fourth grade.  See APS' Memo. ¶ 11, at 4; Response at 5.  Bell completed fourth grade in the 1997-1998 school year, and completed fifth grade in the 1998-1999 school year.  See APS' Memo. ¶ 11, at 4; Response at 5.  Bell returned to Albuquerque and re-enrolled in APS as a sixth grader at the start of the 1999-2000 school year.  See APS' Memo. ¶ 12, at 4; Response at 5.

APS contends that, in September of 1999, APS evaluation specialist Dolores Duran-Fresquez evaluated Bell, using the Weschler Intelligence Scale for Children, Revised Woodcock-Johnson

Achievement Test, parent information, and teacher-student rating scales.  See APS' Memo. ¶ 13, at 4 (relying on Administrative Record, Exhibit 11 at 00383-00452, September 30, 1999 Reevaluation Report and Testing by Dolores Duran Fresquez).  Bell objects to the September 30, 1999 Reevaluation Report and Testing by Dolores Duran Fresquez as hearsay.  See Response at 7. Bell contends that the Individual Education Plan ("IEP") does not establish the facts as alleged by APS, and that those facts are not supported by a person with knowledge.  See id. Bell also argues that APS has not properly supported, for summary judgment purposes, the facts upon which APS relies.  See id. Additionally, Bell "disputes APS' implication that choice of evaluation tools or actual evaluation comported with professional standards or requirements of IDEA for proper or comprehensive evaluations of [his] cognitive function or educational abilities or needs."  Id.  Bell contends that Dr. Smith found deficits with the testing upon which APS relies.  See Response at 7.

APS represents that Duran-Fresquez summarized her evaluation in a report where she noted that Bell scored a full scale I.Q. score of 62.  See APS' Memo. ¶ 14, at 4.  APS states that Bell's score resulted primarily from a lower score on the verbal I.Q. portion of the test.  See id.  APS alleges that Duran-Fresquez noted Bell "had made good gains in the areas of reading and math, and minimal gains in written language, also noting that [Bell's] written language skills were in the first percentile among same-aged peers."  Id.  Bell disputes APS' contention because APS "assumes that Ms. Duran-Fresquez'. . . report is accurate or complete."  Response at 8.

APS represents that, on October 6, 1999, another "multi-disciplinary team consisting of Ms. Duran-Fresquez, [Bell's stepmother], [Bell], and teachers Tammy Clarke and Dorothy Woodward determined that [Bell] was eligible for special education services under the eligible category of Intellectual Disabled."  APS' Memo. ¶ 15, at 4.  Bell disputes APS' contention "to the extent [that]

it implies that the limitations of the evaluation process of alleged results were explained to [Bell's stepmother]." Response at 8.  Bell contends that APS denied his stepmother knowledge of important facts which were known or should have been known by APS "related to the evaluation and evaluation process that would allow [Bell] or his mother to be able to meaningful[ly] participate in [the] determination of [Bell]'s eligibility."  Id.  Bell relies on Dr. Smith's report regarding the alleged deficiencies in the testing done by APS.  See id.

APS represents that Bell's eligibility for special education led to the development of IEPs for him, which were prepared "at least annually, and at times more frequently."  APS' Memo. ¶ 16, at 4 (citing id., Exhibits A-F).  Bell disputes the contention to the extent "it implies that he was provided educational services informed by a correct understanding of his actual disability." Response at 8.  Bell represents that members of the IEP team "were denied accurate information about [his] abilities and such denial made it impossible for them to participate meaningfully in the development of [his] IEPs."  Id. at 8-9 (relying upon Exhibits 1 and 2).

All of Bell's IEPs provided "special education services, instructional modifications, and placement for at least a portion of the school day in a regular education setting."  APS' Memo. ¶ 17, at 5.  Bell and his stepmother participated in all of his IEP meetings.  See id. ¶ 18, at 5.

In December of 2001, Duran-Fresquez performed "a performance[-]based re-evaluation on [Bell]."  Id. ¶ 19, at 5.  On January 17, 2002, another multi-disciplinary team consisting of Duran-Fresquez, Bell's stepmother, teachers Shanette Ruttinger, Melinda Blaine, Paul Schaffer, Ana Plante, and speech and language pathologist Rebecca Ging determined that Bell was eligible for special-education services under the eligibility category of intellectually disabled.  See id. ¶ 20, at 5.  Bell disagrees with the factual statements only  "[t]o the extent [that] this fact . . .  assumes [his

stepmother] was provided with sufficient or accurate information at the January 2002 meeting or that the evaluation process or results were sufficiently explained to [her]."  Response at 9 (relying on id., Exhibits 1 and 2).

On November 19, 2003, APS wrote an IEP for Bell identifying his eligibility as "mentally retarded."  Response , Exhibit 6, IEP (dated November 19, 2003).  In that IEP, APS reported that Bell was at an eighth-grade math level and a tenth-grade reading level.  See Response ¶ 14, at 11 (citing Exhibit 6).  Bell was in the tenth grade when the IEP was written.  See Exhibit 6 at 1.

APS continued to label Bell as mentally retarded from November 19, 2003 through May 12, 2005.  See Response ¶ 15, at 11 (citing Exhibit 3, IEPs (dated March 31, 2005 and May 12, 2005), Exhibit 4, Reevaluation Summary (dated March 9, 2005), Exhibit 6, IEP (dated November 19, 2003)).  Bell argues that it was not until May 2005 that Bell and his family realized APS had erred in  labeling him as "mentally retarded" since 1996.  Response, Exhibit 2, testimony of Gina Bell (taken May 11, 2006) at 1009:10-1014:17 (G. Bell)).

Bell was born in 1987 and turned 18 in February of 2005.  See Response ¶ 1, at 9. Bell contends that mental retardation is a static condition that does not go away and is a permanent neurological deficit.  See id. ¶ 2, at 9 (citing Exhibit 1, Psychological Evaluation (dated February 16, 2006), Testimony of Dr. Laura Smith (taken May 8, 2006) at 158:11-159:8, 160:8-13, 161:11-13, 169:10-12, 172:20-173:11, 182:1-183:5, 206:12-18, 234:14-235:14, 236:1-5, 888:1-889:19, 892:15-894:18, 1009:10-1012:9).  Bell represents that APS changed his disability eligibility label in May 2005 from "mentally retarded" to "specific learning disability."  Id. ¶ 5, at 10 (citing Exhibit 3). Bell represents that, when APS changed his eligibility label, it did not perform any new I.Q. or achievement testing, and relied on the same testing it used in 1999.  See Response ¶ 6, at 10 (citing

Exhibit 4, Reevluation Summary (dated March 9, 2005); and Exhibit 7, Testimony of Lori Rowe (taken May 8, 2006) at 87:23-88:25). Bell contends that he is not mentally retarded and has never been mentally retarded "as those terms were used in the IDEA and the state of New Mexico." Response ¶ 18, at 12 (relying on Exhibit 1, Psychological Report of Bell by Dr. Smith (dated February 16, 2006) and Exhibit 7 (testimony of Lori Rowe (taken May 8, 2006) at 87:23-88:25).

## **PROCEDURAL BACKGROUND**

Bell filed an IDEA due-process hearing request on December 28, 2005. See APS' Memo. ¶ 1, at 2; Response at 5. Bell initiated his lawsuit by filing a Complaint in the Second Judicial District Court, County of Bernalillo, on July 26, 2006. See Doc. 1. Bell contends that the administrative-hearing officer improperly limited his claims to two years. See Third Amended Complaint for Violation of Civil Rights Pursuant to Section 1983, Title VI of the Civil Rights Act of 1964 and Section 504 and Civil Action Following Exhaustion of IDEA Administrative Procedures, filed October 15, 2007 (Doc. 51)("Third Amended Complaint").

APS moves the Court for partial summary judgment on Bell's claims to the extent that they arise from events occurring on or before December 27, 2003 on the grounds that the statute of limitations bars such claims. See Defendant's Motion for Summary Judgment on Statute of Limitations and Exhaustion Grounds at 1, filed July 20, 2007 (Doc. 31)("Motion"). APS argues that Bell's claims arising from alleged events occurring on or before December 27, 2003 are time barred under the IDEA's two-year statute of limitations. See id. ¶ 4, at 2. Alternatively, APS contends that Bell has failed to exhaust his administration remedies with respect to such claims. See id. ¶¶ 5, 6, at 2.

APS also contends that Bell's non-IDEA claims regarding education, including his 42 U.S.C.

§ 1983, Title VI of the Civil Rights Act of 1964, and the Rehabilitation Act of 1973 ("RA"), and

state constitutional claims, are also subject to the two-year IDEA statute of limitations. See id. ¶ 7,

at 2. Alternatively, APS argues that the Court should apply New Mexico's three-year statute of

limitations provided in New Mexico Statutes Annotated § 37-1-8 to Bell's non-IDEA claims. See

Motion ¶ 8, at 2. APS contends that, under the New Mexico three-year statute of limitations, all

non-IDEA claims for events occurring on or before July 25, 2003 are time-barred. See id. ¶ 9, at

2.

        Bell responded to APS' Motion on August 23, 2007. See Response. Bell counters that APS'

motion "does not seek summary judgment for any IDEA claim based on events after December 27,

2003." Response at 1. Bell contends that APS' motion does not attack: (i) his IDEA claims for

denial of a FAPE based on events after December 28, 2003; and (ii) his non-IDEA claims based on

events after July 25, 2003. Id. at 2. Bell contends that all of his claims concern APS' discriminatory

acts occurring and continuing through 2005, or APS' retaliation, occurring and continuing through

2006. See id. Bell argues that APS' first mislabeling of him "was one point on a long timeline of

discrete and connected discrimination and harm." Id. at 3. Bell contends that "[a]pplication of

limitations periods requires a more complex analysis than Defendant APS identifies." Id. at 3.

        Bell asserts that his claim did not accrue until March of 2005 when he "knew of the

triggering fact of misidentification." Id. at 4. Bell contends that the applicable statute of limitations

governing his claim is two years from the date the parent or agent knew, or should have known,

about the alleged action forming the basis of his complaint. See id. at 14 (citing 20 U.S.C. §

1415(f)(3)(C)). Bell argues that, because APS did not inform him and his parents that he was not

mentally retarded until May of 2005, his claims relate back to 1996 so long as his action was filed

by May 2007.  See Response at 15.  Bell further argues that APS' conduct constitutes a "continuing

violation" warranting the consideration of his IDEA claims dating back to June of 1996.  Id. at 17.

Bell also contends that a shorter IDEA limitations period cannot be used to abbreviate the time

available for bringing non-IDEA claims. See id. at 19. Bell contends that APS' conduct constitutes

a continuing violation warranting consideration of his § 1983 and race-discrimination claims back

to 1996.  See Response at 19.   Bell asserts that he properly exhausted his administrative remedies

under the IDEA.  See Response at 20-22.  Alternatively, Bell argues that his claims were tolled

based on New Mexico law on equitable tolling.  See id. at 22.

In his Response, Bell contends that the IDEA gives Local Educational Agencies ("LEA"),

including APS, the authority and power to label students with disabilities for the purpose of

providing special education.  See id. ¶ 3, at 9 (citing 20 U.S.C. § 1414).  Bell argues that APS

employees are considered experts who provide information and training to parents concerning their

children's disabilities and educational needs.  See Response ¶ 4, at 9-10 (citing 34 C.F.R. §

300.24(7)).  Bell asserts that, at all material times, from August 1999 until May 2005, the IDEA

provided that APS employees had the right and duty to reconvene the IEP meeting and/or seek new

testing for Bell, when necessary.  See Response ¶ 8, at 10 (citing 20 U.S.C. §§ 1414(a)(2)(A),

1412(c), 1414(d)(4)).

Bell contends that the IDEA mandated APS not use any single procedure as its sole criterion

in determining whether he was a child with a disability, see Response ¶ 10, at 10-11 (citing 20

U.S.C. § 1414(b)(2)(B)), and that the IDEA mandated that APS "use technically sound instruments

that may assess the relative contribution of cognitive and behavioral factors, in addition to physical

or developmental factors," Response ¶ 11, at 11 (quoting 20 U.S.C. § 1414(b)(2)(C)).  Bell argues

that the IDEA mandated APS ensure that tests and other evaluation materials used to assess him are

"'selected and administered so as not to be discriminatory on a racial or cultural basis.'"  Response

¶ 12, at 11 (quoting 20 U.S.C. § 1414(b)(3)(A)(i)).  Bell contends that APS has

> consistently failed to obtain sufficient developmental or social history required by professional standards and IDEA to recommend eligibility under either intellectually disabled or mental retardation; it also consistently failed to adequately assess [Bell]'s obvious adaptive behaviors and functional ability and to take into consideration his demonstrated ability to make significant academic progress between review periods.

Response ¶ 17, at 12 (relying on Exhibit 1, Psychological Evaluation of Bell performed by Dr. Smith

(dated February 16, 2006)).  Bell notes that the "IDEA defines mental retardation as 'significantly

subaverage general intellectual function, existing concurrently with deficits in adaptive behavior and

manifested during the developmental period that adversely affects a child's educational

performance.'"  Response ¶ 19, at 12 (quoting 34 C.F.R. § 300.7(c)(6)).

The Court held a hearing on October 4, 2007.  APS agreed that there are two tolling

provisions under the IDEA in 20 U.S.C. § 1415(f)(3).  See Transcript of Hearing (taken October 4,

2007)("Tr.") at 19:23-25 (Carrico), filed October 21, 2007 (Doc. 54 (Court Only)).  APS argued that

neither tolling provision had any application to the case.  See id. at 20:2-16 (Carrico).  APS

contended that Congress rejected the application of other tolling provisions by expressly stating the

tolling provisions that apply to IDEA.  See id. at 21:3-5 (Carrico).

Bell contended that 28 U.S.C. § 1415(f)(3)(C) states that the statute of limitations is within

two years of the date that the parent or agency knew or should have known about the alleged action

forming the basis of the complaint.  See id. at 22:7-13 (Stewart).  Bell contended that, because he

did not know he was misidentified until May of 2005, APS has no statute-of-limitation argument.

See id. at 22:14-18 (Stewart).  Bell conceded that he knew APS had identified him as a student with

mental retardation in 1996, but contended that he did not know it was a misidentification at that time.  See id. at 24:19-25 (Stewart).

APS countered that Bell was adding words to the statute.  See id. at 27:2-6 (Carrico).  It argued: "[T]he statute is [in] very plain language.  It says it's two years from the date of the action, that the parents knew of the action.  Not two years from the date the parents knew the action was wrong.  And they're adding words to the statute that aren't there." Id.  APS noted that, under federal law, "the accrual period under federal statute of limitations analysis is not when somebody discovers that an action was wrong; it's when you discover [that] you have an injury."  Id. at 27:9-12 (Carrico).  APS argued that the plain language of the statue is two years from the date that the plaintiff knew of the action and that there is no dispute that Bell knew of the actions at issue in his case.  See id. at 28:7-10 (Carrico).

APS argued that Bell has not administratively exhausted his IDEA claims, because "[n]o hearing officer has ever had the occasion to address whether the IEPs developed for [Bell] in 1996, 1999, 2000, 2001, [and] 2002 were inappropriate and did not provide [Bell] with [a] free appropriate public education."  Id. at 30:20-23 (Carrico).  Bell countered that he tried to exhaust his grievances back to 1996, but the hearing officer kept out a lot of information "with regard to trying to attack those decisions."  Id. at 33:5-9 (Stewart).  Bell also contended that, even if he allegedly failed to exhaust his IDEA claims, his other "pure discrimination" claims would go forward regardless of that failure.  Id. at 43:15-22 (Stewart).  Bell noted, however,  that, even if he were constricted to claims from December of 2003 to May of 2005,  while it could potentially impact his damages, "the evidence may not change that much."  Id. at 44:15-45:10 (Court & Stewart).

## LAW GOVERNING MOTIONS FOR SUMMARY JUDGMENTS

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The movant has "the initial burden to show that there is an absence of evidence to support the nonmoving party's case." Mirzai v. State of New Mexico Gen. Servs. Dep't, 506 F.Supp.2d 767, 774 (D.N.M. 2007)(Browning, J.)(internal quotations omitted).  That is, the moving party has the initial burden to demonstrate absence of a genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

If the movant meets that burden, then the burden shifts to the nonmovant "to present specific, admissible facts from which a rational trier of fact could find for the nonmovant." Velasquez v. Frontier Medical, Inc., 375 F.Supp.2d 1253, 1262 (D.N.M. 2005)(Browning J.).  The nonmovant must set forth specific facts and cannot rely only on his pleadings.  See Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 671 (10th Cir. 1998). "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."  Id.

"For the purposes of summary judgment, the court assumes the evidence of the nonmoving party to be true, resolves all doubts against the moving party, construes all evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor."  Velasquez v. Frontier Medical, Inc., 375 F.Supp.2d at 1263 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).  Summary judgment is appropriate if there is no genuine issue of material fact.  See Trujillo v. Bd. of Educ., Albuquerque Public Sch., 410 F.Supp.2d 1033,

1039 (D.N.M. 2005)(Browning, J.).  "An issue of fact is 'genuine' if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the non-moving party." Id. (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248).  "Essentially, the inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Velasquez v. Frontier Medical, Inc., 375 F.Supp.2d at 1263 (internal quotations and citations omitted).

### LAW REGARDING LIMITATIONS PERIOD ON IDEA CLAIMS

Under the IDEA, a plaintiff must file his or her request for an impartial due process hearing within two years of the date he or she became aware of the actions upon which her or his claims are based.  The 2004 reauthorization of IDEA, which became effective July 1, 2005, amended the IDEA to include 20 U.S.C. §1415(f)(3)(C), which provides:

> (C) Timeline for requesting hearing
>
> A parent or agency shall request an impartial due process hearing within 2 years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint, or, if the State has an explicit time limitation for requesting such a hearing under this subchapter, in such time as the State law allows.

20 U.S.C. §1415(f)(3)(C).  Before the 2004 reauthorization, IDEA did not have a statute of limitations.  See Pub. L. No. 108-446, 118 Stat. 2647.

On August 14, 2006, the Secretary of the Department of Education issued regulations "after a determination that such regulations were 'needed to implement changes made to the Individuals with Disabilities Education Act, as amended by the Individuals with Disabilities Education Improvement Act of 2004 (Act or IDEA).'" J.L. ex rel. J.L. v. Ambridge Area School Dist., Civil Action No. 06-1652, 2008 WL 509230 (W.D.Pa. February 22, 2008)(quoting 71 F.R. 156 at 46540

-15-

(dated August 14, 2006), available at: http://www.ed.gov/ legislation/FedRegister/ finrule/2006-3/ 081406a.html).  In discussing the two-year limitation period, the Secretary stated it is

> clear that a due process complaint must allege a violation that occurred not more than two years before the date the parent or public agency knew, or should have known, about the alleged action that forms the basis of the due process complaint, or if the State has an explicit time limit for filing a due process complaint, in the time allowed by that State law.

71 F.R. 156 at 46697, available at: http:// www.ed.gov/ legislation/ FedRegister/ finrule/2006-3/081406a.html.  The Secretary acknowledged that "[s]ome commenters expressed concern that reducing the statute of limitations from three years to two years makes it impossible to protect the rights of children." Id.  In response, the Secretary stated:  "It is not necessary to clarify that common-law directives regarding statutes of limitations should not override the Act or State regulatory timelines, as the commenters recommended, because the Act and these regulations prescribe specific limitation periods which supersede common law directives in this regard." Id.

There are two exceptions to the two-year statute of limitations.  20 U.S.C. §1415(f)(3)(D) provides:

> The timeline described in subparagraph (C) shall not apply to a parent if the parent was prevented from requesting the hearing due to --
>
> (i)  specific misrepresentations by the local educational agency that it had solved the problem solving the basis of the complaint; or
>
> (ii)  the local educational agency's withholding of information from the parent that was required under this subchapter to be provided to the parent.

20 U.S.C. §1415(f)(3)(D).

The Tenth Circuit explained in McQueen v. Colorado Springs School District No. 11, 488 F.3d 868 (10th Cir. 2007), that

> [e]ither party may appeal the hearing officer's decision to the [SEA], which reviews

-16-

the findings and decision and "make[s] an independent decision upon completion of such review."  § 1415(g).  Only after the state agency has issued its decision may a party bring "a civil action with respect to the complaint" in state or federal court.  § 1415(i)(2)(A); see id. § (i)(1)(B); id. § (i)(3)(A)(jurisdiction of federal courts).

McQueen v. Colorado Springs School District No. 11, 488 F.3d at 874.  "The role of the § 1415 process is to resolve a complaint about the education of a specific child."  Id.

## LAW REGARDING EXHAUSTION UNDER THE IDEA

"Congress requires parents to exhaust IDEA's administrative procedures and remedies before filing suit in federal court."  Ellenberg v. New Mexico Military Institute, 478 F.3d 1262, 1267 (10th Cir. 2007).  State educational agencies enact procedures and polices to implement the IDEA, and ensure both state and local compliance with it.  See id. at 1269.  "When parents believe their child is not being provided a [free and public education ("FAPE")] in the least restrictive environment, they are entitled to an impartial due process hearing."  Id. The losing party may appeal to the state educational agency.  See id.  "Once state administrative procedures and remedies are exhausted, any party 'aggrieved' by the hearing officer's decision has a right to file a civil action in state or federal court."  Id. at 1269-70.

The United States Court of Appeals for the Tenth Circuit has interpreted "the IDEA's exhaustion requirements broadly, noting Congress' clear intention to allow those with experience in educating the nation's disabled children at least the first crack at formulating a plan to overcome the consequences of educational shortfalls."  Id. at 1275 (internal quotations omitted).  "[C]ourts consistently have required exhaustion for alleged acts that both have an educational source and an adverse educational consequence."  Cudjoe v. Independent Sch. Dist. No. 12, 297 F.3d 1058, 1067 (10th Cir. 2002).  The Tenth Circuit "believe[s] that both the language and the policy of the IDEA suggest that if a student with a disability seeks to bring a claim for educational injuries, then he must

plead and show either that he has exhausted his administrative remedies under the IDEA or that the relief he is seeking is not available under the IDEA." Id. at 1063.  See id. at 1068 (concluding that the plaintiff-appellant must exhaust administrative remedies under the IDEA for claims of educational deficiencies before seeking relief in a civil suit where it was not demonstrated that the student was ineligible for relief under the IDEA, and thus, a complaint could have been filed with the district and "utilized the IDEA's procedural machinery to address the alleged deficiencies in the provision of his FAPE.").  Exhaustion permits agencies to exercise discretion and expertise on issues within their specified purviews, allows technical issues and a factual record to develop fully before judicial review, prevents deliberate disregard of the administrative procedures Congress establishes, and avoids unnecessary judicial decisions by giving agencies an opportunity to correct errors. See Ass'n for Cmty. Living v. Romer, 992 F.2d at 1044 (10th Cir. 1993)(citations omitted).

The burden of demonstrating that exhaustion is not required is on the party seeking to avoid the exhaustion requirement. See Honig v. Doe, 484 U.S. 305, 327 (1988)(stating that the burden is on the party seeking to avoid exhaustion).  Failure to exhaust is excusable if the plaintiff seeks relief unavailable under IDEA.  See Ellenberg v. New Mexico Military Institute, 478 F.3d at 1276.  Exhaustion is also excused if it would be futile or "if an agency has adopted a policy or pursued a practice of general . . . applicability that is contrary to the law."  Id. at 1276 (internal quotations omitted).

"Administrative remedies are generally futile or inadequate when plaintiffs allege structural or systemic failure and seek system-wide reforms."  Urban v. Jefferson County Sch. Dist. R-1, 89 F.3d 720, 725 (10th Cir. 1996).  Claims directed solely at the creation of a plaintiff's IEP do not allege systemic violations.  See id.  To fall into the "general applicability" exception, the school

district must "have adopted a policy of general applicability contrary to law which thereby renders agency expertise and the factual development of an administrative record less important." Id. at 725. The "contrary to law" language means that the exhaustion doctrine is not served because the issue is "a pure matter of law." Ass'n for Cmty Living in Colo., 992 F.2d 1040, 1044 (10th Cir. 1993). Claims that target "the effect of a single component of a[n] . . . educational program on individual children's IEPs [are] . . . not the kind of systematic violation that renders the exhaustion requirement inadequate or futile." Id.

Judicial review under 20 U.S.C. § 1415(e)(2) of the IDEA is unavailable "until a plaintiff has exhausted the administrative remedies provided under 1415(b)(2) and (c)." Mason v. Los Lunas Sch. Dist., No. Civ. 05-470JB/ACT, 2005 WL 3662921 (D.N.M. October 31, 2005)(Browning, J.)(internal quotations omitted). If the IDEA's ability to remedy an injury is unclear, exhaustion should be required. See Ellenberg v. New Mexico Military Institute, 478 F.3d at 1276.

## LAW REGARDING NON-IDEA CLAIMS

"[W]henever a plaintiff brings a claim that is educational in nature purporting to challenge the provision of educational services by a local school district, the claim is presumptively redressable by the IDEA's administrative procedures." Ellenberg v. New Mexico Military Institute, 478 F.3d at 1280. "This is true regardless of what statute the plaintiff purports to cite as the basis for the suit." Id. "[T]he IDEA offers no relief [for pure discrimination claims], for they do not relate to the provision of a FAPE in the least restrictive environment." Id. at 1281.

To determine whether a plaintiff "must utilize the IDEA's administrative procedures relates to the source and nature of the alleged injuries for which he or she seeks a remedy, not to the specific remedy itself." Padilla v. Sch. District No. 1 in Denver, Colo., 233 F.3d 1268, 1274 (10th Cir.

-19-

2000).  The inquiry is "whether the plaintiff has alleged injuries that could be redressed to any degree by the IDEA's administrative procedures and remedies."  Id.  If so, exhaustion is required. See id.  (holding that the plaintiff was not required to exhaust where she sought only sought monetary damages for physical injuries suffered allegedly as the result of the school district's and board of education's alleged ADA violations because damages should be awarded in civil actions not administrative hearings).

In Padilla v. School District No. 1 in Denver, Colorado, the Tenth Circuit explained that the Supreme Court of the United States' "holding that the [predecessor to the IDEA] provided a comprehensive enforcement scheme that preempted other overlapping but independent statutory of constitutional claims necessarily meant that the [predecessor to the IDEA] also supplanted § 1983 claims based simply on . . violations [of the predecessor to the IDEA]."  233 F.3d at 1273 (citing Smith v. Robinson, 468 U.S. 992, 1008-1009 (1984)).  Thus, "§ 1983 may not be used to remedy IDEA violations."  Padilla v. Sch. Dist. No. 1 in Denver, 233 F.3d at 1274.

The presumption that non-IDEA claims in an IDEA suit must be exhausted using the IDEA's administrative procedures may be overcome by "pure discrimination claims," because IDEA offers no relief for those claims.  "[T]hey do not relate to the provision of a FAPE in the least restrictive environment."  Ellenberg v. New Mexico Military Institute, 478 F.3d at 1281-82.  The IDEA is "not an anti-discrimination statute."  Id.

In Ellenberg v. New Mexico Military Institute, the plaintiffs had "pure" discrimination claims, because they were challenging "the alleged discriminatory admissions practices of a state-funded secondary school."  Id. at 1281.  The Tenth Circuit explained:

> At no point would the [IDEA] administrative process offer insight into the merits of a discrimination claim.  Requiring exhaustion before the [plaintiffs] could pursue

> their claims under the ADA and RA would create an anomalous result: Plaintiffs who conceded a student['s] IDEA rights have not been violated, or have settled the IDEA claims, would be required to craft an IDEA claim and proceed through the state administrative process to determine if the students' IDEA rights have been violated.

Id. In the specific context of Ellenberg v. New Mexico Military Institute, where the plaintiffs sought the student's admission into the New Mexico Military Institute, the Tenth Circuit noted: "'Under Section 504, a state special school cannot hide behind the justification that another public school might provide a FAPE; it must show that somehow [the student] does not qualify for admission. Unlike the IDEA, Section 504 does not only look at what is a FAPE, but also what is fair.'" Id. at 1282-82 n.22 (quoting Walker, Note, Adequate Access or Equal Treatment: Looking Beyond the IDEA to Section 504 in a Post-Schaffer Public School, 58 Stan. L. Rev. 1563, 1589 (2006)). The Tenth Circuit was concerned with adopting the principle "that if the state provides a student with a FAPE in the least restrictive environment, it has not violated § 504 or the ADA." Ellenberg v. New Mexico Military Institute, 478 F.3d at 1281 n.22. The Tenth Circuit explained that to adopt that principle would "contradict Congress' express legislative mandate" contained in 20 U.S.C. § 1415(l). Ellenberg v. New Mexico Military Inst., 478 F.3d at 1281 n.22. Thus, the plaintiffs' RA and Americans with Disabilities Act ("ADA") claims in Ellenberg v. New Mexico Military Institute were not automatically dismissed because their IDEA claim failed: "Any other interpretation of [Tenth Circuit] caselaw would mean that a state educational institution that receives public funding could openly discriminate against applicants with disabilities so long as the state offered the student a FAPE in the least restrictive environment." Id. at 1282. The plaintiffs could still pursue claims under the ADA and the RA on the ground that the student "was precluded from receiving a state benefit -- military-style education -- provided to her non-disabled peers." Id.

Moreover, non-IDEA claims that are duplicative of IDEA claims are governed by the same

limitations period. See Birmingham v. Omaha Sch. Dist., 220 F.3d 850, 856 (8th Cir. 2000)(applying the same limitations period for IDEA and § 1983 claims to "ensure . . . that identical claims remain viable for an identical period.").

## LAW REGARDING STATUTE OF LIMITATIONS
## AND TOLLING IN § 1983 CLAIMS

New Mexico's three-year personal injury statute applies to § 1983 claims. See Wilson v. Garcia, 471 U.S. 261, 280 (1985)("In view of our holding that § 1983 claims are best characterized as personal injury actions, the Court of Appeals correctly applied the 3-year statute of limitations governing actions 'for an injury to the person or reputation of any person.'")(quoting N.M.S.A § 37-1-8 (1978)); Mondragon v. Thompson, No. 06-2358, 2008 WL 624434 at * (10th Cir. March 10, 2008)("The statute of limitations is drawn from the personal-injury statute of the state in which the federal district court sits.")(citing Wilson v. Garcia, 471 U.S. at 269). Moreover, "Congress did not establish a statute of limitations or a body of tolling rules applicable to actions brought in federal court under § 1983 . . . . As such, state law governs the application of tolling in a civil rights action." Alexander v. Oklahoma, 382 F.3d at 1217 (internal quotations omitted). Under extraordinary circumstances "in which state statutes of limitations eradicate rights or frustrate policies created by federal law" "federal courts possess the power to use equitable principles to fashion their own tolling provisions." Id. at 1217 n.5 (internal quotations omitted).

IDEA's exhaustion requirement applies to civil actions filed under other laws seeking relief also available under the IDEA:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990 . . .  title V of the Rehabilitation Act of 1973 . . . , or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this

subchapter, the procedures under subsections (f) and (g) of this section shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

20 U.S.C. § 1415(l)(alternations in the original).

## LAW REGARDING ACCRUAL OF CLAIMS UNDER FEDERAL LAW

"The accrual date of a § 1983 cause of action is a question of federal law that is <u>not</u> resolved by reference to state law." <u>Wallace v. Kato</u>, 127 S.Ct. 1091, 1095 (2007). Thus, accrual under § 1983 is governed by "federal rules conforming in general to common-law tort principles." <u>Id.</u> Accrual occurs "when the plaintiff has a complete and present cause of action." <u>Id.</u> (internal quotations omitted). This phrase means when the plaintiff "can file suit and obtain relief." <u>Id.</u>

"While state law governs limitations and tolling issues, federal law determines the accrual of section 1983 claims." <u>Fratus v. Deland</u>, 49 F.3d 673, 675 (10th Cir. 1995). "A civil rights action accrues when facts that would support a cause of action are or should be apparent." <u>Id.</u>

"In general, under the federal discovery rule, claims accrue and [t]he statute of limitations begins to run when the plaintiff knows or has reason to know of the existence and cause of the injury which is the basis of his action." <u>Alexander v. Oklahoma</u>, 382 F.3d 1206, 1215 (10th Cir. 2004)(internal quotations omitted). The focus is "on whether the plaintiff knew of facts that would put a reasonable person on notice that wrongful conduct caused the harm. In this context, a plaintiff must use reasonable diligence in seeking to discover facts giving rise to a claim for relief." <u>Id.</u> at 1216 (internal citations omitted).

## LAW REGARDING THE CONTINUING VIOLATION DOCTRINE

The Tenth Circuit has yet to apply the continuing-violation doctrine outside of the context of Title VII employment cases. <u>See</u>, <u>e.g.</u>, <u>Dean v. Boeing Co.</u>, No. 07-3060, 2008 WL 102420 at

* 2 (10th Cir. January 9, 2008)(affirming trial court's holding that "equitable doctrines such as the continuing violations doctrine that might be utilized in regard to a Title VII action were not applicable when considering [the plaintiff's] § 1981 claims."); Rassam v. San Juan College Bd., 113 F.3d 1247 (Table), No. 95-2292, 1997 WL 253048 at *3 (10th Cir. May 15, 1997)(noting that "[s]ome courts have observed that the 'continuing violation doctrine' has rarely been applied outside of the Title VII employment discrimination context" and that "it is to be narrowly applied, and is not intended to excuse plaintiffs from diligently pursuing their claims."). Under that doctrine, "a plaintiff may recover for discriminatory acts that occurred prior to the statutory limitations period if they are part of a continuing policy or practice that includes the act or acts within the statutory period." Davidson v. Am. Online, Inc., 337 F.3d 1179, 1183 (10th Cir. 2003)(internal quotations omitted). "A plaintiff may establish a continuing violation by showing either that [i] a series of related acts was taken against him, with one or more of those acts occurring within the limitations period, or [ii] the defendant maintained a company-wide policy of discrimination both before and during the limitations period." Id. at 1183-84.

The Tenth Circuit has applied the continuing violation doctrine narrowly. See Thomas v. Denny's, Inc., 111 F.3d 1506, 1513 (10th Cir. 1997), cert. denied, 522 U.S. 1028 (1997). In Thomas v. Denny's, Inc., the Tenth Circuit explained:

> Moreover, while the continuing violation theory as it functions in a Title VII case in essence extends the limitation period, it does not address the period within which damages can be recovered. That period, as we have stated above, is specifically limited by section 2000e-5(g) to the two years prior to the filing of administrative charges. See Kornegay v. Burlington Indus., Inc., 803 F.2d 787, 788 (4th Cir.1986). Moreover, we agree with the court in Kornegay that because the continuing violation theory is a creature of the need to file administrative charges, and because a section 1981 claim does not require filing such charges before a judicial action may be brought, the continuing violation theory is simply not applicable. The state limitation period in a section 1981 suit serves the same function that section 2000e-5(g)

-24-

> performs in a Title VII case, that is, it provides a cap on the period for which damages can be recovered. Accordingly, the district court here properly instructed the jury that any damages awarded under section 1981 were to be limited by the applicable two year-statute of limitation.

Id. at 1514.  Moreover, in National Railroad Passenger Corp v. Morgan, 536 U.S. 101 (2002), the Supreme Court of the United States explained that "[d]screte acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable unlawful employment practice."  536 U.S. at 114 (internal quotations omitted).  See Martinez v. Potter, 347 F.3d 1208, 1211 (10th Cir. 2003)(stating that "[o]ur decisions have unambiguously recognized Morgan as rejecting application of the 'continuing violation' theory.").

There is a split of authority outside of the Tenth Circuit whether the continuing-violation theory applies to IDEA cases.  Some courts have applied the continuing violation theory to IDEA cases before the IDEA contained a two-year limitations period.  In Weyrick v. New Albany-Floyd County Consolidated Sch. Corp., No. 4:03-CV-0095-DFH-WGH, 2004 WL 3059793 (S.D. Ind. December 23, 2004), the court noted that at that time "[t]he IDEA [did] not provide a limitations period for filing a civil action."  Id. at *11.  The court borrowed the Indiana two-year limitations period for personal injury actions, because of "IDEA's emphasis on prompt resolution of educational issues."  Id. at *12.  The court then applied the doctrine of continuing violation because:

> Plaintiffs have also made allegations that could permit a finding that it is unreasonable to require them to sue separately over every incident of Defendants' unlawful conduct.  This reflects a critical aspect of the continuing violation doctrine: namely it requires a continuing violation.  It does not apply where a single violation sets in motion merely a continuing injury.

Id. at *14 (emphasis in original).  The court found that the IDEA duties at issue were ongoing: "[e]valuation, case conferences, and IEP development."  Id.  The court denied the defendants'

motion to dismiss the IDEA claims for untimeliness on "plaintiffs' allegations of at least three years of continuous inaction with respect to [the student's] disability [because they] might support a finding of continuing violation."  Id.

In Hammond v. District of Columbia, No. Civ.A. 99-1723(GK), 2001 WL 34360429 (D.D.C. March 1, 2001) the court noted that the IDEA did not provide a statute of limitations in 2001.  See id. at *3.  It then noted that the "settled practice is to borrow the most closely analogous state statute of limitations, unless doing so would frustrate the policy embodied in the federal law."  Id. (citing Wilson v. Garcia, 471 U.S. at 266-67).  The district court explained that the plaintiffs' claims did not accrue with the knowledge that the student had a disability, because "mere knowledge of a child's disability may not necessarily lead a custodian to conclude that the child's education is 'inappropriate.'"  Id. at *5.  The court then found that the District of Columbia Public Schools' initial actions and subsequent inactions constituted an ongoing violation.  See id.  The court found it relevant that the IDEA was silent "as to when an action accrues," and noted that it must "keep in mind the purpose of the statute and the practical end to be served by the applicable limitations period."  Id. The court found that, because the primary goal of the IDEA is to "foster cooperation and non-adversarial resolution of special education disputes," the parents' failure to request a hearing was consistent with that purpose because she "may have reasonably believed that [the school system] was making a good faith effort to address [the student's] problems."  Id.  See Jeffrey Y. v. St. Marcy's Area Sch. Dist., 967 F.Supp. 852, 855-56 (W.D.Penn. 1997)(applying doctrine of continuing violation after noting that the IDEA did not have a statute of limitations and finding it appropriate because the complaint alleged a practice of ongoing discriminatory activity).

Other courts have refused to apply the continuing-violation doctrine to the IDEA.  In

Vandenberg v. Appleton Area Sch. Dist., 252 F.Supp.2d 786, 789-93 (E.D.Wis. 2003), the court refused to apply the continuing violation doctrine because it found the IDEA encouraged prompt resolution of disputes concerning a disabled student's education, and thus a short limitations period is "consistent with the IDEA's goal of prompt resolution of disputes and proper placement of the child.")(internal quotations omitted);  SJB ex rel. Berkhout v. New York City Dep't of Educ., No. 03 Civ. 6653(NRB), 2004 WL 1586500 at **6-8 (S.D.N.Y. July 14, 2004)(refusing to apply the continuing-violation doctrine because "the defendant's alleged failures to implement different IEPs from different years were each discrete, actionable offenses" and were not "based on the accumulation over several years" of the school system's failure to implement IEPS)(citing Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115 (2002)).

In a case decided after the amendment of the IDEA to include a two-year limitations period, a federal district court did not apply the continuing-violation doctrine.  In J.L. ex rel. J.L. v. Ambridge Area School Dist., Civil Action No. 06-1652, 2008 WL 509230 (W.D.Pa. February 22, 2008), the court  explained that the two-year limitations period superceded common-law doctrines. See id. at *9 (noting that "[i]t is not necessary to clarify that common-law directives regarding statutes of limitations should not override the Act or State regulatory timelines, as the commenters recommended, because the Act and these regulations prescribe specific limitation periods which supersede common law directives in this regard")(internal quotations omitted). That court found that "the two exceptions specifically set forth in the statute are the exclusive exceptions to the statute of limitations and, as such, the Court [granted the] Defendant's Motion to Dismiss as to Plaintiffs' assertion that the statute of limitations provision is tolled by applying the continuing violation theory or other common law doctrines" and precluded the plaintiffs from "proceed[ing] on such theory or

doctrines."  Id.

## NEW MEXICO LAW REGARDING EQUITABLE TOLLING

Equitable tolling applies before a complaint was filed when the litigant was prevented from filing suit because of "extraordinary events beyond his or her control."  Ocana v. Am. Furniture Co., 2004-NMSC-018, ¶ 15, 91 P.3d 58, 66.  "Equitable tolling is a nonstatutory tolling theory which suspends a limitations period."  Id.  "Such extraordinary event[s] include conduct by a defendant that caused the plaintiff to refrain from filing an action during the applicable period." Roberts v. Barreras, 484 F.3d 1236, 1241 (10th Cir. 2007)(internal quotations omitted)(citing In re Drummond, 1997-NMCA-094, ¶ 13, 945 P.2d 457, 462 ("a party may be estopped from asserting a statute-of-limitations defense if that party's conduct has caused the plaintiff to refrain from filing an action until after the limitations period has expired.").

## ANALYSIS

APS is entitled to summary judgment on Bell's claims under the IDEA arising from events occurring on or before December 27, 2003.  These claims are barred under the IDEA's two-year limitation period, because no common-law doctrines apply to allow Bell to escape that limitations period.  Accordingly, the Court need not decide whether Bell exhausted those claims.  Bell exhausted, however, his claims arising from events occurring on or after December 27, 2003.  Moreover, APS is entitled to summary judgment on Bell's non-IDEA claims arising from events occurring on or before December 27, 2003, because those non-IDEA claims are educational in nature, seek relief available under the IDEA, are not pure discrimination claims.  Bell's non-IDEA claims arising from events occurring on or after December 27, 2003 are intertwined with his exhausted IDEA claims, and thus remain viable claims.

-28-

I.      **APS IS ENTITLED TO SUMMARY JUDGMENT ON BELL'S CLAIMS UNDER THE IDEA FOR EVENTS OCCURRING ON OR BEFORE DECEMBER 27, 2003.**

IDEA's two-year limitations period applies to Bell's IDEA claims. No common-law doctrines apply to allow Bell to escape that limitations period.  Bell is also required to exhaust his claims under the IDEA.  Bell has exhausted his IDEA claims for events occurring on or after December 27, 2003.

A.      **IDEA'S TWO-YEAR LIMITATIONS PERIOD BARS BELL'S CLAIMS FOR EVENTS OCCURRING ON OR BEFORE DECEMBER 27, 2003.**

In considering the facts in the light most favorable to Bell, on May 12, 2005, Bell and his family realized APS had erred in labeling him as "mentally retarded" since 1996.  Response, Exhibit 2, testimony of Gina Bell (taken May 11, 2006) at 1009:10-1014:17.  Bell filed an IDEA due-process hearing request on December 28, 2005.  <u>See</u> APS' Memo. ¶ 1, at 2; Response at 5.  The IDEA provides that "[a] parent or agency shall request an impartial due process hearing within 2 years of the date the parent or agency <u>knew or should have known about the alleged action</u> that forms the basis of the complaint."  20 U.S.C. §1415(f)(3)(C).

Because Bell's action was based upon APS' mislabeling of him, the "alleged action . . . form[ing] the basis of [his] complaint" was the change of label in May 12, 2005.  Final Decision at 00131 (citing 20 U.S.C. § 1415(b)(6)(B)).  At the hearing, Bell contended that, because he did not know he was misidentified until May of 2005, APS has no statute-of-limitation argument.  <u>See</u> Tr. at 22:14-18 (Stewart).  While Bell conceded that he knew APS had identified him as a student with mental retardation in 1996, he argued that he did not know it was a misidentification in 1996.  <u>See</u> <u>id.</u> at 24:19-25 (Stewart).

The IDEA's plain language states that the limitations period is two years from the date that the parents knew of the complained-of action, not two years from the date that the parents knew the

action taken was wrong.  To adopt Bell's construction would require the Court to add words to the statute that Congress did not write into its legislation.  Accordingly, under the IDEA, Bell's claims are limited to those arising from events occurring on or after December 27, 2003.[2]

## B.   COMMON-LAW DOCTRINES DO NOT EXEMPT BELL FROM IDEA'S TWO-YEAR LIMITATIONS PERIOD.

Bell further argues that APS' conduct constitutes a "continuing violation" warranting the consideration of his IDEA claims back to June of 1996.  Response at 19.  Alternatively, Bell contends that his claims were tolled based on New Mexico law of equitable tolling.  See id. at 22.

The Tenth Circuit has yet to apply the continuing-violation doctrine outside of the context of Title VII employment cases.  See e.g., Dean v. Boeing Co., 2008 WL 102420 at * 2; Rassam v. San Juan College Bd., 1997 WL 253048 at *3.  When the Tenth Circuit has applied the doctrine in the context of Title VII-employment cases, it has done so narrowly.  See Thomas v. Denny's, Inc., 111 F.3d at 1513.  Moreover, there is a split of authority outside of the Tenth Circuit whether the continuing-violation doctrine applies to IDEA claims.  Compare Weyrick v. New Albany-Floyd County Consolidated Sch. Corp., 2004 WL 3059793 at **11-14; Hammond v. District of Columbia, 2001 WL 34360429 at **3-5; Jeffrey Y. v. St. Marcy's Area Sch. Dist., 967 F.Supp. at 855-56; with

---

[2]  The Court notes that none of the parties have argued that the 2004 limitations period for IDEA is inapplicable to Bell's claims.  See Blunt v. Lower Merion School Dist., Civil Action No. 07-3100, 2008 WL 442109 at * 10 (E.D. Pa. 2008)(explaining that "the amended version of the IDEA took effect on July 1, 2005. By its terms, it is applicable to all decisions of a hearing officer which were handed down on or after that date.").  "Retroactive legislation presents problems of unfairness that are more serious than those posed by prospective legislation, because it can deprive citizens of legitimate expectations and upset settled transactions."  Hem v. Maurer, 458 F.3d 1185, 1189-90 (10th Cir. 2006)(internal quotations omitted).  Although there may be some issue whether the IDEA's two-year limitation period enacted in 2004 is applicable to all of Bell's IDEA claims, even those arising from events occurring on or before December 27, 2003, neither party argued that the two-year limitation period is inapplicable.  Moreover, if the two-year limitations period is applicable to all administrative decisions handed down on or after July 1, 2005, then it is applicable to Bell's IDEA claims.

Vandenberg v. Appleton Area Sch. Dist., 252 F.Supp.2d at 789-93; SJB ex rel. Berkhout v. New York City Dep't of Educ., No. 03 Civ. 6653(NRB), 2004 WL 1586500 at ** 6-8.  The Court notes that all of the cases that applied the continuing-violation doctrine were decided before the IDEA contained the two-year limitations period added in 2004. Moreover, the Secretary of Education implementing the two-year limitations period stated: " It is not necessary to clarify that common-law directives regarding statutes of limitations should not override the Act or State regulatory timelines, as the commenters recommended, because the Act and these regulations prescribe specific limitation periods which supersede common law directives in this regard."  71 F.R. 156 at 46697, available at: http:// www.ed.gov/ legislation/ FedRegister/ finrule/2006-3/ 081406a.html.

Congress has explicitly included two exceptions to the IDEA limitations period.  See 20 U.S.C. §1415(f)(3)(D)(noting that the two-year limitation period will not apply if the parent was prevented from requesting the hearing because of "(i) specific misrepresentations by the local educational agency that it had solved the problem solving the basis of the complaint; or (ii)  the local educational agency's withholding of information from the parent that was required under this subchapter to be provided to the parent.").  Bell does not argue that he is exempted from exhausting his claims under the IDEA under the explicit exceptions set forth in 20 U.S.C. §1415(f)(3)(D). Because the Tenth Circuit has applied the continuing-violation theory narrowly, because Congress has set forth explicit exceptions to the two-year limitation period, and because there is some indication that Congress' explicit exceptions superceded the common-law exceptions to exhaustion, the Court does not believe it is free to apply a common-law doctrine to Bell's claims so that he may escape the two-year limitation period set forth in the IDEA.  The Court will not apply the continuing-violations doctrine to allow Bell to assert claims that arise from events occurring on or before

-31-

December 27, 2003.

Because the two-year limitation period in the IDEA applies to Bell's IDEA claims, his claims under the IDEA arising from events occurring on or before December 27, 2003 are barred. Thus, APS is entitled to summary judgment on those claims. There are no issues of material fact and it is entitled to judgment as a matter of law. There is no dispute that Bell exhausted his IDEA claims arising from events occurring on or after December 27, 2003.

### C.   THE COURT NEED NOT DECIDE WHETHER BELL EXHAUSTED HIS CLAIMS FOR EVENTS OCCURRING ON OR BEFORE DECEMBER 27, 2003.

Because of the Court's ruling on the statute of limitations, the Court need not decide whether Bell has exhausted his claims for events occurring on or before December 27, 2003. Nevertheless, the Court will discuss the various issues because of their relevance to other exhaustion issues in the case it must decide.

"Congress requires parents to exhaust IDEA's administrative procedures and remedies before filing suit in federal court." Ellenberg v. New Mexico Military Institute, 478 F.3d at 1267. The Tenth Circuit has interpreted "the IDEA's exhaustion requirements broadly, noting Congress' clear intention to allow those with experience in educating the nation's disabled children at least the first crack at formulating a plan to overcome the consequences of educational shortfalls." Id. at 1275 (internal quotations omitted). "Once state administrative procedures and remedies are exhausted, [then] any party 'aggrieved' by the hearing officer's decision has a right to file a civil action in state or federal court." Id. at 1269-70.

Bell contends that he properly exhausted his administrative remedies under the IDEA. See Response at 20-22. APS contends, however, that Bell has exhausted only claims arising from events

-32-

occurring on or after December 27, 2003.

Bell does not argue that he is exempt from exhaustion because (i) administrative remedies would be futile or (ii) that the administrative agency "has adopted a policy or pursued a practice of general applicability that is contrary to the law." Urban v. Jefferson County Sch. Dist., 89 F.3d at 724. Rather, Bell argues that, because he and his parents were not informed by APS until May of 2005 that he was not mentally retarded, his claims relate back to 1996 so long as his action was filed by May 2007. See Response at 15. Because Bell has not asserted that he is exempt from exhaustion under the exceptions enumerated by Congress in the IDEA, Bell must exhaust his claims arising from events occurring on or before December 27, 2003. See 20 U.S.C. § 1415(f)(3)(D)(stating that parents are exempt from the two-year limitations period if they were "prevented from requesting the hearing due to . . . [i] specific misrepresentations by the [LEA] that it had solved the problem solving the basis of the complaint; or [ii] the [LEA]'s withholding of information from the parent that was required . . . to be provided to the parent."). APS contends that Bell has not administratively exhausted his IDEA claims, because "[n]o hearing officer has ever had the occasion to address whether the IEPs developed for [Bell] in 1996, 1999, 2000, 2001, [and] 2002 were inappropriate and did not provide [Bell] with [a FAPE]." Id. at 30:20-23 (Carrico).

At the administrative level, Bell "sought an expansion of the statute of limitations on multiple grounds to include all claims raised in [his request], in particular [Bell]'s claims that the evaluations conducted in 1996, 1999, and 2002 were inadequate and discriminatory." Administrative Record, Final Decision of the New Mexico Public Education Department, Office of Special Education, Case No. NMPED DPH 0506-03 at 00008 ("Final Decision"). The hearing officer dismissed all of Bell's claims arising before December 27, 2003. See Administrative Record, Order Dismissing All Claims

-33-

Arising Prior to December 27, 2003 at 00125-00136.  Bell asserted three bases of expanding the limitations period: "[i] [p]roper application of the timeline in the [IDEA] mandates such expansion; [ii] [t]he claim did not accrue until May 2005, the date the District changed [Bell]'s eligibility category; and [iii] [t]he conduct complained of constitutes a continuing violation."  Id. at 00127.

The hearing officer rejected Bell's argument that Congress did not intend for the IDEA to bar his claim and would not consider "[r]eference . . . to concerns regarding classification of minorities and long term deprivations of educational benefit reflected in the Congressional record" to the extent that they suggested anything other than the plain meaning of the limitation period in the IDEA.  Id. at 00130.  The hearing officer rejected Bell's accrual claim because she focused on "whether [Bell] or his parents knew of facts that would put a reasonable person on notice of an alleged action that forms the basis of his complaint."  Id. at 00131 (citing 20 U.S.C. § 1415(b)(6)(B)).  The hearing officer decided that, even if Bell's parents could "be excused from failing to examine the results in 1996 sufficiently to discover the alleged inadequacies, they also failed to take any action that would likely have disclosed such inadequacies when [APS] failed to reevaluate [Bell] in 2002."  Id.

The hearing officer found "no basis to exclude [Bell]'s parents from timely exercising diligence and availing themselves of procedural safeguards granted to them under IDEA . . ." Final Decision at 00132.  Finally, the hearing officer rejected Bell's argument that APS engaged in a continuing violation, because "[t]he [continuing-violation] doctrine does not apply where a single violation merely sets in motion a continuing injury and cannot support the expansion of the timeline [Bell] seeks."  Id. at 00134 (citing Weyrick v. New Albany-Floyd County Consolidated Sch. Corp., No. 4:03-CV-0095-D.H.-WGH, 2004 WL 3059793 (S.D. Ind. December 23, 2004)).  The hearing officer also determined that each evaluation and IEP of Bell "are more properly classified as discrete

-34-

acts, each subject to review, rather than continuing violations."  Final Decision at 00134.

Although Bell argues that he attempted to exhaust his claims occurring on or before December 27, 2003 and that the administrative hearing officer kept out a lot of information, there remains a question whether Bell's attempts to raise those claims before the administrative hearing officer were attempts to exhaust those claims.  As the hearing officer explained, even if Bell's parents could "be excused from failing to examine the results in 1996 sufficiently to discover the alleged inadequacies, they also failed to take any action that would likely have disclosed such inadequacies when [APS] failed to reevaluate [Bell] in 2002."  Final Report at 00131.  In response, Bell argues that:

> When a family is told by the school, which is the authority to whom they are entrusting their child, when they are given the news by the school, "your child has mental retardation," the family is grappling with any number of emotions and questions and concerns about who their child's going to get through life.  Their immediate thought is not: Oh, well, I think I should fight this.  They look at the school, Your Honor, as the people that are going to help the child.  They look at the school as the people who know.  They trust the school.  The family had no reason to question the school's professionalism in terms of delivering that information to them. . . .  Certainly we can say: Oh, families should question everything that the school does.  And the reality is, when families do that, they get right away targeted as troublemakers.  The system does not allow families to easily question decisions of school personnel.

Tr. at 38:15-39:13 (Stewart).  Bell also argues that "the Court has struggled with the complexity of IDEA, not just this Court[,] but other courts.  And is it realistic to think the family faced with this news is going to start reading the statute?  It's not realistic."  Id. at 40:3-6 (Stewart).

Because of the Court's ruling on the statute of limitations, the Court need not decide whether Bell's arguments counter the hearing officer's interpretation of the IDEA, or demonstrate that the hearing officer unlawfully or arbitrarily cut off his introduction of evidence before the limitations period in the IDEA.  Although the Court agrees with Bell that the IDEA is complex, it is the

procedure that Congress has put forth for students, their families, and educators to follow.   It is sufficient for the Court here to find that Bell has exhausted his IDEA claims arising from events occurring after December 27, 2003, and that his claims for events before that date are barred for failure to timely request a due-process hearing.

**II.     APS IS ENTITLED TO SUMMARY JUDGMENT ON BELL'S NON-IDEA CLAIMS ARISING FROM EVENTS OCCURRING ON OR BEFORE DECEMBER 27, 2003, BECAUSE THEY REQUEST RELIEF AVAILABLE UNDER THE IDEA AND <u>THUS MUST BE EXHAUSTED UNDER THE IDEA.</u>**

Bell has non-IDEA claims.  These claims arise, however, from educational services and educational opportunity, and seek relief available under the IDEA.  Moreover, Bell's non-IDEA claims are not for "pure discrimination."  Thus, these claims must be exhausted under the IDEA.

### A.     BELL'S NON-IDEA CLAIMS ARE EDUCATIONAL IN NATURE.

Under § 1983, Bell alleges violations of his Equal-Protection rights under the Fourteenth Amendment, procedural and substantive Due-Process violations, race discrimination and retaliation in violation of Title VI of the Civil Rights Act of 1964, and retaliation in violation of the RA.  <u>See</u> Third Amended Complaint ¶ 1, at 1. "[W]henever a plaintiff brings a claim that is educational in nature purporting to challenge the provision of educational services by a local school district, the claim is presumptively redressable by the IDEA's administrative procedures."  <u>Ellenberg v. New Mexico Military Institute</u>, 478 F.3d at 1280.  To determine whether Bell "must utilize the IDEA's administrative procedures [is an inquiry that] relates to the source and nature of the alleged injuries for which he . . . seeks a remedy, not to the specific remedy itself."   <u>Padilla v. School District No. 1 in Denver, Colo.</u>, 233 F.3d at 1274.  The source and nature of Bell's alleged injuries is APS' alleged conduct towards Bell in misidentifying him as mentally retarded based on race.  Because Bell's non-IDEA claims are also "educational in nature," they are presumptively redressable by the

IDEA.   Bell may overcome this presumption, however, if his non-IDEA claims are "pure discrimination" claims.  Ellenberg v. New Mexico Military Institute, 478 F.3d at 1280.

## B.   BELL'S CLAIMS ARE NOT "PURE DISCRIMINATION" CLAIMS.

"[T]he IDEA offers no relief [for pure discrimination claims], for they do not relate to the provision of a FAPE in the least restrictive environment."  Ellenberg v. New Mexico Military Institute, 478 F.3d at 1280-81.  In Ellenberg v. New Mexico Military Institute, the plaintiffs had "pure discrimination claims," because they were challenging "the alleged discriminatory admissions practices of a state-funded secondary school."  Id. at 1281.  In the specific context of Ellenberg v. New Mexico Military Institute, where the plaintiffs sought the student's admission into the New Mexico Military Institute, the Tenth Circuit noted: "Under [the RA], a state special school cannot hide behind the justification that another public school might provide a FAPE; it must show that somehow [the student] does not qualify for admission.  Unlike the IDEA, [the RA] does not only look at what is a FAPE, but also what is fair."  Id. at 1282-82 n.22 (internal quotations omitted).  Thus, the plaintiffs' RA and ADA claims in Ellenberg v. New Mexico Military Institute were not automatically dismissed because their IDEA claim failed: "Any other interpretation of [Tenth Circuit] caselaw would mean that a state educational institution that receives public funding could openly discriminate against applicants with disabilities so long as the state offered the student a FAPE in the least restrictive environment."  473 F.3d at 1282.  The plaintiffs could still pursue claims under the ADA and the RA on the ground that the student "was precluded from receiving a state benefit -- military-style education -- provided to her non-disabled peers."  Id.

In this case, the administrative hearing officer stated in the Final Decision:

[Bell] states in his discussion of continuing violation that his "claims arise out of [APS] pattern and practice of inappropriately evaluating [Bell], an African American

student, and misidentification of him as a student with mental retardation.  [Bell]'s
experience illustrates a[n APS] practice of segregating African American students
(from education in the LRE as well as meaningful access to the general education
curriculum[).]"  It is noted that [Bell] made no pattern and practice allegation in either
the Request or the Amended Request and this hearing will be confined to claims
therein.

Further, this Hearing Officer's jurisdiction is confined in 20 [U.S.C.] § 1415(f)(1)(A)
and 1415(b)(6) to hearing complaints with respect to any other matter relating to the
identification, evaluation, or educational placement of the child, or the provision of
a [FAPE] to such child.  Claims of discrimination are not subject to redress under the
[IDEA].  To the extent [Bell]'s motion attempts to broaden his Request to embrace
claims of discrimination and patterns and practices of discrimination, such attempt is
hereby rejected and such claims will not be heard.

Final Decision at 00134-00135 (internal citations omitted).  Unlike the plaintiffs in <u>Ellenberg v. New</u>

<u>Mexico Military Institute</u>, Bell's non-IDEA claims are not discrimination claims that seek relief

unavailable under the IDEA, like admission into a school.  The Court begins its analysis by noting

that Bell did not separate out his legal contentions from his allegations of facts in his Complaint.  As

such, the Court will review each portion of Bell's complaint which contains allegations regarding

discrimination.

Bell alleges that:

The United States Office of Special Education . . . has reported to Congress that
African American youth are over-represented as students identified for receipt of
special education as students with mental retardation.  The over[-]identification of
African American students as students with mental retardation is based on racial
prejudice and historic patterns of racial segregation in public education. . . . APS
knew or should have known that, historically, African American students are
disproportionately labeled as students with mental retardation. . . .On or before
September 18, 2003, [APS], through notice to the Director of Special Education, was
specifically informed by the New Mexico Public Education Department ("NMPED")
of APS['] failure to appropriately evaluate and identify African American students for
receipt of special education.  At that time, if not before, the [NMPED] informed APS
of its concern that APS over-identified African American students for receipt of
special education and disproportionately segregated such students.  APS['] failure to
take appropriate action after September 2002 constituted deliberate indifference and
intentional discrimination which harmed Bell, a student who had been misidentified

-38-

as a student with mental retardation on the basis of racially discriminatory special education practices of . . . APS.

Complaint ¶ 21-23, at 5.  Moreover, Bell alleges that "[f]ailure by APS to change Bell's identification before 2005 constitutes discrimination on the basis of race," and that "APS['] policies, practices and customs for special education eligibility determination resulted in intentional disparate treatment and discrimination against Bell on the basis of race."  Id. ¶¶ 26-27, at 6.  Bell alleges that APS has

> instituted and maintained policies and practices of improper evaluation, not based on acceptable professional standards, of African American students for disability eligibility.  In the alternative, APS has instituted and maintained a policy and practice of allowing its individual schools and Evaluation Specialists to function without sufficient oversight to ensure that professional standards govern over individual unprofessional practices biased against African American students and therefore has sanctioned the resulting discriminatory eligibility determinations.

Id.  ¶ 29, at 6.  Bell alleges that

> APS has intentionally discriminated against [him] by knowingly misidentifying and/or continuing to misidentify him as a student with mental retardation in spite of clear knowledge by individual staff in APS and at Manzano High School, including but not limited to evaluation specialist, Lori Rowe, and [his] teachers and coaches that APS should be questioning historic determinations of special education eligibility for African American students and that Bell did not exhibit characteristics of mental retardation.

Id. ¶ 30, at 6-7.

Bell further alleges that "APS has instituted and maintained a policy and practice which fails to properly identify and provide FAPE to African-American students; and of placing African-American students in special education classes without evaluating their individualized needs for appropriate education and related services."  Id. ¶ 31, at 7.  Bell alleges that APS "arbitrarily and irrationally treated [him] differently than other students because of his race, including but not limited to being misidentified as a student with mental retardation, not being re-evaluated to determine appropriate disability eligibility and being segregated into special education classes without

-39-

appropriate goals in his IEP."   Complaint ¶ 33, at 7.   Bell also alleges that APS denied him "educational services, educational opportunity" and damaged him "as a result of [its] actions and inactions consistent with its deliberate and intentional policies and practices based on race discrimination." Id. ¶ 35, at 7.   Bell seeks compensatory damages for "lost educational opportunity, lost wages, lost earning capacity and emotional distress." Id. ¶ 3, at 11.

Bell's non-IDEA claims arise from his complaints regarding APS' purported denial of educational services and educational opportunities to him.   His claims are thus, at least in part, claims for alleged denial of a FAPE.   Because Bell's non-IDEA claims arise from educational service and educational opportunities, the Court believes that they are inextricably intertwined with his IDEA claims and APS' alleged denial of a FAPE to Bell.

The Court is unable to find any claims in Bell's complaint that are for "pure discrimination." Ellenberg v. New Mexico Military Institute, 478 F.3d at 1280.   Although the Tenth Circuit did not define the term "pure discrimination"  in Ellenberg v. New Mexico Military Institute, it noted that the Supreme Court has explained that the IDEA is not a general anti-discrimination statute.   See 478 F.3d at 1275 (noting that the IDEA is "a virtual treasure trove providing disabled children with a limitless number of substantive rights")(citing Board of Educ. of Hendrick Hudson Central School Dist., Westchester County v. Rowley, 458 U.S. 176, 198 (1982);  Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 623 n. 6 (1999) (Thomas, J., dissenting)).   The Tenth Circuit characterized the plaintiffs' claims in Ellenberg v. New Mexico Military Institute as "pure discrimination" that the New Mexico Military Institute "unlawfully discriminated against [the student-applicant] in violation of the RA and the ADA by denying her admission on the basis of her disability even though she was otherwise qualified to attend, and that [the New Mexico Military Institutes]'s qualifying admissions

-40-

standards are facially discriminatory."  Ellenberg v. New Mexico Military Inst., 478 F.3d at 1280.

Bell's claims, in contrast, relate to APS' purported denial of "educational services, educational

opportunity," and allege damages to Bell "as a result of [its] actions and inactions consistent with its

deliberate and intentional policies and practices based on race discrimination."  Complaint ¶ 35, at

7.  Bell seeks compensatory damages for "lost educational opportunity, lost wages, lost earning

capacity and emotional distress." Id. ¶ 3, at 11.

The Court is unable to extricate any pure discrimination claims that do not "both have an

educational source and an adverse educational consequence." Cudjoe v. Independent Sch. Dist. No.

12, 297 F.3d at 1067.  Bell is required to exhaust his non-IDEA claims under the IDEA, because they

are not "pure discrimination"claims.  Thus, the two-year limitations period applies to his non-IDEA

claims as it does to his IDEA claims.

Similarly, the Court need not decide whether Bell exhausted these barred claims.

Nevertheless, the administrative hearing officer's refusal to hear Bell's claims of discrimination does

not alter the Court's analysis.  Although the administrative hearing officer refused "[Bell]'s . . .

attempts to broaden his Request to embrace claims of discrimination and patterns and practices of

discrimination," Bell has not alleged any pure discrimination claims before this Court that would

have been exempted from exhaustion in front of the administrative hearing officer.  Final Decision

at 00134-00135 (internal citations omitted).

Bell seeks some monetary damages unavailable under the IDEA, and also seeks nonmonetary

relief such as review of the IDEA administrative process and injunctive relief.  See Complaint ¶¶ 2,

5, at 11-12.  Compare Padilla v. School District No. 1 in Denver, Colo., 233 F.3d at 1274 (holding

that the plaintiff was not required to exhaust where she sought "damages solely to redress the

-41-

fractured skull and other physical injuries she suffered allegedly as a result of the school district's and board of education's purported ADA violations.").  Unlike the plaintiff in <u>Padilla v. School District No. 1 in Denver, Colorado</u>, Bell does not seek solely monetary damages.  <u>See</u> Complaint ¶¶ 2, 5, at 11-12.  Because Bell seeks relief other than monetary damages, he is not exempt from exhaustion. Moreover, the Tenth Circuit's holding "simply recognize[d] the fact that even if damages are available under the IDEA they should be awarded in civil actions, not in administrative hearings," but did not hold that "damages are unavailable under the IDEA" because it did not need to answer that issue to resolve the case.  <u>Padilla v. School District No. 1 in Denver, Colo.</u>, 233 F.3d at 1274.

The Court does not believe that finding Bell's claims are not for "pure discrimination" would allow state educational institutions to openly discriminate against students on the basis of race or disability.  <u>See</u> <u>Ellenberg v. New Mexico Military Institute</u>, 478 F.3d at 1282 (expressing a concern that dismissal of RA and DA claims because IDEA claims were dismissed "would mean that a state educational institute that receives public funding could openly discriminate against applicants with disabilities so long as the state offered the student a FAPE in the least restrictive environment."). Bell does not,  unlike the plaintiffs in <u>Ellenberg v. New Mexico Military Institute</u>, contend that he was deprived a specific state benefit, such as a military-style education, on the basis of race or disability discrimination.  <u>See</u> <u>id.</u>  Instead, Bell alleges that APS discriminated on the basis of his race because it purportedly denied him "educational services, educational opportunity," and damaged him "as a result of [its] actions and inactions consistent with its deliberate and intentional policies and practices based on race discrimination."  Complaint ¶ 35, at 7.

Bell seeks compensatory damages for "lost educational opportunity, lost wages, lost earning capacity and emotional distress." <u>Id.</u> ¶ 3, at 11.  Bell's non-IDEA claims are for APS denying him

-42-

a FAPE.  He does not complain that APS denied him admission to a school based on race or disability.

The Court cannot, on the record before it, untangle what claims Bell has that are under the IDEA for denial of a FAPE, and those non-IDEA claims, if any, that may be for "pure discrimination."  Bell thus does not allege any "pure discrimination" claims, and must exhaust his non-IDEA claims, which "have an educational source and an adverse educational consequence." Cudjoe v. Independent Sch. Dist. No. 12, 297 F.3d at 1067.  Bell's non-IDEA claims arising from events occurring on or before December 27, 2003 are educational in nature and seek relief available under the IDEA, and must be exhausted under the IDEA.

Because Bell's non-IDEA claims are intertwined with his IDEA claims, however, the Court finds that Bell properly exhausted his non-IDEA claims arising from events occurring on or after December 27, 2003 because he properly exhausted his IDEA claims arising from events occurring on or after December 27, 2003.  Thus, APS is entitled to summary judgment on Bell's non-IDEA claims arising from events occurring on or before December 27, 2003, because there are no issues of material fact.  APS is entitled to judgment as a matter of law on those claims.

**IT IS ORDERED** that the Defendant's Motion for Summary Judgment on Statute of Limitations and Exhaustion Grounds is granted in part and denied in part.

_____
UNITED STATES DISTRICT JUDGE

-43-

*Counsel:*

Tara Ford
Pegasus Legal Services
Albuquerque, New Mexico

 -- and --

Gail S. Stewart
Steven Granberg
Albuquerque, New Mexico

 *Attorneys for the Plaintiff*

Michael L. Carrico
Samantha Adams
Modrall Sperling Roehl Harris & Sisk, P.A.
Albuquerque, New Mexico

 *Attorneys for the Defendant*