# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

CHANSELOR BELL,

      Plaintiff,

vs.                                 No. CIV 06-1137 JB/ACT

BOARD OF EDUCATION OF THE
ALBUQUERQUE PUBLIC SCHOOLS,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the APS' Motion for Summary Judgment on Claims Arising from Plaintiff's IDEA Eligibility, filed January 18, 2008 (Doc. 84). The Court held a hearing on March 7, 2008. The primary issues are: (i) whether Defendant Board of Education of the Albuquerque Public Schools ("APS") violated Plaintiff Chanselor Bell's rights under the Equal-Protection Clause, because APS erroneously identified him as a student with mental retardation and such error was race-based; (ii) whether APS violated his rights under Title VI of the Civil Rights Act, because APS erroneously identified him as a student with mental retardation and such error was race-based; and (iii) whether Bell was stigmatized by his eligibility under the Individuals with Disabilities Education Act ("IDEA") and is able to state a claim under the Due-Process Clause. Because Bell concedes that he is unable to prove a traditional Fourteenth Amendment Equal-Protection claim, the Court will grant APS summary judgment on Bell's equal-protection claim. Because Bell has not shown that there is a genuine issue of material fact regarding whether APS treated similarly situated non-African American students differently, Bell has not shown a prima-facie case under Title VI, and the Court will grant summary judgment on that claim. Because the

IDEA due-process procedures afforded Bell a hearing to challenge the alleged erroneous IDEA eligibility determination and there is no evidence of a tangible injury resulting from the alleged stigmatization, the Court will thus grant summary judgment on Bell's due-process claim.  The Court will grant APS' Motion for Summary Judgment on Claims Arising from Plaintiff's IDEA Eligibility.

## FACTUAL BACKGROUND

In May of 2006, Bell graduated from Manzano High School in Albuquerque New Mexico on a standard track with a high-school diploma.  See APS' Brief in Support of Motion for Summary Judgment on Claims Arising from Plaintiff's IDEA Eligibility ¶ 1, at 1, filed January 18, 2008 (Doc. 85)("APS Memo.");Plaintiff's Response in Opposition to APS['] Motion for Summary Judgment on Claims Arising from Plaintiff's IDEA Eligibility ¶ 1, at 2, filed February 15, 2008 (Doc. 102)("Response").  Bell earned twenty-five academic credits, which exceeded the required number of credits, twenty-three, to graduate.  See APS Memo.¶ 1, at 1-2; Response ¶ 1, at 2.  Bell passed the New Mexico High School Competency Exam ("NMHSCE").  See APS Memo.¶ 1, at 2; Administrative Hearing Transcript (taken May 8, 2005)("Admin. Tr. Vol. I") at 278:17-20 (Rowe), id. at 285:6-10 (Rowe); Deposition of Chanselor Bell, taken August 14, 2007 ("Bell Depo.") at 102:16-104:25).  Bell notes, however, that he was shown the questions on the NMHSCE before taking the exam and was coached during the test with the proctor saying "good answer."  Response ¶ 1, at 2.  See Administrative Hearing Transcript (taken May 9, 2006)("Admin. Tr. Vol. II) at 532:1-15 (Bell), id. at 533:2-10 (Bell), id. at 577:1-18 (Bell);  Administrative Hearing Transcript (taken May 11, 2006)("Admin. Tr. Vol. IV) at 967:6-20 (Schaffer); Practice Test of Competency Exam for Chanselor Bell, Administrative Rec. at 01321.

Bell was eligible to receive special education and related services.  See APS Memo. ¶ 2, at

2. APS contends that there is not a generic placement for students who have been identified as being mentally retarded.  <u>See</u> APS Memo. ¶ 3, at 2; Admin. Tr. Vol. I at 114:11-115:2 (Rowe), <u>id.</u> at 154:3-20 (Rowe); Admin. Tr. Vol. II at 362:11-23 (Bell); Administrative Hearing Transcript (taken May 12, 2006)("Admin. Tr. Vol. V") at 1238:5-25 (Larson).  Bell "does not dispute that there is not a generic placement for students with mental retardation, [but] . . . states that by definition students with mental retardation have significant subaverage intelligence and that such [a] label sets lower expectations for the child."  Response at 2.  <u>See</u> Admin. Tr. Vol. I at 194:5-195:17 (Smith), <u>id.</u> at 233:3-11 (Smith); Admin. Tr. Vol. II at 315:1-18 (Davis).  In the tenth grade, Bell's Individual Education Program ("IEP"), developed on November 19, 2003, provided for instruction in all academic subjects, except mathematics, in the regular-education classroom.  <u>See</u> APS Memo. ¶ 4, at 2; Admin. Rec. at 0838-0849; IEP dated November 19, 2003, Admin. Rec. at 0771.  Bell's class schedule for the Spring of 2003-2004.  The IEP dated November 19, 2003 indicates that Bell was moved into a special education mathematics class "recently."  Admin. Rec. at 0838-0849, IEP dated November 19, 2003.  <u>See</u> Response ¶ 4, at 2 (citing Admin. Rec. at 0838-0849, IEP dated November 19, 2003)(contending that Bell "started out in a regular education class sometime after the first 2 weeks.").  In the tenth grade, Bell maintained a grade point average of 2.91, which is slightly under a B average.  <u>See</u> APS Memo. ¶ 5, at 2; Admin. Record at 0772.

In eleventh grade, Bell received all of his instruction in regular-education classes, including: United States History/Geography, Algebra I, Chemistry, Art, American Literature, and Athletics Class.  <u>See</u> Admin. Rec. at 0767-0768.  While Bell was in the eleventh grade, he maintained a grade-point average of 2.41, which is between a C and a C+ average.  <u>See</u> Class Schedule, Admin. Record at 0772.

While Bell was in the twelfth grade, he received instruction in regular-education classes, including Economics, World History, and Athletics.  See Admin. Record. at 767.  APS contends that in subjects where Bell needed extra support, including mathematics, language arts, study skills, and science, Bell received instruction in either a classroom with a lower pupil-to-teacher ratio, or in a one-to-one setting.  See APS Memo. ¶ 8, at 2-3 (citing Class Schedule, Admin. Rec. at 0767, IEP dated November 21, 2005, Admin. Rec. at 0785, 0794, 0801-802).  Bell argues that these facts are disputed in part, because "[t]he evidence in the record did not reflect that Bell received extra support based on his individual needs."  Response at 3.  Bell was placed in a "hands-on" special-education science class for 4-5 weeks, and then moved back into basketball.  Admin. Tr. Vol. IV at 917:1-15 (Schlosser).  Bell did not earn credit for science class.  See id. at 11:21:1-4 (Evans).  His study class was accessing a website unknown to APS staff working with Bell, and included taking tests repeatedly.  See id. at 919:18-923:19 (Schlosser); id. at 958:3-24 (Schaffer); id. at 1127:1-24 (Evans).

APS asserts that Bell did "remarkably well" in his regular-education classes.  APS Memo. ¶ 10, at 3; Admin. Tr. Vol. IV at 1083:22-1084:2 (G. Bell).  Bell contends that APS is relying on selective and incomplete portions of the testimony of Gina Bell, Bell's mother, at the administrative hearing, based on correspondence, sent on November 19, 2004, before APS changed Bell's eligibility.  See Response at 3.  At the administrative hearing, Gina Bell testified:

> Q.    Earlier in the same paragraph, you state[:] "For the past couple years, he has been determined to succeed in regular education classes and has done remarkably well with modifications, given his disability.  Is that statement accurate?
>
> A.    That is correct.

Admin. Tr. Vol. IV at 1083:22-1084:2 (G. Bell).  Bell asserts that "[t]he full statement conveys

-4-

different meaning than merely that he did well in regular education because it includes [Bell]'s determination to succeed and lowered [Gina] Bell's expectations based on what she thought was his disability."  Response at 3 (citing E-mail from Gina Bell to Morrison (dated November 19, 2004), Admin. Rec. at 01334).

APS asserts that Bell found his teachers, with limited exceptions, to be helpful.  See APS Memo. ¶ 11, at 3; Admin. Tr. Vol. II at 547:2-555:4 (Bell).  APS argues that, with respect to teachers that Bell believed were unhelpful, "it was either for a brief period of time or was in relation to situations where [Bell] had unrealistic expectations." APS Memo.  ¶ 11, at 3 (citing Admin. Tr. Vol. II at 547:2-555:4 (Bell)).  APS' example consists of Bell complaining that, "when he posed a question, sometimes his teacher would respond to him [one-to-one] which was helpful; but at other times the teacher would respond by instructing the class as a whole."  Response ¶ 11, at 3.  See Admin. Tr. Vol. II. at 549:1-23 (Bell); Admin. Tr. Vol. II. at 552:9-19 (Bell).  Bell contends that APS mischaracterizes his testimony.  See Response at 3.  Bell represents that he testified he needed more assistance and did not understand material in class.   See id.  Bell disputes APS' "characterization of [Bell]'s expectations for assistance as unrealistic, particularly when his IEP specifically recognized that he did require [one-to-one] assistance."  Id.  See Addendum to IEP (dated November 5, 2006), Admin. Rec. at 0775; IEP (dated November 17, 2005), Admin. Rec. at 0783.  A teacher's report corroborated Bell's need for one-to-one assistance.  See Response at 3; Teacher Report from Mary Jane Heath, Admin. Rec. at 0899 (stating that Bell "functioned very low in [her] class.  He needed more time and almost one on one help from me or a peer tutor.  Very respectful and would do anything.").

Bell was required to master academic material to earn the grades he received.  See APS

Memo. ¶ 12, at 3; Response at 3-4.  Bell was required to participate in class to the same extent as his non-disabled peers.  See APS Memo. ¶ 12, at 3; Response at 3-4.  Bell did one to two hours of homework per night.  See Admin. Tr. Vol. II at 514:13-17 (Bell); Admin. Tr. Vol. III at 62:2-863:24 (Homicz); Admin. Tr. Vol. IV at 1138:6-1139:2 (Henderson); Admin. Tr. Vol. V at 1209:3-14 (Harrison); Admin. Tr. Vol. V at 1218:1-22 (Butler).  Bell disputes that he was provided an opportunity to master the academic materials in his classes and that he was required to learn class material to receive his grades.  See Response at 3-4.

Thomas D. Oakland, Ph.D, testified that "grades represent a summary of achievement [and] . . . . may be given for different purposes; some motivational, some recognition, some actual summation of the person's attainment."  Deposition of Thomas D. Oakland, Ph.D. (taken January 7, 2008) at 151:13-17 ("Oakland Depo.").  Dr. Oakland testified that "it's not that I consider grades to be irrelevant.  I consider information from the teachers' evaluation of these students to be more relevant."  Id. at 151:18-21.  Bell testified that, because he was flunking pre-Algebra, he was moved to special-education mathematics.  See Admin. Tr. Vol. II at 519:17-22 (Bell).  Bell ended Algebra I five chapters behind his classmates.  See Admin. Tr. Vol. II. at 520:24 (Bell), id. at 523:7-9 (Bell).  One of Bell's teachers, Michael Kamman, testified that Bell was three chapters behind the other students in his Algebra I class.  See Admin. Tr. Vol. IV at 1152:23 (Kamman); id. at 1154:11-19 (Kamman).  Bell contends that his history teacher stated that he received his grade because of effort.  See Response at 4 (citing Memorandum from Robanne Harrison to Patti Morrison & Lori Rowe (dated January 24, 2006), Admin. Rec. at 01320 (stating that the teacher factored into Bell's grade that he had "what turned out to be a very weak partner" on a "business project" which "frustrated Chanselor," and so Bell's final grade "reflects [the teacher's] awareness that he worked very hard

-6-

to pull this project together and the fact that he worked very hard on every classroom assignment.").

APS contends that Bell found all of his academic subjects challenging, except for special-education mathematics. See Response ¶ 13, at 3; Admin. Tr. Vol. II at 541:5-546:7 (Bell). Bell asserts that he wanted his special-education classes to be more challenging, see Admin. Tr. Vol. II. 544:3-5 (Bell), and wanted to "actually get some help" from his teachers, id. at 548:11-553:21 (Bell).

Mathematics was an area of difficulty for Bell. See Admin. Tr. Vol. II at 557:9-18 (Bell); Admin. Tr. Vol. IV at 1066:14-10:67:22 (G. Bell). In tenth grade, Bell began the year in a regular-education pre-Algebra class, but after having difficulty, was switched to a special-education mathematics class. See Admin. Tr. Vol. I at 279:1-22 (Rowe). In the special education mathematics class, Bell received instruction in basic math skills, such as addition, subtraction, multiplication, division, fractions, and decimals. See Admin. Tr. Vol. II at 541:8-13 (Bell). Bell initially struggled with basic mathematics skills, but after help from Flores, his mathematics teacher, he improved. See id. at 542:11-21 (Bell). In eleventh grade, Bell was in a regular-education Algebra II class for two weeks. See id. at 520:17-18 (Bell). He then moved to a regular-education Algebra I class that Kamman taught. See id. at 520:24-521:1 (Bell). Kamman worked with Bell one-to-one for about five to fifteen minutes each day, in addition to regular-class instruction. See id. at 598:1-599:5 (Bell); Admin. Tr. Vol. IV 1165:15-1166:22 (Kamman). Kamman created assignments specifically tailored to Bell's level of performance. See id. at 1157:4-21 (Kamman); id. at 1161:13-1162:4 (Kamman). In Kamman's class, Bell grasped the basic concepts of algebra and progressed through approximately seven to nine chapters in his Algebra I book. See Admin. Tr. Vol. II. at 599:6-12 (Bell); Admin. Tr. Vol. IV at 1153:1-25 (Kamman); Admin. Tr. Vol. IV at 1155:13-18 (Kamman);

-7-

Admin. Tr. Vol. IV at 1161:3-7 (Kamman); Admin. Tr. Vol. IV at 1168:7-18 (Kamman).  During the summer, Bell received remedial, special-education mathematics instruction, as review for the NMHSCE, focusing on fractions, decimals, and other pre-algebra concepts.  See  Admin. Tr. Vol. I at 148:3-18 (Rowe); Admin. Tr. Vol. IV at 979:6-981:4 (Shaffer); Admin. Tr. Vol. IV at 987:19-988:4 (Shaffer).  In twelfth grade, Bell was placed in a special-education mathematics class where he received remedial instruction in the areas of basic mathematics and consumer mathematics.  See Admin. Tr. Vol. II at 545:4-21 (Bell).

Bell disputes that he received instruction to address his identified mathematics deficits.  See Response at 4.  Bell asserts that he did not have a mathematics goal during his sophomore and junior years, and did not have a mathematics goal to guide instruction for ESY mathematics.  See Admin. Tr. Vol. I at 120:10-121:12 (Rowe); Admin. Tr. Vol. IV at 981:24-982:6 (Shaffer).  Bell asserts that, while he began Algebra I only two weeks into the semester, he ended somewhere between three and five chapters behind the rest of the class.  See Response at 4.  Bell represents that he sat in the back of the class while the instructor taught mathematics to the other students who were working chapters ahead of him in the book.  See Response to 4.  Bell agrees that Kamman provided an additional five to fifteen minutes outside of class time to instruct Bell.  See Response at 4.

APS contends that it provided Bell with support and services to pass the NMHSCE, including specialized instruction in the areas of mathematics and science where Bell was having difficulty.  See Admin. Tr. Vol. I at 148:8-18 (Rowe); Admin. Tr. Vol. II at 346:3-8 (Rowe); Admin. Tr. Vol. II at 366:4-16 (Rowe); Admin. Tr. Vol. IV at 979:14-980:23 (Shaffer).  When Bell was in twelfth grade, APS provided him with one-to-one instruction in the areas of social studies, reading, and science.  See  Admin. Tr. Vol. I at 274:10-25 (Rowe); Admin. Tr. Vol. II at 353:12-20 (Rowe);

Admin. Tr. Vol.  IV at 918:10-24 (Schlosser); Admin. Tr. Vol. IV at 923:20-24 (Schlosser).  The

one-to-one instruction included Bell taking practice exams by using a website available to all

students, "sponsored by either PED [ Public Education Department] or the test provider going over

answers with [Bell]."  APS Memo. ¶ 15, at 4; Admin. Tr. Vol. IV at 927:14-23 (Schlosser); Admin.

Tr. Vol. IV at 958:3-24 (Shaffer).

       Bell argues that these facts are disputed in part, because "[t]he evidence in the record did not

reflect that Bell received extra support based on his individual needs."  Response at 4.  Bell was

placed in a "hands-on" special-education science class for four to five weeks, and then moved back

into basketball.  Admin. Tr. Vol. IV at 917:1-15 (Schlosser).  Bell did not earn credit for science

class.  See id. at 11:21:1-4 (Evans).  Bell asserts that his study class was accessing a website,

unknown to APS staff working with Bell, and included taking tests repeatedly.  See Response at 4;

Admin. Tr. Vol. IV at 919:18-923:19 (Schlosser); id. at 958:3-24 (Schaffer); id. at 1127:1-24

(Evans).

       Bell has "mild to moderate deficits in the area of expressive and receptive communication

skills."  APS Memo. ¶ 16, at 4.  See Speech and Language Evaluation of Chanselor Bell (dated

October 22, 2004 and October 29, 2004), Admin. Rec. 1006-1008, Present Levels of Performance,

Annual Goals for Chanselor Bell (dated October 24, 2005), Admin. Rec. at 1173.  Bell asserts that

the record does not clearly identify his level of deficit as "mild to moderate," but does not dispute

that he has deficits in these areas.  Response at 4.

       Bell received related services from a speech and language pathologist, which was designed

to improve his language skills, including instruction in the use of figurative language, see Admin.

Tr. Vol. III 687:16-23 (Oetzel); id. at 744:7-24 (Oetzel), self-talk to increase understanding, see

Admin. Tr. Vol. III at 694:10-695:19 (Oetzel), test-taking skills, see Admin. Tr. Vol. III at 698:6-12 (Oetzel); id. at 733:21-734:9 (Oetzel), increasing auditory and reading comprehension, Admin. Tr. Vol. III at 696:7-16 (Oetzel); id. at 713:16-25 (Oetzel); id. at 726:4-727:25 (Oetzel), id. at 739:16-24 (Oetzel), vocabulary, see Admin. Tr. Vol. III at 702:1-12 (Oetzel), id. at 722:12-724:25 (Oetzel), id. at 739:2-24 (Oetzel); id. at 744:7-24 (Oetzel);  Administrative Hearing Transcript (taken May 17, 2006)("Admin. Tr. Vol. VI") at 1322:5-1323:3 (Oetzel), id. at 1341:19-1343:25 (Oetzel), sentence completion and structure, Admin. Tr. Vol. III at 702:7-12 (Oetzel), id. at 726:1-11 (Oetzel); id. at 729:16-21 (Oetzel), Admin. Tr. Vol. VI at 1322:2-24 (Oetzel); id. at 1345:8-20 (Oetzel), paragraph building, Admin. Tr. Vol. VI at 1324:5-20 (Oetzel), expressive writing strategies, Admin. Tr. Vol. III at 728:16-730:2 (Oetzel); Admin. Tr. Vol. VI at 1321:10-1322:24 (Oetzel), verbal reasoning skills, id. at 1323:4-11 (Oetzel), auditory perceptual and auditory memory skills, id. at 1323:12-1324: 20 (Oetzel), notetaking skills, see id. at 1325:13-19 (Oetzel).  Bell made academic gains from his instruction.  See Admin. Tr. Vol. III at 742:4-23 (Oetzel), Admin. Tr. Vol. VI at 1293:5-11 (Winslow-King).

Bell disputes that he received speech and language instruction based on his individualized needs.  See Response at 5.  Bell contends that the APS Speech and Language Pathologist did not review any formal speech and language evaluation.  See Response at 5 (citing Admin. Tr. Vol. III at 665).  Bell contends that APS relied on a computer-based instruction for its speech-and-language program.  See Admin. Tr. Vol. I at 50:9-25 (Green); Admin. Tr. Vol. III at 655:1-25 (Oetzel).  Bell worked on Fast ForWard Reading III, a computer-based instruction, for nearly one year.  See Admin. Tr. Vol. III at 702:13-703:19 (Oetzel).  Bell did not feel like his speech services were helping him.  See Admin. Tr. Vol. II at 508:14-17 (Bell); id. at 563:9-564:12 (Bell).

Bell disputes that the speech-and-language program resulted in academic gains.  See Response at 5.  Bell contends that his speech-and-language pathologist at Manzano, Suzanne Oetzel, determined that his instruction benefitted him based on discussions with teachers about whether he was passing his classes.  See Response at 5 (citing Admin. Tr. Vol. III at 706).  Oetzel testified that she would "attempt to make . . . [a] correlation between the. . . computer results and Chanselor's progress . . . [by] talk[ing] to the teachers, and [she] would say, ['H]ow is this student doing?  What kind of strategies are you using in the classroom[.']"  Admin. Tr. Vol. III at 705:22-706:4.  Oetzel testified that she would "look at, like, his performance in his classes.  [She] would check in with the teachers; how is he doing, what kind of activities are you working on, that type of thing."  Id. at 706:5-8.  Bell contends that Oetzel knew that, despite any speech-and-language instruction provided to him, Bell's college-entrance scores were not college-level scores and that one significant skill for ACT success is vocabulary.  See Admin. Tr. Vol. III at 707:16-25 (Oetzel).  Bell notes that his "language limitations may be due to a lack of academic exposure."  Response at 5.  See Admin. Tr. Vol. VI at 1278:1-4 (Winslow-King).  Ms. Suzie Winslow-King, a speech-language pathologist, testified that, in her opinion, Bell would have benefitted from more verbally interactive therapy. See id. at 1267:16-18, 1281:15-10 (Winslow-King);  Letter from Gail Stewart to Suzie Winslow-King (dated April 24, 2006), Admin. Rec. at 01205, Letter from Suzie Winslow-King (dated April 28, 2006), Admin. Rec. at 01206, Report of Suzie Winslow-King, M.A., CCC/SLP of Chanselor Bell (dated April 26, 2006), Admin. Rec. at 01207-01212, Auditory Integration Training webarticle, Admin. Rec. at 01213-01219.

APS contends that Manzano staff made extra efforts to ensure that Bell had a successful educational experience by: (i) selecting teachers that would be a good match for Bell, see Admin.

Tr. Vol. I at 148:12-18 (Rowe), Admin. Tr. Vol. II at 366:4-16 (Rowe), Admin. Tr. Vol. II 445:4-22

(Dahl); (ii) communicating frequently and regularly with Bell, his mother, and his teachers to ensure

that he was doing well, see Admin. Tr. Vol. II at 439:11-441:14 (Dahl), id. at 455:18-456:16 (Dahl),

Admin. Tr. Vol. III at 814:19-815:13 (Brown), id. at 826:3-827:5 (Brown), Admin. Tr. Vol. IV at

937:3-938:19 (Schlosser); (iii) providing extra support and incentives, see Admin. Tr. Vol. II at

425:24-427:13 (Dahl), 438:4-19 (Dahl), 443:2-15 (Dahl), Admin. Tr. Vol. III at 824:15-24 (Brown),

848:2-850:2 (Brown); (iv); switching classes, teachers or service providers when there was a

potential personality conflict or other issue, see Admin. Tr. Vol. II at 424:21-24 (Dahl), id. at 428:6-

11 (Dahl), Admin. Tr. Vol. III at 689:3-8 (Oetzel), id. at 697:5-25 (Oetzel), Admin. Tr. Vol. IV at

1089:2-15 (G. Bell); and (v) coming in on Saturdays to provide one-to-one testing for Bell. Admin,

see Tr. Vol. IV at 939:4-15 (Schlosser).

        Bell disputes that it was "extra effort" on his behalf that led to selection of teachers and to

switching classes.  Response at 5.  Bell contends that his schedule was determined by APS and

included many class changes, with detrimental effect on his learning.  See Admin. Tr. Vol. IV at

954:8-19 (Shaffer)(explaining that the reason students are not allowed to change classes after the

first ten days is that, if they are "continually moving around from one situation to another, they are

not meeting the requirements of the class."); id. at 955:17-20 (Shaffer)(commenting that Bell's

transcript is "complex.").  Bell contends that APS' examples are of required accommodations and

modifications, and thus such examples are not "extra effort."  Response at 5 (stating that

communicating with parents, providing support and providing one-to-one testing are required

accommodations or modifications)(citing IEP (dated November 21, 2005), Admin. Rec. at 0796,

0798, 0802) and IEP (dated March 31, 2005), Admin. Rec. at 0822, 0828, 0829).

APS asserts that Bell's educational and related-service needs, academic achievement, and functional performance did not warrant an early re-evaluation.  See APS Memo. ¶ 36, at 8; Admin. Tr. Vol. II at 342:1-344:4 (Rowe); id. at 375:10-376:24 (Rowe).  20 U.S.C. § 1414(a)(2)(A) states

> In general [a] local educational agency shall ensure that a reevaluation of each child with a disability is conducted . . .  (i) if the local educational agency determines that the educational or related services needs, including improved academic achievement and functional performance, of the child warrant a reevaluation; or (ii) if the child's parents or teacher requests a reevaluation.

Bell contends that his adaptive behaviors and academic achievement warranted re-evaluation. See Response at 7; Exhibit 4 to Response, Deposition of Julianne Glinski (taken October 9, 2007) at 44:20-45:12 ("Glinski Depo."); Exhibit 5 to Response, Deposition of David Rostetter (taken December 14, 2007) at 119:5-20 ("Rostetter Depo.").  At the October 21, 2004 IEP meeting, Bell's mother requested a re-evaluation to determine if Bell's eligibility determination was correct.  See Present Levels of Performance, Goals, Objectives/Benchmarks for Chanselor Bell (dated October 21, 2004), Admin. Rec. at 01153.

In March of 2005, evaluation specialist Lori Rowe completed a re-evaluation of Bell.  See APS Memo. ¶ 38, at 8-9.  She conducted formal testing of Bell's adaptive behavior skills, using the Vineland Adaptive Behavior Scales.  See Reevaluation Summary of Chanselor Bell (dated March 9, 2005), Admin. Record at 1098.  Rowe relied upon the previously completed IQ testing, but contrary to the approach of the diagnosticians that previously evaluated Bell, based his IQ scores on his performance sub scores, not his full scale IQ. She measured his IQ at 71. See Reevaluation Summary of Chanselor Bell (dated March 9, 2005), Admin. Record at 1098.  Oetzel also performed a speech-and-language evaluation of Bell, which was completed on October 29, 2004.  See Speech and Language Evaluation (dated October 22, 2004 and October 29, 2004), Admin. Rec. at 1006-

1008.  Bell asserts that, "[c]ontrary to professional standards, Rowe relied on Vineland scores based on Bell's abilities in 9th grade, two years earlier."  Response at 7.  Bell contends that, "given [his] clear adaptive behaviors and achievement, professional standards required full evaluation and new IQ testing."  Response at 7.  See Glinski Depo. at 36:18-21; id. at 44:5-45:12, id. at 60:7-21, id. at 68:1-23.  Rowe concluded that Bell did not meet the IDEA eligibility criteria for mentally retarded, but that Bell met the eligibility criteria for specific-learning disabled.  See Reevaluation Summary of Chanselor Bell (dated March 9, 2005), Admin. Rec. at 1100.

Bell is not aware of facts showing that APS overidentifies African-American students and Bell is not aware of statistical data about APS which demonstrates a statistical overrepresentation of African American students within APS students identified as students with mental retardation as compared to the number of African American students who attend APS.  See APS Memo., Exhibit C, Plaintiff's Supplemental Answers to Defendant Albuquerque Public School's Interrogatories to Plaintiffs, Supplemental Answer to Interrogatory No. 7.  In answer to interrogatories, Bell stated:

> Plaintiff is not aware of any facts showing APS overidentifies African-American students as Plaintiff understands that overidentification is established through statistical data and Plaintiff is not aware of statistical data about APS which demonstrates a statistical overrepresentation of African American students within APS students identified as students with mental retardation as compared to the number of African American students who attend the APS.

Id. Bell is not aware of any other APS student who is African American and who was erroneously identified as being mentally retarded.  See Bell Depo. at 126:21-127:3.

It is undisputed that there is no evidence that APS' conduct in relation to the identification of students for receipt of special-education services under the eligibility of mental retardation disparately impacts African American students.  See APS Memo. ¶ 42, at 9.  It is also undisputed that there is no evidence of APS' conduct, to the extent to which students are educated in a regular-

education setting in the Least Restrictive Environment, disparately impacts African American students.  See APS Memo. ¶ 43, at 9.  It is further undisputed that there is no evidence of non-African American students who have similar evaluation results to Bell, and who were not determined to be eligible for special education under the eligibility criteria for mentally retarded. See APS Memo. ¶ 44, at 9.

APS contends that there is no evidence of non-African American students similarly situated to Bell who were subjected to different evaluation or reevaluation procedures.  See APS Memo. ¶ 45, at 9.  APS also asserts that there is no evidence of non-African American students similarly situated to Bell who were subjected to different procedures relating to performance evaluations.  See APS Memo. ¶ 46, at 10.  APS further contends that there is no evidence of non-African American students similarly situated to Bell who were subjected to different considerations relating to the determination of their IDEA eligibility.  See APS Memo. ¶ 47, at 10.  Bell disputes these assertions,

> because classification of Bell as mentally retarded conflicted with federal standards which APS is bound to follow: [(i)] IDEA provides a standard for the factors which must be present in order to categorize a student as a person with mental retardation. 34 CFR 300.7(c)(6)(1999) and 34 CFR 300.8(c)(6)(2006); [(ii)] IDEA creates a presumption, not rebutted by APS, that APS as an LEA, complies with IDEA including its provisions on determination of eligibility, evaluations and reevaluations. 20 U.S.C. §1413(a) and 20 U.S.C. §1414.

Response at 7-8.

It is undisputed that Bell has no facts to show that similarly situated students of a different race were treated differently than he was treated.  See Bell Depo. at 4:17-7:23.  APS also contends that there is no evidence that APS has published Bell's eligibility for special education to any third party.  See APS Memo. ¶ 49, at 10.  Bell counters that his eligibility for special education was published to his teachers, his parents, his administrators, himself, and New Mexico Department of

Vocational Rehabilitation ("DVR").  See IEP (dated November 19, 2003, Admin. Rec. at 0849; IEP (dated January 17, 2005), Admin. Rec. at 0859.

Bell contends that APS uses the terms "intellectually disabled" and "mentally retarded" interchangeably. Response at 8.  Bell asserts that, before 2003, APS used the term "intellectually disabled" to refer to students who were eligible for receipt of special education under federal law as students with mental retardation.  Id.  After 2003, APS changed its terminology to match the term used in IDEA and students who were previously identified as students who were "intellectually disabled," were given the eligibility label "mentally retarded."  Response, Exhibit 6, Defendant APS' Response to Plaintiff's First Set of Interrogatories, First Requests for Production, and First Requests for Admission, Answer to Interrogatory 7 at 2; id. at 14, 15.  Bell asserts that, at IEP meetings that APS conducted Bell was referred to as "mentally retarded."  Response at 8 (citing IEP (dated January 17, 2005), Admin. Rec. at 0837-0839; IEP (dated January 17, 2005), Admin. Rec. at 0850-0861; Admin. Tr. Vol. II. at 327:11-18 (George); id. at 510:2-17 (Bell); Response, Exhibit 7, Deposition of Gina Bell (taken August 15, 2007) at 57:17-58:24 ("G. Bell Depo.")).

At all times from 1996 through 2005, IDEA has provided four factors which are necessary prerequisites for identification as mentally retarded: "[(i)]significantly subaverage intellectual functioning, [(ii)] existing concurrently with deficits in adaptive behavior and [(iii)] manifested during the developmental period, [(iv)] that adversely affects a child's educational performance."  Response at 8-9 (quoting 34 C.F.R. § 300.7(c)(6)(providing that "[c]harter school has the meaning given the term in section 5210(1) of the Elementary and Secondary Education Act of 1965, as amended, 20 U.S.C. 6301 et seq. (ESEA).").  Bell also cites to Wendy Shanahan's testimony in November 2002 regarding the criteria for mental retardation.  See Response at 9 (citing Deposition

-16-

of Wendy Shanahan (taken November 29, 2007) at 46:9-47:23 ("Shanahan Depo.")). Bell contends

that "[a]t no time from 1996 through 2005 did Chanselor Bell meet the prerequisites for

identification as 'mentally retarded.'" Response at 9. Bell asserts that he did not have "significantly

subaverage intellectual functioning;" he made steady growth in learning and in some academic areas

had skills which were above grade level. Response at 9, Psychological Evaluation of Chanselor Bell

(dated February 19, 2006), Admin. Rec. 01190-01199; Admin. Tr. Vol. I. at 175:5-176:25 (Smith),

id. at 180:3-182:19 (Smith), id. at 206:18-207:3 (Smith); IEP (dated January 17, 2005) at Admin.

Rec. 00842. Bell contends that he did not have deficits in adaptive behavior and, instead, had

superior adaptive behaviors in: (i) meeting all developmental milestones early or within average-

time frames; (ii) participating in general-education classes and receiving passing grades; (iii) playing

varsity basketball all four years of high school; (iv) being independent in self-care skills as

appropriate to age and gender; and (v) being popular among peers and polite and well-mannered

with adults. See Student Contract with Chanselor Bell (dated May 12, 2005), Admin. Rec. at 0873;

Response, Exhibit 8, Deposition of Dolores Fresquez (taken October 11, 2007 at 38:3-21 ("Fresquez

Depo."); Response, Exhibit 9, Deposition of Ann Plante (taken December 11, 2007) at 5:9-6:3

("Plante Depo."); Plante Depo. at 24:3-16.

      Bell asserts that APS' diagnosticians, Adamson and Fresquez, provided written opinions that

Bell "met the criteria" for eligibility for identification as a person with mental retardation. Response

at 9. Bell contends that neither of APS' diagnosticians, Adamson and Fresquez, nor any other APS

employee, explained what the "criteria" were for labeling a student with "mental retardation" to

Bell's family "participating" in the MDT decision on eligibility. Response at 9. Bell asserts that

Gina Bell did not know or understand what the criteria were, and trusted the school personnel to

advise her.  See G. Bell Depo. at 28:1-31:4-25; id. at 131:3-133:25;  id. at 161:4-164:16; Fresquez

Depo. at 38:3-21, 47:10-23, 62:6-21 (testifying that the focus of Bell's evaluations was on IQ

testing), id. at 70:15-19 (testifying that Gina Bell trusted her); Shanahan Depo. at 40:7-12, 43:19-

44:18 (testifying that diagnosticians are there to explain why a student does or does not meet a

criteria).

Bell asserts that IDEA contemplates delivery of appropriate education based on accurate

knowledge about the student's disability as reflected in formal evaluation.  See Shanahan Depo. at

76:7-12; Gliniski Depo at 62:1-22; Oakland Depo. at 128:19-129:25.  Bell contends that IDEA

requires that determination of eligibility be based on multiple sources and tests. See Response at 10

(citing 34 C.F.R. §§ 300.304(b)(1) and 300.532); Shanahan Depo. at 44:1-18; Oakland Depo. at

18:3-19:24.  Bell contends that, at all times that APS identified Bell as "intellectually disabled," or

"mentally retarded," APS evaluators had made recommendations based solely on IQ testing while

ignoring known data and facts about Bell contradicting the features of a person with mental

retardation.  See Response at 10; Psychological Evaluation (dated February 16, 2006), Admin. Rec.

at 01190-01199; Fresquez Depo. at 38:3-21, 47:1-9, 62:10-18.  Bell asserts that the label of mental

retardation is negative in school culture and creates lowered expectations.  See Admin. Tr. Vol. I

at 194:12-195:17 (Smith); Admin. Tr. Vol. II at 315:1-24 (Davis); Oakland Depo. at 74:14-75:12.

The word "retarded" is commonly used slang by teenagers to signify something or someone which

is dumb or objectionable. Admin. Tr. Vol. III at 818:14-23 (Brown).

During the time that Bell was labeled as a student with mental retardation, APS failed to give

him all standardized tests which were required for students in his grade.  See IEP (dated March 21,

2008), Admin. Rec. at 0782.  Bell argues that, "[d]uring the time that Bell was labeled as a student

with mental retardation, APS recommended placement on a 'career' pathway to diploma rather than a standard pathway to diploma. A 'career pathway' is selected when it is anticipated that the student is and will remain unable to pass the New Mexico High School Competency Exam, which is the state's high stakes exit exam for receipt of a standard high school diploma." Response at 10-11. See IEP (dated March 21, 2008), Admin. Rec. at 0782-0783. During the time Bell was labeled as a student with mental retardation in middle school, he was placed in segregated classes attended only by students with disabilities. See IEP (dated October 6, 2002), Admin Rec. at 01265-01278; Admin. Tr. Vol. III at 895:19-897:7 (G. Bell); Plante Depo. at 13:8-24. Bell asserts that, "[d]uring the time he was labeled as a student with mental retardation in high school, he was placed in general education classes where he was allowed to languish without instruction provided to the rest of the class." Response at 11 (citing Response at 3-4). Bell argues that reevaluation of IDEA eligibility is performed whenever conditions warrant. See Response at 11; 34 C.F.R. § 300.536(b)(Change of placement because of disciplinary removals); 34 C.F.R. § 300.303 (Reevaluations). Any school staff member may request an IEP for any student whenever such a meeting is necessary. See 20 U.S.C. §1414 (a)(2)(A), (b), (c); Shanahan Depo. at 69:4-9, id. at 73:4-9 (testifying that staff can also request reevaluation).

Bell argues that APS school staff knew that Bell did not meet the criteria for mental retardation and that the APS school staff do not know why his eligibility was not changed by APS, and do not believe that it matters. See Admin. Rec. Vol. I. at 84:1-7, id. at 88:1-25, id. at 99:1-20, id. at 108:1-18, id. at 139:19-24, id. at 153:8-16 (Rowe); Admin. Tr. Vol. II at 392:2-15 (Dahl); Admin. Tr. Vol. IV at 984:217 (Shaffer); Reevaluation Summary (dated March 9, 2005), Admin. Rec. at 01098-01100.

Bell contends that APS educators' belief that a false label of mental retardation does not matter in the context of modern education evidences a complete absence of professional judgment and standards which are required under federal special-education law. See Response at 11-12 (citing 20 U.S.C. §1414(b), (c) and 34 C.F.R. §§ 300.530 to 300.543). Bell argues that APS' "[f]ailure to exercise professional judgment for a period of six years in the context of statutorily mandated criteria and procedures shows deliberate indifference because of the continuous ability under the procedural framework for correction of the misidentification." Response at 12 (emphasis in original). See 20 U.S.C. §1413 (discussing local educational agency eligibility).

Bell argues that since the 1970s, education professionals have expressed concern over the known overidentification of African-American children as children with mental retardation. See Response at 11. See Oakland Depo. at 49:10-20; Rostetter Depo. at 73:2-77:21. Bell contends that, on or before 1997, Congress specifically noted a national concern that IDEA special-education identification by school personnel was resulting in disproportionate numbers of African-American children being tagged as students with mental retardation. See Response at 12; Rostetter Depo. at 73:2-77:21; 20 U.S.C. § 1400(C)(8)(noting congressional findings regarding education of persons with disabilities); 20 U.S.C. § 1400(12)(stating that "[g]reater efforts are needed to prevent the intensification of problems connected with mislabeling and high dropout rates among minority children with disabilities."). Bell asserts that "mental retardation" is a "soft" eligibility label built on subjective criteria due, resulting from the requirements for assessing adaptive behaviors. Response at 12; Rostetter Depo. at 98:17- 99:13. Bell argues that "[r]ecognition of special education eligibility for students in objectively defined eligibilities such as hearing impairment does not result in disproportionate identification of students who are African American." Response at 12. "Historic

-20-

race discrimination is believed to underlie the overidentification of African American students as students with mental retardation."  Response at 12.  See Larry P. v. Riles, 793 F.2d 969, 977, 984 (9th Cir. 1984)(affirming the district court's finding that "the defendants were guilty of intentional discrimination in the use of the IQ tests for E.M.R. placement. The court based this determination on the fact . . . that the historical background of the IQ tests shows cultural bias."); Oakland Depo. at 49:10-20.  Bell contends that, "[despite Congress's specific concern in the IDEA about overidentification of African American students as students with mental retardation, neither APS nor any of its staff bothered to squarely confront the clear contradiction between Bell's designated eligibility label and Bell's actual presentation in all the years between 1999-2005."  Response at 13. See Admin. Rec. Vol. I. at 84:1-7;  id. at 88:1-25; id. at 99:1-20; id. at 108:1-18; id. at 139:19-24; id. at 153:8-16 (Rowe); Admin. Tr. Vol. II at 392:2-15 (Dahl); Admin. Tr. Vol. IV at 984:217 (Shaffer); Reevaluation Summary (dated March 9, 2005), Admin. Rec. at 01098-01100.

Bell argues that, as a result, he lost access to education and educational opportunity by receiving the inaccurate and stigmatizing label of mental retardation.  See Response at 13.  Bell contends that the label was published to school staff in permanent educational records and in meetings.  See id.  The label was published to Bell's father and stepmother through educational records and in meetings.  See id.; IEP (dated November 19, 2003, Admin. Rec. at 0849, IEP (dated January 17, 2005), Admin. Rec. at 0859.  Bell asserts that, "[i]n 2005-2006, in connection with his attempt to access transition planning and services available through the DVR, Bell was required to sign a Release allowing a third party state agency, 'DVR' to review his educational records maintained by APS, which records included multiple documents labeling Bell as 'intellectually disabled,' or 'mentally retarded.'"  Response at 13.  Bell argues that APS has "practices for initial

evaluations and reevaluations which exemplify the exercise of professional judgment and which provide a minimal standard for professional practice."  Response at 13.  <u>See</u> Shanahan Depo. at 38:6-20.  Bell argues that "APS did not apply its best practices in its initial evaluation and continuing reevaluations of Bell which labeled him as a student with mental retardation despite clear knowledge that he did not meet the required criteria as established by federal law."  Response at 13. <u>Compare</u> Shanahan Depo. at 38:6-20; <u>id.</u> at 46:3-47:23 <u>with</u> Frezquez Depo. at 38:3-21; <u>id.</u> at 40:3-24; <u>id.</u> at 52:1-17; <u>id.</u> at 62:6-21.

Bell represents that, at the IDEA due-process hearing conducted in May 2006, APS argued that the evidence supported a conclusion that Bell was appropriately labeled as a student with mental retardation.  <u>See</u> Response at 14; Admin. Tr. Vol. VI at 1378:1-3; <u>id.</u> at 1393:1-24 (APS)(stating, in closing argument that "[i]t seems . . . that the linchpin of [Bell's] entire argument is, well, we think you're wrong on the mental retardation eligibility. . . . [Bell] want[s] to focus on, well, somebody did an evaluation, and [Bell's] contention is it was wrong, and all kinds of little things that happened during the course of his education.").  Bell asserts that now APS' expert witness for trial, Dr. Oakland, maintains that the label was correct.  <u>See</u> Response at 14; Oakland Depo. at 78:3-22.  Bell argues that the IDEA due-process hearing officer imposed limitations on the evidence which Bell wished to present to disprove the propriety of the "mental retardation" label.  Response at 14.  Bell represents that the IDEA due-process hearing officer excluded evidence before December 2003 with limited exceptions.  <u>See</u> Response at 14 (citing Plaintiff's Motion for Additional Evidence Pursuant to the IDEA, filed January 18, 2008 (Doc. 89)).

## **PROCEDURAL BACKGROUND**

At the March 7, 2008 hearing, Bell noted that he has conceded that summary judgment is

appropriate on his Equal Protection and § 1983 claims.  See Transcript of Hearing (taken March 7, 2008)("Tr.") at 3:7-11 (Court & Stewart).[1]  Bell explained that he is still claiming that summary judgment is not appropriate on his Title VI claim.  See id. at 3:13-15 (Court & Stewart).   Bell asserted that his prima-facie showing under Title VI would be that "[t]he IDEA establishes standards which cannot be deviated from [by] public school personnel with regard to eligibility."  Id. at 32:1-5 (Court & Stewart).  Bell conceded that he did not have a specific case for that standard.  See id. at 32:6-8 (Court & Stewart).  Bell argued that the "plus" he alleges, under the stigma plus standard, is that "negative presumptions about ability to learn impact what educational opportunities he receive[d] in public education."  Id. at 37:18 (Stewart).  See id. at 41:8-10 (Stewart).  Bell contended that a name-clearing event in his situation would require "get[ting] a chance to specifically address whether the mental retardation was wrong, proof that it was wrong, and pro[of] that you know that the state actor here . . .  continued this wrong label in spite of contrary knowledge, and that there's a remedy then that fits the harm."  Id. at 46:13-18 (Stewart).

APS argued that Bell's asserted prima-facie showing for Title VI would have the effect of "making every IDEA case the functional equivalent of a Title VI case and there is not construction that would support . . . that."  Id. at 52:13-16 (Carrico).  APS asserted that, "if you have a hearing officer who is specifically addressing the question [whether the] . . . IDEA eligibility [is] wrong, that is a name clearing hearing."  Id. at 54:11-13 (Carrico).  APS contended that, "absent some facts showing that [Bell] could not access his education, there is no plus to his stigma plus claim."  Id. at 57:1-3 (Carrico).

---

[1] The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

## LAW GOVERNING MOTIONS FOR SUMMARY JUDGMENTS

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant has "the initial burden to show that there is an absence of evidence to support the nonmoving party's case." Mirzai v. State of N.M. Gen. Servs. Dep't, 506 F.Supp.2d 767, 774 (D.N.M. 2007)(Browning, J.)(internal quotations omitted). That is, the moving party has the initial burden to demonstrate absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

If the movant meets that burden, then the burden shifts to the nonmovant "to present specific, admissible facts from which a rational trier of fact could find for the nonmovant." Velasquez v. Frontier Med., Inc., 375 F.Supp.2d 1253, 1262 (D.N.M. 2005)(Browning J.). The nonmovant must set forth specific facts and cannot rely only on his pleadings. See Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 671 (10th Cir. 1998). "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." Id.

"For the purposes of summary judgment, the court assumes the evidence of the nonmoving party to be true, resolves all doubts against the moving party, construes all evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor." Velasquez v. Frontier Med., Inc., 375 F.Supp.2d at 1263 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)). Summary judgment is appropriate if there is no genuine issue of material fact. See Trujillo v. Bd. of Educ., Albuquerque Pub. Sch., 410 F.Supp.2d 1033, 1039 (D.N.M. 2005)(Browning, J.). "An issue of fact is 'genuine' if the evidence is significantly

probative or more than merely colorable such that a jury could reasonably return a verdict for the non-moving party." Id. (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248).  "Essentially, the inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Velasquez v. Frontier Med., Inc., 375 F.Supp.2d at 1263 (internal quotations and citations omitted).  Moreover, the court may consider only admissible evidence when ruling on a motion for summary judgment.  See World of Sleep, Inc. v. La-Z-Boy Chair, Co., 756 F.2d 1467, 1474 (10th Cir. 1985)(citing Fed. R. Civ. P. 56(e)).

## LAW REGARDING EQUAL PROTECTION AND 42 U.S.C. § 1983 CLAIMS

"[T]he essence of the equal protection requirement is that the state treat all those similarly situated similarly, with its central purpose [being] the prevention of official conduct discriminating on the basis of race [or other suspect classifications]." Powers v. Harris, 379 F.3d 1208, 1215 (10th Cir. 2004)(internal citations and quotations omitted).  A plaintiff must be similarly situated with those treated differently.  See Cleburne v. Cleburne Living Cent., Inc., 473 U.S. 432, 439 (1985); Buckley Constr. Inc. v. Shawnee Civic and Cultural Dev. Auth., 933 F.2d 853, 859 (10th Cir. 1991). If a state acts on the basis of race, then it must demonstrate, under a strict scrutiny review, that "the means chosen fit [the] compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." Concrete Works of Colo., Inc. v. City and County of Denver, 321 F.3d 950, 957 (10th Cir. 2003)(internal quotations omitted). "[M]ental retardation [is not] a quasi-suspect classification calling for a more exacting standard of judicial review than is normally accorded economic and social legislation." City of Cleburne, Tex. v. Cleburne Living Cent., 473 U.S. at 442.  Thus, "[t]o withstand equal protection review, legislation

that distinguishes between the mentally retarded and others must be rationally related to a legitimate governmental purpose." Id. at 446.

The party alleging discrimination has the burden of proving that the state's conduct was motivated by a discriminatory purpose. Witus v. Georgia, 385 U.S. 545, 550 (1967)(explaining that "[t]he burden is, of course, on the petitioners to prove the existence of purposeful discrimination"); Sauers v. Salt Lake County, 1 F.3d 1122, 1130 (10th Cir. 1993)(stating that "[a] plaintiff in an equal protection action has the burden of demonstrating discriminatory intent."). It is "hornbook constitutional law that mere negligence or mistake resulting in uneven application of the law is not an equal protection violation." Roe v. Keady, 329 F.3d 1188, 1191-92 (10th Cir. 2003).

## LAW REGARDING TITLE VI

Title VI of the Civil Rights Act provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Title VI claims are coextensive with equal-protection claims based on race. See Grutter v. Bollinger, 539 U.S. 306, 343 (2003)(explaining that "Title VI . . . proscribe[s] only those racial classifications that would violate the Equal Protection Clause or the Fifth Amendment.")(internal quotations omitted); United States v. Fordice, 505 U.S. 717, 732 n.7 (1993)(noting that "the reach of Title VI's protection extends no further than the Fourteenth Amendment.").

The court analyzes a Title VI claim using the McDonnell-Douglas burden-shifting analysis. See Bryant v. Indep. Sch. Dist. No. I-38, 334 F.3d 928, 929-30 (10th Cir. 2003). The United States Court of Appeals for the Tenth Circuit explained the analysis in Bryant v. Independent School

District No. I-38 of Garvin County, OK:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for [the discharge]. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination . . . . The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.

Id. at 930.

To make a prima facie showing of discrimination, a plaintiff must establish that: (i) he or she is a member of a protected class; (ii) he or she suffered an adverse action; and (iii) he or she was treated differently from similarly situated individuals.  See Buhendwa v. Univ. of Colo. at Boulder, 214 Fed. Appx. 823, 828 (10th Cir. 2007).  "Inevitably, the degree to which others are viewed as similarly situated depends substantially on the facts and context of the case." Jennings v. City of Stillwater, 383 F.3d 1199, 1214 (10th Cir. 2004).  "Plaintiffs will have an easier time stating a claim where there are few variables in play and the set of potentially similarly situated individuals is well-defined."  Id.  "In the context of employment discrimination cases . . . . Individuals are considered similarly-situated when they [(i)] have dealt with the same supervisor; [(ii)] were subjected to the same work standards; and [(iii)] had engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Buhendwa v. Univ. of Colo. at Boulder, 214 Fed. Appx. at 828 (internal quotations omitted)(discussing a plaintiff's claim that a professor discriminated against her "by showing that two 'blond' students were given an opportunity, not afforded to her, to take quizzes and examinations in the [p]rofessor['s] . . . office, and that one of the students was told by the

[p]rofessor . . . that, in calculating her grade, he would ignore her missed quizzes."). A plaintiff must make a showing of intentional discrimination. See Cudjoe v. Indep. Sch. Dist. No. 12, 297 F.3d 1058, 1069 (10th Cir. 2002)(explaining that 42 U.S.C. § 2000d "proscribes only intentional discrimination.").

In some instances, the Tenth Circuit has not required plaintiffs to demonstrate that similarly-situated persons were treated differently. In Sorbo v. United Parcel Serv., 432 F.3d 1169 (10th Cir. 2005), the Tenth Circuit noted that "the Supreme Court has specifically held that age-discrimination plaintiffs need not show disparate treatment as compared to co-workers outside the protected class (i.e., those not over forty years of age)." Id. at 1173 (citing O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 311-12 (1996). In English v. Colo. Dep't of Corr., 248 F.3d 1002, 1008 (10th Cir. 2005), the Tenth Circuit explained that, in the context of discriminatory discharge, a plaintiff does not have to show differential treatment of persons outside the protected class to meet the initial prima-facie burden under McDonnell Douglas: "The firing of a qualified minority employee raises the inference of discrimination because it is facially illogical to randomly fire an otherwise qualified employee and thereby incur the considerable expense and loss of productivity associated with hiring and training a replacement.")(internal quotations omitted).

## LAW REGARDING PROCEDURAL DUE PROCESS
## AND STIGMA PLUS CLAIMS

The Tenth Circuit's stigma-plus standard requires a plaintiff to demonstrate: "[(i)] the government made a statement about him or her that is sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she asserts is false, and [(ii)] the plaintiff experienced some governmentally imposed burden that significantly altered [his or] her status as a matter of state law." Kennedy v. Smith, No. 07-7035, 2007 WL 4532823 at * 4 (10th Cir.

December 26, 2007).   Tenth Circuit caselaw on stigma-plus claims generally arises out of

employment-law cases.   See, e.g., Six v. Henry, 42 F.3d 582, 585 (10th Cir. 1994); Corbitt v.

Andersen, 778 F.2d 1471, 1474-75 (10th Cir. 1985).   To satisfy a liberty-interest claim, however,

a plaintiff must demonstrate:

> [(i)] to be actionable, the statements must impugn the good name, reputation, honor,
> or integrity of the employee[; (ii)] the statements must be false[; (iii)] the statements
> must occur in the course of terminating the employee or must foreclose other
> employment opportunities[; a]nd [(iv)] the statements must be published. These
> elements are not disjunctive, all must be satisfied to demonstrate deprivation of the
> liberty interest.

Evers v. Regents of Univ. of Colo., 509 F.3d 1304, 1308 (10th Cir. 2007).

   An alleged defamatory or stigmatizing statement by a government actor, standing alone, is

insufficient to state a due-process claim.   See McGhee v. Draper, 639 F.2d 639, 643 (10th Cir. 1981)

(stating that "[s]tigmatization or reputational damage alone, no matter how egregious, is not

sufficient to support a § 1983 cause of action.")(citing Paul v. Davis, 424 U.S. 693, 697-713 (1976)).

   A "stigma plus," due-process claim cannot survive solely on the basis that the government

said something about the plaintiff that is allegedly inaccurate; the claim must be based on a denial

of due process to contest the allegedly erroneous statement.   Segal v. City of New York, 459 F.3d

207, 214 (2d Cir. 2006)(holding that, where the plaintiff's protected interest was her reputation and

professional interest, a post-deprivation hearing was sufficient to defeat a stigma-plus claim).   In

Segal v. City of New York, the United States Court of Appeals for the Second Circuit explained:

"Because stigma plus is a species within the phylum of procedural due process claims, however, it

is not enough that the plaintiff has demonstrated the deprivation of her liberty interest; in order to

bring a successful stigma-plus claim, the plaintiff also must demonstrate that her liberty was

deprived without due process of law. Stated differently, the availability of adequate process defeats

a stigma-plus claim." Id. at 214.

Due-process concerns may be implicated only when the subject of the stigmatizing statement is denied a hearing to clear his or her name. Gwinn v. Awmiller, 354 F.3d 1211, 1216 (10th Cir. 2004)("Where a person's good name, reputation, or integrity is at stake because of what the government is doing to him, a protectible liberty interest may be implicated that requires procedural due process in the form of a hearing to clear his name.")(internal quotations omitted). "A person who establishes a liberty-interest deprivation is entitled to a name-clearing hearing." Evers v. Regents of Univ. of Colo., 509 F.3d at 1308.

A plaintiff who fails to assert his or her right to a due-process hearing cannot assert a stigma-plus due process claim. See Winskowski v. City of Stephen, 442 F.3d 1107, 1110-11 (8th Cir. 2006)(noting that it had "previously held that a government employee cannot recover for a due process violation where the employee simply failed to avail himself of the post-termination process that was available.")(citing Schleck v. Ramsey County, 939 F.2d 638, 642 (8th Cir. 1991)(stating that "it is undisputed that [the plaintiffs] were offered an extensive post-termination hearing, which would have allowed the introduction of evidence and cross-examination of witnesses . . . . That such a hearing never was conducted because [the plaintiffs] declined to avail themselves of it does not give rise to a due process violation)); Quinn v. Shirey, 293 F.3d 315, 321-22 (6th Cir. 2002)(same); Rosenstein v. City of Dallas, 876 F.2d 392, 396 (5th Cir. 1989)(same).

The law requires a tangible injury to support a stigma-plus claim. See Phelps v. The Wichita Eagle-Beacon, 886 F.2d 1262, 1268-69 (10th Cir. 1989)(holding that future harm to prospective relationships and damages to prospective employment opportunities are too intangible to constitute a deprivation of a property or liberty interest). In Phelps v. The Wichita Eagle-Beacon, the attorney

-30-

brought suit against employees of a newspaper and a former assistant attorney general for articles that he contended "placed a defamatory cloud over his employment opportunities."  886 F.3d at 1266, 1268.  The Tenth Circuit noted that the plaintiff had "merely . . . alleged speculative future harm to prospective relationships as a result of the generalized damage to his reputation."  Id. at 1268.  The Tenth Circuit noted that the "plaintiff ha[d] not been foreclosed from practicing law.  At most, he allege[d] that the newspaper articles made him less attractive to potential clients."  Id. at 1269.  The Tenth Circuit held "[t]hat allegation is insufficient to state a deprivation of a liberty or property interest."  Id.

In Workman v. Jordan, 32 F.3d 475 (10th Cir. 1994), the plaintiff asserted a due-process claim for deprivation of a liberty interest based on "damage to his reputation due to allegedly stigmatizing documents placed in his personnel file" by defendants after his reinstatement to a job. See 32 F.3d at 480.  The Tenth Circuit found that the plaintiff had not shown lost-employment opportunities, and was unable to make a "sufficient showing of false stigmatizing statements entangled with his interest in employment."  Id. at 481.  The Tenth Circuit noted that, because the plaintiff was not deprived of a liberty interest, "due process did not require an adequate name-clearing hearing."  Id. at 482.

The Supreme Court explained in Paul v. Davis that:

> While we have in a number of our prior cases pointed out the frequently drastic effect of the "stigma" which may result from defamation by the government in a variety of contexts, this line of cases does not establish the proposition that reputation alone, apart from some more tangible interests such as employment, is either "liberty" or "property" by itself sufficient to invoke the procedural protection of the Due Process Clause.

424 U.S. at 701.  In Paul v. Davis, the plaintiff's name and photograph appeared on a flyer with the caption "Active Shoplifters" that was distributed to local area merchants.  424 U.S. at 695-96.  The

Supreme Court explained: "The 'stigma' resulting from the defamatory character of the posting was doubtless an important factor in evaluating the extent of harm worked by that act, but we do not think that such a defamation, standing alone, deprived [the plaintiff] of any 'liberty' protected by the procedural guarantees of the Fourteenth Amendment." Id. at 709.

To state a stigma-plus, due-process claim, a plaintiff must establish that the allegedly stigmatizing information was published. See Workman v. Jordan, 32 F.3d at 481 (10th Cir. 1994); Harrison v. Bd. of City Comm'rs., 775 F.Supp. 365, 367 (D. Colo. 1991) (explaining that intra-government disclosure of information does not constitute publication in the context of a liberty interest claim. In Orozco v. County of Monterey, 941 F. Supp 930 (N.D. Ca. 1996), the district court noted that

> In order for plaintiff to satisfy the 'publication' requirement, [the] plaintiff must plead that the defendants published the allegedly false and stigmatizing information to the public. [The p]laintiff has not so alleged. [The p]laintiff has alleged only that the information was disseminated within her department and to law enforcement departments in the course of the investigation of plaintiff's activities. This is not sufficient.

Id. at 939. See Diehl v. Albany County Sch. Dist. No. 1, 694 F.Supp 1534, 1537 (D. Wy. 1988)(explaining that statements made about a coach by a school board regarding nonrenewal were not published, because "[r]easons for termination or nonrenewal given to an employee in private cannot impair the employee's interest in his good name, reputation, honor, or integrity. . . . Statements made in the course of a judicial proceeding also do not support a liberty interest claim.)(internal quotations and citations omitted). The Tenth Circuit requires actual dissemination of information for a plaintiff to satisfy the publication prong of the stigma-plus standard. See Bell v. Bd. of County Com'rs of Jefferson County, 343 F.Supp.2d 1016, 1021 (D.Kan. 2004)(stating that, while "[o]ther circuits have held that placement of false and stigmatizing information in an employee

personnel file may constitute publication if the file is either available to the public or likely to be disclosed to prospective employers . . . the Tenth Circuit appears to require dissemination in lieu of a more lenient 'likely to be disseminated' or 'available to the public' standard.")(citing <u>Harris v. Blake</u>, 798 F.2d 419, 419 n. 2 (10th Cir.1986)).

In <u>Goss v. Lopez</u>, 419 U.S. 565 (1975), the Supreme Court noted that students, on the basis of state law, had legitimate claims of entitlement to a public education. <u>See</u> 419 U.S. at 573. The Supreme Court explained that "the State is constrained to recognize a student's legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause and which may not be taken away for misconduct without adherence to the minimum procedures required by that Clause." <u>Id.</u> at 574. School authorities suspended students, for periods up to 10 days, based on charges of misconduct in <u>Goss v. Lopez</u>. <u>See</u> 419 U.S. at 575. The Supreme Court noted: "If sustained and recorded, those charges could seriously damage the students' standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment." <u>Id.</u> In <u>Goss v. Lopez</u>, the appropriate name-clearing process, in connection with a suspension of 10 days or less, is "that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." <u>Id.</u> at 551.

American society has historically endorsed beliefs that mental retardation signified a need for exclusion from the rest of society and reduced civil rights. Those beliefs have been characterized by the Supreme Court of the United States as "an irrational prejudice against the mentally retarded." <u>City of Cleburne v. Cleburne Living Cent.</u>, 473 U.S. at 450. A negative stigma attaches to mental retardation flowing from society's longstanding prejudicial assumptions about the potential and

worth of persons who have mental retardation. "[T]here have been and there will continue to be instances of discrimination against the retarded that are in fact invidious." City of Cleburne v. Cleburne Living Cent., 473 U.S. at 446.

## ANALYSIS

Bell contends that APS violated his rights under the due-process and equal-protection clauses of the Fourteenth Amendment, and under Title VI of the Civil Rights Act, because APS erroneously identified him as a student with mental retardation and such error was race based. Bell concedes that he has no equal-protection claim. Because the Court concludes that Title VI extends no further than the Fourteenth Amendment, the Court will also dismiss his Title VI claim. Finally, because APS provided Bell an extensive name-clearing hearing, the Court will also dismiss his due-process claim.

## I.   THE COURT WILL GRANT SUMMARY JUDGMENT ON BELL'S EQUAL-PROTECTION AND TITLE VI CLAIMS.

Bell concedes that summary judgment should be granted on his equal-protection claim brought under 42 U.S.C. § 1983. See Response at 31 (stating that "[t]his Court should deny APS['] motion for summary judgment on Bell's Title VI and stigma plus claims while granting summary judgment by stipulation on the equal protection claim."). Bell "concedes that he is unable to prove a traditional 14th Amendment Equal Protection claim, but continues to assert that APS is not entitled to summary judgment on his Title VI race discrimination claim." Response at 28. Bell contends that he need not demonstrate, for his Title VI claim, that similarly situated students were treated differently. See Response at 29 (citing Sorbo v. United Parcel Serv., 432 F.3d at 1173) and English v. Colo. Dep't of Corr., 248 F.3d at 1008).

Bell is not excused from demonstrating that similarly situated persons were treated differently for his Title VI claim. In Sorbo v. United Parcel Service, the Tenth Circuit noted that

"the Supreme Court has specifically held that age-discrimination plaintiffs need not show disparate treatment as compared to co-workers outside the protected class (i.e., those not over forty years of age)." 432 F.3d at 1173. In English v. Colorado Department of Corrections, however, the Tenth Circuit explained that, in the context of discriminatory discharge, a plaintiff does not have to show differential treatment of persons outside the protected class to meet the initial prima-facie burden under McDonnell Douglas, because "[t]he firing of a qualified minority employee raises the inference of discrimination because it is facially illogical to randomly fire an otherwise qualified employee and thereby incur the considerable expense and loss of productivity associated with hiring and training a replacement." 248 F.3d at 1008. Because Bell is not alleging age discrimination, and is not making a discriminatory discharge claim, he is required to demonstrate that he was treated differently than similarly situated persons. See, e.g., Buhendwa v. Univ. of Colo. at Boulder, 214 Fed.Appx. at 828 (requiring a student bringing a Title VI claim to demonstrate that she was treated differently from similarly situated individuals).

Bell suggests that the appropriate prima-facie showing that he must make, to survive summary judgment on his Title VI claim, is that "[t]he IDEA establishes standards which cannot be deviated from [by] public school personnel with regard to eligibility." Tr. at 32:1-5 (Court & Stewart). Bell conceded that he did not have a specific case to cite for that standard. See id. at 32:6-8 (Court & Stewart). The Tenth Circuit has stated that the prima-facie showing Bell must satisfy is: (i) he or she is a member of a protected class; (ii) he or she suffered an adverse action; and (iii) he or she was treated differently from similarly situated individuals. See Buhendwa v. Univ. of Colo. at Boulder, 214 Fed.Appx. at 828.

APS suggests that Bell cannot demonstrate that similarly situated individuals were treated

differently, because he

> has no evidence that the performance evaluation procedures were applied differently for any other student. Nor does [Bell] have any evidence of other similarly situated students who were re-evaluated earlier, re-evaluated using different test protocols, provided educational programming pursuant to different procedures or otherwise treated differently. [Bell] has no evidence that the diagnosticians who evaluated him used different evaluation tests or procedures than were used with other students.

APS Memo. at 13. Bell has conceded that he has no facts demonstrating that APS has overidentified African-American students as mentally retarded. See APS Memo., Exhibit C, Plaintiff's supplemental Answers to Defendant Albuquerque Public School's Interrogatories to Plaintiffs at 1. As Bell stated in his answer to interrogatories:

> [Bell] is not aware of facts showing that APS overidentifies African-American students as [Bell] understands that overidentification is established through statistical data and [Bell] is not aware of statistical data about APS which demonstrates a statistical overrepresentation of African-American students within APS students identified as students with mental retardation as compared to the number of African American students who attend the APS.

Id.

Moreover, the Supreme Court has indicated that Title VI claims extend no further than equal-protection claims based on race. See Grutter v. Bollinger, 539 U.S. at 343 (explaining that "Title VI . . . proscribe[s] only those racial classifications that would violate the Equal Protection Clause or the Fifth Amendment.")(internal quotations omitted); United States v. Fordice, 505 U.S. at 732 n.7 (noting that "the reach of Title VI's protection extends no further than the Fourteenth Amendment."). For the Court to extend Title VI to cover Bell's situation when the Equal-Protection Clause would not provide a remedy would be to extend Title VI farther than the Fourteenth Amendment, in contradiction to the Tenth Circuit's instructions. Because Bell has conceded that summary judgment is appropriate on his equal protection claim, it is also appropriate on his Title

VI claim.

There are no genuine issues of material fact whether Bell was treated differently than other similarly situated individuals. Bell has thus not shown that he was treated differently from similarly situated individuals. Accordingly, APS is entitled to summary judgment on his Equal Protection and Title VI claims. Summary judgment is appropriate on Bell's Title VI, Equal Protection, and § 1983 claims.

## II. THE COURT WILL GRANT SUMMARY JUDGMENT TO APS ON BELL'S STIGMA-PLUS DUE-PROCESS CLAIM, BECAUSE THE IDEA DUE-PROCESS HEARING WAS A NAME-CLEARING EVENT.

Bell asserts that:

> The "stigma plus" of a public school mislabeling an African American student as a student with "mental retardation" over six school years attaches because, historically, both "categories" of students were denied access to public education. The longstanding historic exclusion from receipt of public education, an allegedly universal benefit of citizenship, creates "echos" even in the present which invade both [(i)] the individual's self-worth, motivation to learn and internal expectations and [(ii)] expectations of the rest of society based on the lingering irrational prejudices. In the specific context of public education of children, a stigma plus claim arises when the school district improperly labels a student, "mentally retarded" and then, by failing to change the inaccurate classification, sends a repeated message to the child, each school year, that the institution sanctions the label. This stigma plus claim is particularly well supported in our jurisprudence when the misidentified youth is African American.

Response at 23-24 (emphasis in original). Bell contends that he was tangibly injured by the "negative presumptions about [his] ability to learn [that] impact[ed] . . . [the] educational opportunities he receive[d] in public education." Tr. at 37:18 (Stewart); id. at 41:8-10 (Stewart). Bell asserts an interest that is "either [(i) a ] state law interest in receipt of public education; [(ii) a ] state . . . and federal law interest in correct eligibility identification under IDEA." Response at 15. Bell maintains that he is asserting a "per se 'stigma plus' claim." Response at 17 (emphasis in

-37-

original).

The Tenth Circuit's stigma-plus standard requires Bell to demonstrate: "[(i)] the government made a statement about him or her that is sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she asserts is false, and [(ii)] the plaintiff experienced some governmentally imposed burden that significantly altered [his or] her status as a matter of state law." Kennedy v. Smith, 2007 WL 4532823 at * 4.  To satisfy a liberty-interest claim under the Due-Process Clause, Bell must demonstrate:

> [(i)] to be actionable, the statements must impugn the good name, reputation, honor, or integrity of the employee[; (ii)] the statements must be false[; (iii)] the statements must occur in the course of terminating the employee or must foreclose other employment opportunities[; a]nd [(iv)] the statements must be published. These elements are not disjunctive, all must be satisfied to demonstrate deprivation of the liberty interest.

Evers v. Regents of Univ. of Colo., 509 F.3d at 1308.

## A.    THE COURT WILL ASSUME THAT BELL HAD A PROTECTABLE INTEREST.

Bell must demonstrate more than an alleged defamatory or stigmatizing statement by APS to state his due-process claim.  See McGhee v. Draper, 639 F.2d at 643 (stating that "[s]tigmatization or reputational damage alone, no matter how egregious, is not sufficient to support a § 1983 cause of action.").  The law requires a tangible injury to support a stigma-plus claim.  See Phelps v. The Wichita Eagle-Beacon, 886 F.2d at 1268-69 (10th Cir. 1989)(holding that future harm to prospective relationships and damages to prospective employment opportunities are too intangible to constitute a deprivation of a property or liberty interest).  As the Supreme Court explained in Paul v. Davis, "[w]hile we have in a number of our prior cases pointed out the frequently drastic effect of the 'stigma' which may result from defamation by the government in a variety of contexts, this

-38-

line of cases does not establish the proposition that reputation alone, apart from some more tangible interests such as employment, is either 'liberty' or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause." 424 U.S. at 701.

The Supreme Court recognized, in <u>Goss v. Lopez</u>, that students had legitimate claims of entitlement to a public education. <u>See</u> 419 U.S. at 573. The Supreme Court explained that "the State is constrained to recognize a student's legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause and which may not be taken away for misconduct without adherence to the minimum procedures required by that Clause." <u>Id.</u> at 574. In <u>Goss v. Lopez</u>, school authorities suspended students for periods up to 10 days based on charges of misconduct. <u>See</u> 419 U.S. at 575. The Supreme Court noted that, "[i]f sustained and recorded, those charges could seriously damage the students' standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment." <u>Id.</u> In <u>Goss v. Lopez</u>, the appropriate name-clearing process, in connection with a suspension of 10 days or less, was "that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." <u>Id.</u> at 551. Bell has not introduced evidence that APS entirely deprived Bell of an education, unlike the suspended students in <u>Goss v. Lopez</u>. Because the Supreme Court has recognized, however, that deprivation of education is a property interest that the Due-Process Clause protects, the Court believes that Bell was entitled to a name-clearing hearing. <u>Cf.</u> <u>Evers v. Regents of Univ. of Colo.</u>, 509 F.3d at 1308 (explaining that "[a] person who establishes a liberty-interest deprivation is entitled to a name-clearing hearing."); <u>Gwinn v. Awmiller</u>, 354 F.3d at 1216 (explaining that due-process concerns may be implicated only when the subject of the

statement is denied a hearing to clear his or her name).

The Court need not decide whether all that Bell contends are property or liberty rights are in fact constitutionally protected rights.  It is sufficient for the Court to find that there is some constitutionally protected right.  For purposes of this motion, the Court will assume that there is a property interest in receipt of an education and in proper eligibility identification under the IDEA.

### B.      BELL WAS AFFORDED AN ADEQUATE NAME-CLEARING EVENT.

Although the Tenth Circuit has discussed name-clearing events in connection with deprivation of liberty interests, the Court believes that Bell's claim is more analogous to the suspended schoolchildren's claim in Goss v. Lopez than the Tenth Circuit caselaw regarding stigma-plus claims in the context of employment claims.  Thus, although Bell alleges deprivation of an interest that has been defined by the Supreme Court as a property interest, the Court believes that Bell's complaint is that he was not afforded a name-clearing event.  See Response at 25-26 (arguing that "APS['] assertion that the availability and eventual provision of an IDEA due process hearing fulfills the due process need for a 'name clearing hearing' is not supported by [Bell]'s material facts.").

APS contends that the allegedly stigmatizing information was not "published" about Bell, because it never "published" his IDEA eligibility to a third party.  APS Memo. at 25.  APS argues that communication of Bell's IDEA eligibility within APS is not publication.  See id.  The Tenth Circuit requires actual dissemination of information for a plaintiff to satisfy the publication prong of the stigma-plus standard.  See Harris v. Blake, 798 F.2d at 422 n. 2 (explaining that the Tenth Circuit has held that such intra-government dissemination, by itself, falls short of the Supreme Court's notion of publication.")(internal quotations omitted); Bell v. Bd. of County Com'rs of

-40-

Jefferson County, 343 F.Supp.2d at 1021 (stating that, while "[o]ther circuits have held that placement of false and stigmatizing information in an employee personnel file may constitute publication if the file is either available to the public or likely to be disclosed to prospective employers . . . the Tenth Circuit appears to require dissemination in lieu of a more lenient likely to be disseminated or available to the public standard.")(internal quotations omitted).

Bell asserts that the information about him was "published," because DVR staff accessed APS records and his parents were told about his IDEA eligibility.  Response at 27.  Bell contends that under Bell v. Board of County Commissioners of Jefferson County, his IDEA eligibility was published, because "[i]n future years these records could be accessed by third parties in situations where Bell need[s] either to produce educational records or give up rights."  Response at 27. Because the information was disseminated to persons outside of APS, including Bell's parents and possibly DVR staff, the Court believes that Bell's IDEA eligibility may have been published.  See Harris v. Blake, 798 F.2d at 422 n. 2 (holding that there was no publication where "the record contain[ed] no evidence that the [stigmatizing information] was disseminated to anyone not connected with [the governmental agency].").

The Court acknowledges that there has been a history of discrimination against the mentally retarded in our society.  See City of Cleburne v. Cleburne Living Cent., 473 U.S. at 450 (noting that "the mentally retarded have been subject to a lengthy and tragic history . . .  of segregation and discrimination that can only be called grotesque.")(internal citations and quotations omitted). "[T]here have been and there will continue to be instances of discrimination against the retarded that are in fact invidious." City of Cleburne v. Cleburne Living Cent., 473 U.S. at 446.  "Prejudice, once let loose, is not easily cabined."  Id., 473 U.S. at 464 (Marshall, J., concurring in judgment in part

and dissenting in part).  The Court believes that misidentification as mentally retarded could be a "governmentally imposed burden that significantly alter[s] . . . status as a matter of state law." Kennedy v. Smith, 2007 WL 4532823 at * 4.  Nevertheless, the Court need not decide whether Bell was deprived of an education as a result of erroneous identification as mentally retarded, because even assuming that deprivation occurred, the Court believes that Bell's due-process hearing was a sufficient name-clearing event.

Bell was afforded a due-process hearing that included the right to a prompt evidentiary hearing before an impartial hearing officer.  See 20 U.S.C. § 1415 (describing procedural safeguards provided to students pursuant to IDEA).  Bell's due-process hearing lasted six days and included testimony, briefing, and introduction of exhibits.  See APS Memo. at 24.  Bell contends that a name-clearing event in his situation would require "get[ting] a chance to specifically address whether the mental retardation was wrong, proof that it was wrong, and pro[of] that you know that the state actor here . . . continued this wrong label in spite of contrary knowledge, and that there's a remedy then that fits the harm."  Id. at 46:13-18 (Stewart).  Bell asserts that, because the hearing officer restricted the introduction of some evidence of misidentification and "her findings did nothing to set the record straight," the due-process hearing was not a name-clearing event.  Response at 25-26.  In Goss v. Lopez, the process that the Supreme Court afforded to the students did not guarantee that the students' names would be cleared.  It only provided for a procedure through which the students would be allowed "an explanation of the evidence the authorities have and an opportunity to present his side of the story."   Goss v. Lopez, 419 U.S. at 551.  Pursuant to 20 U.S.C. § 1415, Bell was afforded an "opportunity . . . to present a complaint -- with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free

appropriate public education to such child." 20 U.S.C. § 1415(b)(6)(B).  The procedures afforded

to Bell were much more extensive than those afforded to the schoolchildren in Goss v. Lopez.  The

Court believes that the due process hearing was an adequate name-clearing event for Bell.

Thus, because there are no genuine issues of material fact whether Bell was provided with

an adequate name-clearing event for the alleged deprivation of his interest in an education and/or

in correct eligibility identification under the IDEA, APS is entitled to judgment as a matter of law

on Bell's stigma plus, due-process claim.

**IT IS ORDERED** that APS' Motion for Summary Judgment on Claims Arising from

Plaintiff's IDEA Eligibility is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Tara Ford
Pegasus Legal Services
Albuquerque, New Mexico

 -- and --

Gail S. Stewart
Steven Granberg
Albuquerque, New Mexico

*Attorneys for the Plaintiff*

Michael L. Carrico
Samantha M. Adams
Modrall Sperling Roehl Harris & Sisk, P.A.
Albuquerque, New Mexico

-43-

*Attorneys for the Defendant*