IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

CHANSELOR BELL,

      Plaintiff,

vs.                                                                   No. CIV 06-1137 JB/ACT

BOARD OF EDUCATION OF THE
ALBUQUERQUE PUBLIC SCHOOLS,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Plaintiff's IDEA Brief in Chief, filed January 18, 2008 (Doc. 86)("IDEA Brief"). The Court held a hearing on March 7, 2008,[1] and an evidentiary hearing on whether to supplement the administrative record on May 20, 2008. Plaintiff Chanselor Bell appeals from his administrative due-process hearing, held pursuant to the Individuals with Disabilities Education Act ("IDEA"), in which the Due Process Hearing Officer ("DPHO") determined that Defendant Albuquerque Public Schools ("APS") had committed no remediable violation of the IDEA in its treatment of Bell. The primary issues are: (i) whether the DPHO erred by not determining that APS' failure to timely reevaluate Bell's disability status constituted a denial of a free appropriate public education ("FAPE"); (ii) whether the DPHO erred by determining that an incorrect label of mental retardation did not significantly impede Bell's and his mother's right to participate in his individual educational program ("IEP") process and whether, as a result, APS denied Bell a FAPE; (iii) whether the DPHO erred by failing to find that the incorrect label of mental retardation harmed Bell and denied him a FAPE; (iv) whether Bell's student educational

---

[1] The IDEA Brief was set for oral argument on March 7, 2008, but argument was deferred until after the evidentiary hearing.

program deprived him of a FAPE; and (v) whether APS' provision of a high-school diploma was proper when APS failed to provide him with a FAPE.  The Court concludes that the DPHO erred in certain of its findings and conclusions and that APS denied Bell a FAPE during approximately one and a half years that he was a student at Manzano High School.  Accordingly, Bell should be provided with compensatory education.

## **FACTUAL BACKGROUND**

Bell was born on February 19, 1987.  See DPHO's Final Decision, Findings of Fact ¶ 1, at 10 (R16)(dated June 23, 2006)("Findings of Fact").[2]  He spent his first few years in Texas and then moved to Albuquerque, New Mexico, becoming an APS student in 1996, when he was nine-years old.  See Exhibit KK2, Results of File Review Concerning Special Education Eligibility for Chanselor Bell at 1 (R1101)(dated November 6, 2005)("File Review").  Although he returned to Texas for a while, in 1999 he came back to Albuquerque to live with his father and stepmother.  See id.  Bell entered Manzano High School as a freshman in 2002 and graduated in 2006.

1.     **Bell's Eligibility Determinations.**

On three separate occasions, APS determined that Bell was a student with mental retardation, making him eligible for special-education services: (i) in 1996, when Bell first became an APS student in the third grade; (ii) in 1999, when Bell was in the sixth grade; and (iii) and in 2002, when Bell was in the ninth grade.  See Findings of Fact ¶¶ 15-17, at 11-12 (R17-18); File Review at 1 (R1101).  Bell was given the Weschler Intelligence Scale for Children III ("WISC III") test to measure his IQ in the third and sixth grades.  He received a composite score of 62 in the third grade and 68 in the sixth grade.  See Findings of Fact ¶ 24, at 13 (R19); Exhibit JJ2, Reevaluation

---

[2] When the Court refers to a document in the administrative record, it will refer to the page number in the record parenthetically, for example as "(R14)."

Summary at 1 (R1098) (dated March 9, 2005).  A score below 70 indicates "subaverage intellectual functioning."  Findings of Fact ¶ 24, at 13 (R19); Reevaluation Summary at 3 (R1100).  APS relied on Bell's WISC III scores to determine that Bell met the criteria for mental retardation.[3]  See Findings of Fact ¶ 24, at 13 (R19); File Review at 1 (R1101).  In 2002, when Bell was in the ninth grade, APS "conducted a 'performance-based' reevaluation" and determined that Bell remained mentally retarded, but did not re-test him.  Findings of Fact ¶ 17, at 12 (R18) (quoting File Review at 1 (R1101)).

In March 2005, Bell was reevaluated again; this time APS determined that he had a learning disability, but was not mentally retarded.  During the 2005 reevaluation, Heather Greene, Bell's ninth-grade English teacher, completed the Vineland Adaptive Measure, based on her experiences with Bell when he was a high-school freshman.  The Vineland test is meant to gauge a student's social and daily-living skills.  The teacher had not worked with Bell in his sophomore or junior years.  See Findings of Fact ¶ 26, at 13 (R19); Exhibit 19, Vineland Adaptive Behavior Scales (R1245-60), Volume One of Transcript of Due Process Hearing at 61:3-62:4 (Gail Stewart & Greene)(taken May 8, 2006)("I DPH Tr.").[4]  Bell's composite score on the Vineland test was 116.  An "adequate" score is between 85 and 115.  File Review at 1 (R1101).  APS did not administer a new intelligence test.  Instead, APS used Bell's old WISC III scores, but considered only his performance scores, which were 71 on both tests, and not his composite scores.  See Findings of Fact ¶ 25, at 13 (R19); I DPH Tr. 140:2-140:24 (Stewart & Lori Rowe).  As part of the reevaluation,

_____

[3] Bell was determined to be intellectually disabled; the relevant term was later changed to mentally retarded.

[4] The transcript's front page reads "May 8, 2005," but given the other evidence in the case, it is clear that the hearing took place in 2006.

Bell's Speech/Language Pathologist ("SLP") interpreted the results of four tests. Two of the tests the SLP considered had been administered to Bell in December 2002. See Findings of Fact ¶ 27, at 13 (R19); Exhibit QQ, Speech and Language Evaluation (R1006-08). Based on the Vineland test, Bell's old WISC III scores, and the SLP's report, APS' evaluation specialist determined that Bell was not mentally retarded, but "met the criteria for Specific Learning Disabled ("SLD") in receptive and expressive language skills." Findings of Fact ¶ 28, at 14 (R20). Bell's Multidisciplinary Team ("MDT") -- the team that was to develop and oversee Bell's special education programming -- adopted the specialist's conclusions. See id.; Exhibit 77, Multidisciplinary Team Meeting Evaluation Summary for Specific Learning Disabilities (R1559).

Bell believes that, when APS changed Bell's eligibility to specific learning disability in March 2005, it did so without full disclosure and explanation to Bell and to his mother. See IDEA Brief at 8. The diagnostician assigned to Bell, Lori Rowe, does not recall going over with Bell or Gina Bell, Bell's stepmother, whether Bell had been misidentified as a student with mental retardation. See I DPH Tr. at 146:15-147:7 (Stewart & Rowe). Ms. Bell was concerned about Bell's change of eligibility and wanted more information. See id. at 270:10-22.

Bell's sponsor teacher did not understand why Bell's eligibility was changed. See Volume Two of Due Process Hearing Transcript at 403:2-404:2 (Stewart & Terry Dahl)(taken May 9, 2006)("II DPH Tr."). APS employee and Bell's basketball coach, Greg Brown, did not believe that things were explained at the MDT meeting. See Volume Three of Due Process Hearing Transcript at 820:13-19 (Stewart & Brown)(taken May 10, 2006)("III DPH Tr."). Ms. Bell did not understand how Bell could become "unmentally retarded" and did not know why adaptive behaviors mattered. Volume Four of Due Process Hearing Transcript at 1010:1-10 (Ms Bell)(taken May 11, 2006)("IV DPH Tr."). After Bell's eligibility was changed, Ms. Bell raised questions about his IQ and her

understanding was that he had a new IQ score of 71.  See id. at 1011:8-13 (Stewart & Ms. Bell).

**2.    Bell's IEPs.**

Under the IDEA, a team composed of the disabled student, parents, and school officials develops an IEP -- a document that lays out the plans and goals for the student's education.  The IEP process is the heart of the IDEA's implementation for individual students.  Bell's first IEP in high school was his 2002 IEP.  This IEP documented his self-advocacy skills, his desire for regular education, and his ability to get information that he needed from adults.  See I DPH Tr. at 104:9-105:12 (Stewart & Rowe).  Bell's November 2003 IEP, his second IEP in high school, had no academic goals, and his only goal was a study-skill goal.  See id. at 119:7-12; Exhibit GG, Individualized Education Program (R837-49)(dated November 19, 2003)("2003 IEP").  Bell wanted more challenging classes.  See II DPH Tr. at 544:1-23 (Samantha Adams & Bell).  When he was placed in general-education classes, however, he felt like he needed more assistance.  See id. at 515:7-21 (Tara Ford & Bell); id. at 546:18-552:19 (Adams & Bell).  In the majority of his regular education classes, he earned grades of a C or below.  See Exhibit AA, Grades (R767-772).

APS did not have any goals related to expressive language until after his eligibility was changed in his junior year.  See I DPH Tr. at 123, 124:13-24 (Stewart & Rowe).  Although Bell had consistently been identified as having deficits in the area of mathematics, he did not have a mathematics goal, an objective, or a specific plan for remediation in IEPs in his sophomore or junior year.  See id. at 120:10-12.  In his sophomore year, Bell started in a pre-algebra class and, because he was failing, he was moved into a special-education mathematics class.  See II DPH Tr. at 519:9-22 (Ford & Bell).  In his junior year, he was originally placed in an Algebra II mathematics class, but after two weeks, he was changed into an Algebra I class.  See id. at 520:1-24.  Bell would meet with his teacher outside class to try and catch up to the rest of the class, but was never able to.  See

-5-

id. at 521:1-523:9.  In an independent evaluation performed on February 16, 2006, Bell tested at the fourth- to fifth-grade level in mathematics.  See I DPH Tr. at 179:15-19 (Dr. Laura Smith).

**3.      Bell's Graduation.**

To graduate from high school in New Mexico, students are required to pass the New Mexico High School Competency Examination.  Bell was unable to pass any portion except the composition portion the first three times that he took the examination.  It was not until he retook the test in the winter of his senior year, after the administrative due-process complaint had been filed, that he was able to pass the test. When Bell passed the examination, he was the only student in the room.  There were two teachers in the room, and Bell would be told "good answer" as he marked down answers.  II DPH Tr. at 531:13-532:8 (Ford & Bell).  Many of the questions that were on the examination that Bell passed were on the practice exam the he took beforehand.  See id. at 533:2-10.  Paul Shaffer, Bell's mathematics teacher, testified that he thought he was generally encouraging Bell throughout the test, telling him "good job," but did not recall indicating to Bell right or wrong answers.  See IV DPH Tr. at 967:1-5 (Shaffer).

**4.      The Administrative Proceedings Below.**

Bell filed a request for a due-process hearing in late December, 2005, with Ms. Bell acting as his attorney-in-fact.  See NMPED Special Education Complaint Request Form (R218-34)(dated December 28, 2005).  Bell filed an amended request for due process on March 3, 2006, alleging claims against APS for violations of the IDEA.  Gail Stewart and Tara Ford represented Bell in the amended complaint.  See Petitioners' Amended Request for Due Process (R205-11)(dated March 3, 2006).  A due-process hearing was held, and a decision was issued on June 26, 2006, in which the DPHO ruled that Bell was not denied a FAPE under the IDEA.  See DPHO Final Decision.

During the administrative hearing, Dr. Laura Smith, a psychologist and educational

diagnostician, testified about the effect that labeling a student mentally retarded has on educational considerations, see I DPH Tr. at 194:12-22 (Stewart & Smith), on the expectations of others for the student, see id. at 195:7-17 (Smith), and on expectations that family members have of the student, see id. at 233:6-11.  Ms. Bell thought that the term mentally retarded signified a permanent condition that would limit Bell's achievement.  See III DPH Tr. at 888:2-889:15 (Ford & Ms. Bell).  As a result, she had lower expectations for Bell.  See id. at 894:10-895:5.  Based on the label of mental retardation, Ms. Bell thought that Bell's intellect was far below normal intellect and that he had a limited capacity to learn.  See IV DPH Tr. at 1054:9-1055:1.

Bell testified about how he understood the label mental retardation compared to the label he was later given, learning disability: "[M]entally retarded just basically means that you just come to school, but you don't -- you know, you can't learn.  You don't know nothing, and you won't learn. And learning disability means you still have time to learn and catch up, and pass."  II DPH Tr. at 533:22-534:1 (Bell).  It mattered to Bell his eligibility changed; he was more confident in his work after his eligibility was changed.  See id. at 534:5-8.

Dr. Smith also testified that Bell needed remediation, especially in the area of mathematics and written language study skills.  See I DPH Tr. at 198:7-18 (Stewart & Smith); id. at 217:10-21. As Bell and his family began to investigate post-secondary options, colleges explained to Bell's family that he would need remediation.  See IV DPH Tr. at 1037:3-1046:11 (Ford & Bell).  Bell's ACT score of 12 is not sufficient to get into a New Mexico state school.  See id. at 929:5-10 (Stewart & Rita Schlosser).

After the administrative hearing was complete, the DPHO found that the evidence demonstrated that APS had information sufficient to determine that Bell was not a student with mental retardation at least as early as his freshman year, failed to reevaluate him despite this

knowledge, and failed to provide relevant information to Bell's parents about his eligibility for special education and about his actual needs as identified through adequate evaluation. See Findings of Fact ¶¶ 24-34, 61, at 13-15, 18; (R19-21, 24). The DPHO found that there was credible evidence that Ms. Bell requested a reevaluation. See id. ¶¶ 18-19, at 12 (R18). The DPHO also found that the information on which APS relied to change Bell's eligibility was available to APS in his freshman year. See id. ¶ 30, at 14 (R20).

In terms of academic need, the DPHO found: "In spite of [Bell's] consistently low academic performance in math, there was no evidence in the record that the Evaluation Specialist or any other District staff member made any attempt to assess this area of suspected disability." Id. ¶ 29, at 14 (R20). She further found that "attempts to move [Bell] into regular education math were essentially unsuccessful." Id. ¶ 56, at 17 (R23). After describing modifications that were made for Bell in general-education mathematics in his junior year, the DPHO concluded: "Even with these extensive modifications, [Bell] was still unable to complete the material and finished approximately three chapters behind the rest of the class." Id.

Nevertheless, the DPHO did not find APS' actions to constitute a denial of a FAPE because Bell failed to prove by a preponderance of the evidence that his educational program was not reasonably calculated to deliver educational benefit in light of Bell's unique needs. See DPHO Final Decision, Conclusions of Law ¶ 5, at 25 (R31). The DPHO concluded that Bell was not entitled to compensatory education. See id. ¶ 13.

**PROCEDURAL BACKGROUND**

Bell brought an action against APS and several school officials in New Mexico state court on July 26, 2006. See Notice of Removal, filed November 22, 2006 (Doc. 1), Group Exhibit A, Complaint for Violation of Civil Rights Pursuant to Section 1983, Title VI of the Civil Rights Act

of 1964 and Section 504 and Civil Action Following Exhaustion of IDEA Administrative Procedures (dated July 25, 2006)("Complaint").  In addition to initiating a civil suit against the Defendants, Bell appealed the DPHO's administrative decision.  See id. ¶ 54-59, at 10-11.  Bell filed a First Amended Complaint on October 30, 2006.  See Notice of Filing of State Court Record, filed November 22, 2008 (Doc. 2), Exhibit B, First Amended Complaint for Violation of Civil Rights Pursuant to Section 1983, Title VI of the Civil Rights Act of 1964 and Section 504 and Civil Action Following Exhaustion of IDEA Administrative Procedures.  The Defendants removed the case to federal court on November 22, 2006.  See Notice of Removal at 1.  Bell filed a Second Amended Complaint on July 2, 2007.  See Second Amended Complaint for Violation of Civil Rights Pursuant to Section 1983, Title VI of the Civil Rights Act of 1964 and Section 504 and Civil Action Following Exhaustion of IDEA Administrative Procedures, filed July 2, 2007 (Doc. 19).  Bell filed a Third Amended Complaint on October 15, 2007.  See Third Amended Complaint for Violation of Civil Rights Pursuant to Section 1983, Title VI of the Civil Rights Act of 1964 and Section 504 and Civil Action Following Exhaustion of IDEA Administrative Procedures, filed October 15, 2007 (Doc. 51).

On March 26, 2008, the Court granted in part APS' motion to dismiss on statute of limitations grounds.  See Memorandum Opinion and Order at 43, entered March 26, 2008 (Doc. 117)("March 26 Memo.").  The Court held that Bell's IDEA claims based on events occurring after December 27, 2003 were time-barred.  See March 26 Memo. at 29-30.  On May 6, 2008, the Court dismissed Bell's equal-protection, due-process, and Title VI claims, which, while not IDEA claims, were related to his IDEA claims.  See Memorandum Opinion and Order at 43, entered May 6, 2008 (Doc. 129).

1.    **The Initial Briefing.**

Bell filed his lead brief regarding the administrative proceedings on January 18, 2008, raising

five issues from the administrative hearing: (i) whether a failure to reevaulate him was a denial of a FAPE; (ii) whether incorrectly labeling him mentally retarded significantly impeded his and his parents' ability to participate in the IEP meetings, resulting in a denial of a FAPE; (iii) whether this incorrect labeling denied him a FAPE; (iv) whether his student-education program denied him a FAPE; and (v) whether APS providing him with a high-school diploma was appropriate given the denial of a FAPE.  See IDEA Brief at 1-2.  Bell asserts that the appropriate standard of review is "'modified de novo,'" id. at 11 (quoting Erickson v. APS, 199 F.3d 1116, 1120 (10th Cir. 1999)), reviewing questions of law de novo and independently reviewing the evidence in the administrative record "'while giving due weight to the administrative proceedings below,'" IDEA Brief at 11 (quoting Murray v. Montrose County School Dist. RE-IJ, 51 F.3d 921, 927 (10th Cir. 1995)).

Bell argues that there are two components to determining whether an IEP was appropriate and whether a student received a FAPE.  The first component is procedural: whether the school district follows the relevant procedures in designing the IEP.  The second component is substantive: whether "the IEP is reasonably calculated to confer an educational benefit."  IDEA Brief at 12. These two components, Bell maintains, must be considered cumulatively to determine whether he was denied a FAPE.  See id. at 12-13.  Bell contends that the DPHO incorrectly attempted to separate the two components and consider their impact in isolation.  See id. at 13.

The first point of error Bell raises is that the DPHO incorrectly found that APS' failure to reevaluate him during the statutory period was not a denial of a FAPE.  Bell argues that the IDEA mandates that a student be evaluated for all suspected disabilities.  Failure to do so, Bell asserts, results in a denial of a FAPE.  See IDEA Brief at 14.  Bell maintains that APS had an ongoing duty to reevaluate him every three years, or earlier if conditions warranted or a parent requested reevaluation.  Bell states that the DPHO found credible evidence that a reevaluation of Bell was

requested and that the information on which APS relied to later change his eligibility was available in his freshman year of high school. See id. According to Bell, a reevaluation "must be conducted in accordance with the same procedures governing evaluations." Id. at 15 (citing 20 U.S.C. § 1414(a)(2)). Bell contends that, because he was not reevaluated until 2005, he was denied a FAPE.

Bell's second point of error is that the DPHO did not find that APS' failure to provide accurate information to Bell and his parents deprived them of meaningful participation in the IEP process, resulting in a denial of a FAPE. Bell argues that, because he and his family were incorrectly informed that Bell was mentally retarded, they did not have the accurate information necessary for meaningful participation in developing Bell's IEPs. See IDEA Brief at 16. Bell points out that the DPHO found that Bell and Ms. Bell "'were deprived of cogent information concerning the nature and characteristics of [Bell's learning disability] by virtue of the delay in evaluation and failure to assess [Bell] in all areas of suspected disability.'" Id. at 16-17 (quoting Findings of Fact ¶ 61, at 18 (R24)). The DPHO erred, however, Bell contends, in not finding these failings to be legally sufficient to be a denial of a FAPE. See IDEA Brief at 17. Bell argues that this procedural defect, standing alone, constitutes a denial of a FAPE. See id.

Bell criticizes the position APS takes on this point, which Bell characterizes as being that the lack of proper information was ultimately irrelevant "because somehow magically Bell received FAPE." Id. at 17. Bell contends that the IDEA "requires individualized planning based on the unique needs of the student." Id. Without accurate information, Bell maintains, an appropriately tailored program could not have been provided. See id. Bell emphasizes that the IEPs on which the DPHO relied in concluding that Bell was receiving a FAPE were developed after his eligibility was changed to student with a learning disability. See id. at 18. According to Bell, because of the misinformation he and his parents received, they were not able to meaningfully participate in his

IEPs and also cannot know "with certainty what an appropriate educational program would have been for Bell." Id. at 18.

Bell's third point is that the DPHO erred in concluding that his mislabeling did not constitute a denial of a FAPE. Bell states that he believed, like many people, "that having mental retardation meant he could not learn." Id. at 19. He points to the testimony of Dr. Davis and Dr. Smith, noting that they "both clarified that mental retardation[] implicitly means a persistent, static disability." Id. Bell contends that, because of his mislabeling, he had lower expectations about his ability to learn and less confidence in his learning capabilities. See id. Because of the impact the mislabeling had on him, he maintains, his right to a FAPE was impeded, and he was deprived of an educational benefit. See id. at 20.

Bell's fourth point of error is that the DPHO did not find that his educational program deprived him of a FAPE. Bell criticizes the DPHO for superficially focusing on his passing classes and the competency exam, without considering what his needs were and whether they were addressed. See id. at 20. Bell notes that the DPHO found that there was no evaluation of his consistently low performance in mathematics classes and that the later efforts made to address his problems with mathematics were inadequate. See id. Bell also notes that an independent evaluation expert ("IEE") -- an expert appointed pursuant to the IDEA to assist parents with the IEP process -- found that he had serious problems with written expression. This deficiency, he asserts, was not addressed at all until his junior year. See id. at 21. Bell contends that, under the IDEA, passing grades do not equal genuine progress.

Bell's final point is that APS improperly issued him a diploma despite its failure to provide him with a FAPE. Bell clarifies that he is not seeking "to nullify his diploma," but rather is contesting the provision of the diploma given that APS' failings resulted in him requiring significant

remediation after high school.  IDEA Brief at 21.  Bell notes that he tried three times, without success, to pass the competency examination required for graduation.  Only after his request for a due-process hearing was filed was he "suddenly able to pass the test, with APS indicating that he had 100s on some of the subtests."  Id. (citing Exhibit BB).[5]  This passing examination took place amidst several procedural irregularities.  He had seen some of the questions before and the proctor would indicate to him when he had good answers.  See IDEA Brief at 21.

Bell argues that the DPHO mistakenly interpreted the law to require that she conclude Bell had received a FAPE because he passed his classes and was graduated.  Bell contends that his graduation does not remedy his denial of a FAPE, particularly given his continuing need for remediation.  See id. at 22.  The DPHO's approach, Bell maintains, is contrary to Congress' intent in the IDEA re-authorization in 1997, which was meant to provide not just access to educational opportunities, but success.  See id. at 23.

In conclusion, Bell specifically requests two forms of relief: (i) that the Court "fashion a remedy allowing [Bell] to purchase compensatory education services from other providers"; and (ii) that the Court consider the "equitable need to correct records to indicate that [Bell] was not a student with mental retardation and than any records referencing [Bell] as a student with mental retardation are in error."  Id. at 25.  Bell also asks the Court for such other equitable relief as the evidence suggests.  See id.

On February 15, 2008, APS filed its response brief.  See APS' Response to Plaintiff's IDEA Brief, filed February 15, 2008 (Doc. 101)("Response").  APS contends that the Court should uphold the decision of the DPHO and enter judgment in its favor on Bell's IDEA claims.  See id. at 1.  APS

---

[5] Although Exhibit BB is listed in the administrative record's table of contents, and cited to both by Bell and by the DPHO, it is missing from the record.

notes that the administrative "hearing was comprehensive, lasting six days and involving the testimony of 22 witnesses, including [Bell], his mother, [Bell]'s three expert witnesses, 11 of [Bell]'s teachers, his speech and language pathologist, transition specialist, and others.  The hearing record also includes thousands of pages of documents pertaining to [Bell]'s education." Id.  APS contends that Bell "cannot identify how his eligibility label affected his educational services, much less that his educational services were deficient." Id. at 2.  APS argues that "[t]he evaluation process and the provision of FAPE are distinct concepts." Id. (citing 20 U.S.C. § 1415(b)(6)).

APS asserts that the proper remedy for a deficient evaluation is "an order requiring the entity to evaluate the student correctly."  Response at 3.  APS notes that a parent may request that a school pay for an independent educational evaluation.  See id. (citing 20 U.S.C. § 1415(b)(1)).  APS contends, however, that these remedies "are moot because, before [Bell] ever filed his request for [a] due process hearing, his eligibility was changed to specific learning disabled, an eligibility he does not dispute."  Response at 3.  APS notes that Bell has had the benefit of an independent evaluation, done at its expense, by Dr. Smith.  See id.  APS contends that Bell's "only remaining remedy is compensatory education, which is intended to remedy appropriate educational services that were denied.  Because [Bell] cannot establish he was denied appropriate educational services, there is nothing to be remedied." Id.

APS argues that it provided Bell an educational program "tailored to his individual needs." Id. at 6.  APS maintains that there is no evidence that Bell's educational label was a "driving factor" in developing Bell's educational program. Id.  APS contends that Bell received mathematics instruction tailored to suit his needs.  APS notes that Bell received mathematics instruction from Mr. Flores and, when regular-education algebra class proved too difficult, Bell was placed in a special-education class allowing more one-on-one instruction and an individually paced curriculum. See

id. at 8-9.  APS contends that Bell's counsel, during the due-process hearing, "elected to skirt any specific questions regarding the instructional content of any of [Bell's] math classes, choosing instead to ask only general questions about course selection."  Id. at 9.  According to APS, the mathematics instruction that Bell received was consistent with what Bell's expert recommended for Bell on cross-examination.  See id. at 10.

APS argues that Bell's other educational needs, including extra support and instruction in written expression and vocabulary, individual tutoring, quiet settings and extended time for testing, and independent educational consultants, were met.  See id. at 10-11.  APS maintains that Bell "does not identify any specific instruction, educational services and supports that he contends he needed, which APS was not already providing."  Id. at 11.

APS further argues that Bell's parents participated in Bell's education and the development of his educational goals and plans, and that Bell's being labeled mentally retarded did not impeded their participation. APS maintains that Ms. Bell was able to independently assess Bell's abilities and considered him academically, but not intellectually, "slow."  Id. at 11 (quoting IV DPH Tr. at 1063). APS states that Ms. Bell was a participant in every MDT meeting, which were sometimes postponed to ensure she could attend, and that her advice was considered and incorporated into education plans. See id. at 11-12.  Ms Bell was also always provided with current information about Bell's eligibility, APS contends, and Bell's change in eligibility in 2005 did not mean that his prior designations were incorrect.  See id. at 12.  Most importantly, according to APS, Bell is unable to show "that his parents' alleged lack of knowledge adversely impacted his receipt of appropriate educational services."  Id.  APS maintains that Ms. Bell's testimony at the due-process hearing shows that, despite the assistance of an evaluation expert for fourteen months before the due-process hearing, she was unable to identify any class or instructional material that she felt was inappropriate for Bell.

See id. at 13.

APS also contends that Bell does not genuinely contest his graduation, because "[t]here is no good faith dispute regarding [Bell]'s successful completion of all graduation requirements." Id. at 14. APS argues that Bell's graduation moots all his claims for prospective relief and that, because he did not exhaust his administrative remedies on the graduation claim by raising the argument during the due-process hearing, he cannot contest his graduation for the first time in district court. See id. at 15. APS characterizes Bell's diploma argument as "a machination . . . to avoid application of T.S. v. Independent School Dist. No. 54, 265 F.3d 1090, 1092 (10th Cir. 2001), and to try to impose upon APS an obligation to provides services to [Bell] in college." Response at 14. "Once a child has graduated," APS asserts, "a school district's obligation to provide services ends, even if the child intends to go to college, and even if he needs tutoring or other supports while there." Id. at 15.

APS next argues that a host of Bell's assertions are unsupported in the record or mischaracterize the record. APS contends that Bell did not litigate at the due-process hearing his contention that he was improperly evaluated in 1996, 1999, or 2002. See id. at 16. APS also contends that only conclusory statements support his argument that being labeled mentally retarded impacted his education, see id. at 16-17, while no evidence supports his allegation that the label harmed him, see id. at 17. APS further contends that Bell's position that his eligibility was changed without explanation is not supported in the record. APS maintains that the reasons for the change were stated in his IEP and that Ms. Bell did not seek any further clarification at the meeting. See Response at 17. APS also contends that Bell was a full participant in all his IEP meetings, received proper support or remediation when in a regular education environment, and was subject to the same expectations as others. See id. at 17-18. APS further contends that, contrary to his description of

himself as being of average intelligence, IQ tests have placed him at low-average at best.  See id. at 19.  APS also argues that Bell's lack of confidence in his reading abilities is irrelevant and that his "myopic focus on his eligibility label" ignores his going from illiteracy when he moved to Albuquerque in the third grade to being able to read at or above his grade level.  Id.  Bell also, according to APS, overlooks the importance that passing grades play in demonstrating educational progress.  See id. at 19-20.

Lastly, APS argues that Bell "erroneously asserts that his claims are governed by the IDEA amendments of 2004, which were effective on July 1, 2005."  Id. at 20.  APS contends:

> Events occurring prior to July 1, 2005 are governed by the IDEA as amended in 1997.  Events occurring after July 1, 2005, are governed by the IDEA as amended in 2004.  [Bell]'s IDEA eligibility was changed from mental retardation to specific learning disabled in March 2005.  Accordingly, all of [Bell]'s complaints relating to his alleged wrongful eligibility label (which occurred prior to July 1, 2005) are governed by IDEA, 1997.  [Bell]'s IDEA brief erroneously relies on post-2005 IDEA language when analyzing pre-2005 claims.

Response at 20.

On February 28, 2008, Bell filed a Reply in support of his IDEA Brief.  See Plaintiff's Reply in Support of IDEA Brief in Chief at 1, filed February 28, 2008 (Doc. 108)("Reply").  Bell first argues that being misidentified constitutes denial of a FAPE.  Bell contends that, from December 27, 2003 -- the first date within the limitations period -- until his change of eligibility in spring of 2005, APS was under an obligation to reevaluate him.  Bell agrees with APS that this issue is governed by IDEA 1997, not IDEA 2004, but maintains that the relevant standards are substantially the same between the two versions of the statute.  See Reply at 2-3 (comparing statutory provisions).

Bell asserts that Ms. Bell requested a reevaluation so she could have accurate information about his needs and was deprived of that information by APS' shortcomings.  "It is undisputed that the hearing officer found . . . a procedural violation," Bell maintains, and thus the question "is

whether the procedural violations amount to a denial of FAPE."  Id. at 3.  Bell asserts that the

procedural violation here is not a technical violation, but a significant procedural violation and that

under IDEA 1997, significant procedural violations can constitute a denial of a FAPE.  See id. at 4.

Bell maintains that, for nine years, Ms. Bell operated under the faulty assumption that Bell was

mentally retarded and that she had access to an independent evaluation for only three months before

the due-process hearing.  Thus, Bell contends, it is unsurprising that she was not able to articulate

what educational services Bell should have received and APS' reference to Ms. Bell having fourteen

months to consider accurate information about Bell before the due-process hearing is misleading.

See id. at 5-6.  Moreover, Bell asserts that APS' argument is a "'blame the parent' ploy" that courts

have rejected.  Id. at 6.

Bell also argues that APS wrongly and summarily disregards many of his arguments and the

facts in the record.  Bell points to the testimony of his ninth-grade teacher, Coach Brown, and two

experts as establishing that living with the label "mentally retarded" had impacted Bell's academic

performance.  "APS is arguing against the weight of the evidence, expert knowledge and against

common sense," Bell maintains.  Id. at 7.  Bell further contends that the cases APS marshals are not

on point, while cases dealing with similar facts as here -- situations of erroneous labeling -- have

recognized the error as denying a student a FAPE.  See id. at 8-9.

Bell's second major point is that, when his eligibility was modified, his IEP was also

modified.  When his high school IEP team was working with the understanding that he was mentally

retarded, Bell asserts, he was "placed almost entirely in general education classes."  Id. at 9.  Bell

disputes APS' position that this placement amounted to providing a FAPE.  Bell points out his

generally poor academic performance during the year he was entirely placed in general education,

and argues that "APS seemingly determined that, for a student with mental retardation, success

meant placement in general education and required no further determination of his individualized needs for special education services."  Id. at 10.

Bell contrasts the situation when he was labeled mentally retarded with what happened after his eligibility changed.  When his placement became "specific learning disability," Bell argues, he began receiving additional supports and his need for remediation was recognized.  Id.  Bell maintains that his special-education services were increased during his senior year and significant modifications were made to his IEP, although never with any math-related goal.  See Reply at 10-11.  Bell also maintains that any remediation APS provided was deficient, as evidenced by the independent evaluation expert's finding of a continued need for remediation.  See id. at 11.

Bell's third and final argument is that his IDEA claims are not moot.  Bell points out that he was still a senior when the due-process hearing took place, but his scheduled graduation was an issue at the hearing, leading him to introduce evidence that compensatory education would be necessary after his graduation because he still required remediation.  See id. at 12.  Bell maintains that he has thus consistently contested his graduation to the extent that additional remediation would be necessary.  Bell argues that the Tenth Circuit's precedent indicates that an IDEA claim would be mooted by graduation only where the graduation was not contested or the plaintiff was not "making a viable claim of entitlement to post-graduation relief."  Id. (quoting T.S. v. Independent School. Dist. No. 54, 265 F.3d at 1096).  Moreover, Bell contends that the Supreme Court's opinion in Zobrest v. Catalina Foothills School Dist., 509 U.S. 1 (1992), is dispositive of the issue, as a result of its holding that a claim for reimbursement survives high-school graduation.  See Reply at 13. Bell concludes by noting that APS seems to suggest that Bell was a student with mental retardation and requests that, as the DPHO found that information that Bell did not have mental retardation was available to APS throughout the statutory limitations period, his educational records be corrected

to show this information as an equitable remedy.  See id. at 13-14.

On April 23, 2008, Bell filed a notice of supplemental authority, referring the Court to a case the United States Court of Appeals for the Eleventh Circuit decided.  See Plaintiff's Notice of Supplemental Authority, filed April 23, 2008 (Doc. 124)("Plaintiff's Supp. Authority").  Bell argued that, in this new case, Draper v. Atlanta Independent School System, 518 F.3d 1275 (11th Cir. 2008), the Eleventh Circuit found that the plaintiff's parents should not have been aware of the plaintiff's misdiagnosis and misevaluation before the plaintiff's reevaluation.  Bell also notes that the Eleventh Circuit upheld the District Court's grant of placement in a private school as an acceptable compensatory-education remedy.  See Plaintiff's Supp. Authority at 2.

### 2.    The Evidentiary Hearing and Supplemental Briefing.

In his IDEA Brief, Bell limited his argument to evidence in the record in the due-process hearing.  Bell also requested an opportunity to present additional evidence, as the IDEA allows.  Accordingly, Bell also filed, contemporaneously with his IDEA Brief, a motion for additional evidence.  See Plaintiff's Motion for Additional Evidence Pursuant to the IDEA, filed January 18, 2008 (Doc. 89).  The Court granted Bell's request to present additional evidence.  See Order, entered May 19, 2008 (Doc. 130).  The Court held that it would allow Bell to present additional evidence, but that it would reserve ruling on whether such evidence would be included in the record.  See id. at 1.

The Court held an evidentiary hearing on May 20, 2008.  At the May 20, 2008 evidentiary hearing, Bell offered a number of exhibits into evidence and put on several witnesses.  Bell's first witness was Dr. Stanley Trent, an associate professor of special education at the University of Virginia's Curry School of Education.  See Transcript of Hearing at 12:131-17 (Stewart & Trent)(taken May 20, 2008)(Doc. 141)("Tr.").  Michael Carrico, attorney for APS, objected to Dr.

Trent's testimony on the grounds that he was not an expert in the broad field of special education or any relevant subcategories.  See id. at 18:8-19 (Carrico).  The Court overruled the objection and allowed Dr. Trent to testify, but gave APS leave to make objections afterwards about particular opinions Dr. Trent made.  See id. at 18:20-24 (Court).

Dr. Trent testified that, after reviewing the administrative record and Bell's deposition testimony, he had concluded that Bell's IEPs were not "really geared toward meeting the needs of a student who had a specific learning disability."  Id. at 21:16-17 (Trent).  Dr. Trent expressed concern about the inadequacy of the goals and objectives in Bell's IEPs.  Dr. Trent noted that Bell's 2003 IEP contained only a study-skills goal, see id. at 24:7-15 (Stewart & Trent), and was concerned with the IEP's lack of any academic goals or objects involving mathematics, see id. at 25:18-26:4.  Dr. Trent testified that Bell's 2005 IEP, after he was re-classified as learning disabled, changed and Bell received more special-education services, although Dr. Trent was still concerned whether the IEP adequately met Bell's needs.  See id. at 34:2-35:16.  Dr. Trent gave his opinion that, had Bell been identified as learning disabled at the beginning of high school, more effective strategies would have been employed for his education.  See id. at 38:12-39:2.  Dr. Trent then testified that parents being incorrectly told their child is mentally retarded will not be able to effectively or appropriately advocate on their child's behalf.  See id. at 43:18-44:8.  Dr. Trent also testified that Bell's receipt of a high-school diploma did not indicate that Bell had received the services he required as a learning-disabled student and that Bell was likely to have academic difficulties in post-secondary education.  See id. at 47:4-48:4.

Mr. Carrico objected to the entirety of Dr. Trent's testimony as not being supported by reliable methodologies.  The Court reserved ruling on the issue.  See id. at 50:15-60:15 (Carrico & Court).  On cross-examination, Dr. Trent testified that he had not been contacted about the case until

2007 and that he had not interviewed Bell or any of his teachers.  See id. at 51:19-53:15 (Carrico & Trent).  Dr. Trent also testified that he did not know whether Bell's mathematics instruction was inappropriate or appropriate, and was not aware of what Bell's particular needs in mathematics were.  According to Dr. Trent, his observations of deficiencies were based on the flawed IEP process.  See id. at 75:9-76:5.

On re-direct, Ms. Stewart, Bell's counsel, questioned Dr. Trent about the methodology he used in reaching his conclusions.  Dr. Trent testified that he engaged in a retrospective analysis based on the documentary record.  See id. at 76:24-77:13 (Stewart & Trent).  In a retrospective analysis, Dr. Trent testified, the only material to be reviewed is the educational record.  See id. at 78:15-19.

After Dr. Trent, Bell put on several witnesses that had worked for APS.  First, Julianne Glinski testified.  Glinski is an educational diagnostician who had reviewed Bell's file in November 2005.  See id. at 87:24-88:15 (Stewart & Glinski).  Glinski compiled a summary report of Bell's educational file that was part of the administrative-hearing record.  See id. at 91:4-11.  On cross-examination, Glinski testified that she would have been available at the due-process hearing had she been asked to testify.  See id. 103:11-16 (Carrico & Glinski).

Dolores Fresquez, a diagnostician who  reevaluated Bell in 1999, testified next.  Fresquez testified that, as part of her reevaluation, she determined that Bell had not been in special education in Houston, see id. at 116:23-117:15 (Stewart & Fresquez), performed better than expected on a standardized test, see id. at 117:16-118:22, and was performing near grade level in reading ability, see id. at 121:8-18.  Fresquez doubted that Bell's IQ was as low as his earlier tests indicated.  See id. at 115: 12-19.  Fresquez also noted that Bell was socially adaptive and popular, see id. at 119:22-120:15, "he walked around with a trail of girls behind him," id. at 128:2-3, and had made

considerable gains in academic development, see id. at 135:24-136:15.  On cross-examination, Fresquez testified that Bell's improvements indicated that his placement was working.  See id. at 145:12-146:2 (Carrico & Fresquez).

Wendy Shanahan, a diagnostic coordinator, then testified about the practices that APS diagnosticians use in performing evaluations.  See generally id. at 160-17.  Shanahan testified that APS is required to explain eligibility criteria to parents and does not expect parents to be experts in diagnostics.  See id. at 172:3-12 (Stewart & Shanahan).  On cross-examination, Shanahan testified that she probably would have been able to testify at the due-process hearing if she had been asked to testify.  See id. at 181:23-182:8 (Carrico & Shanahan).

Bell was the last witness at the evidentiary hearing and testified about his experiences since the due-process hearing.  Bell had tried, unsuccessfully, to get into college.  Two universities rejected him because of low ACT scores.  See id. at 191:6-12 (Stewart & Bell).  Texas Southern University accepted Bell, but he did not have enough money to cover tuition.  See id. at 191:15-192:2.  Bell testified that he had worked at a music warehouse and was currently working for Global Security, doing airport security.  See id. at 194:22-196:5.  Bell testified that he wanted his records corrected because he did not like being labeled mentally retarded.  See id. at 199:5-16.  On cross-examination, Bell testified that he was not able to continue with college because of money issues and not because of academic reasons.  See id. at 204:2-8 (Carrico & Bell).  Bell also testified that no one had asked to see his special-education records.  See id. at 211:12-15.

After the hearing, APS moved for the Court's leave to present additional evidence to rebut Bell's request for expungement of his records.  APS argued that this remedy was not a remedy that Bell had requested during the administrative process.  See APS' Motion for Leave to Present Supplemental Evidence ¶ 2, at 1-2, filed May 28, 2008 (Doc. 136).  APS also argued that Bell's

conduct was inconsistent with the relief he was seeking, as the course of litigation had tended to publicize his eligibility labels. See id. ¶ 3, at 2. Bell responded to the motion, arguing that APS mischaracterized the remedy he was seeking. Bell stated that the remedy he sought was for the records to indicate the error made, not expungement. See Plaintiff's Response to APS's Motion for Leave to Present Supplemental Evidence at 1-3, filed June 11, 2008 (Doc. 137). APS then replied in support of its motion, arguing that Bell had abandoned the remedy of expungement that he sought in his Third Amended Complaint. See APS' Reply Brief in Support of its Motion for Leave to Present Supplemental Evidence at 1-2, filed June 25, 2008 (Doc. 140). APS argued that Bell's requested relief of affixing a label to his education records remained inappropriate and continued to request leave to present evidence on the issue. See id. at 2-6.

The parties agreed to attempt to prepare a stipulated order with a list of stipulated facts and the Court granted APS' motion to the extent of allowing that stipulation to be presented. See Memorandum Opinion and Order at 1-2, entered August 27, 2008 (Doc. 153). On October 1, 2008, APS filed a stipulated statement of facts with the Court. See Stipulated Supplemental Facts, filed October 1, 2008 (Doc. 185). The filing contained three stipulations the parties made: (i) that Bell, through counsel, gave notice of the evidentiary hearing to newspaper reporter Andrea Schoellkopf, resulting in a front-page story in the Albuquerque Journal mentioning Bell's previous IDEA eligibility of mental retardation, see Stipulated Supplemental Facts ¶ 1, at 1; (ii) that Bell, through counsel, introduced records into evidence during this litigation without requesting the records be sealed or otherwise kept confidential, see id. ¶ 2, at 1; and (iii) that Bell, through counsel, requested that the due-process hearing be made open to the public, see id. ¶ 3, at 2.

After the evidentiary hearing, Bell submitted a supplemental brief addressing the new evidence introduced at the hearing. See Plaintiff's Supplemental IDEA Brief, filed August 18, 2008

(Doc. 150)("Bell Supp. Brief").  According to Bell, the "APS witnesses continue to sound the same refrain: they did not have to accurately identify [Bell] as a child with learning disabilities."  Id. at 2.  Bell argues that the testimony of APS' diagnosticians reveals that APS did not consider comprehensive reevaluation to be required, and did not view there being any difference between mental retardation and learning disability.  See id. at 3.  Bell contends that this position is contrary to the IDEA's language, and constituted not just a minor procedural violation but an error significant enough to constitute a denial of a FAPE.  See id. at 4-5.

Bell then discusses the testimony of Dr. Trent, who testified that the IDEA categories were determined based on the different characteristics of students in those categories and that different students had different needs.  Bell notes that Dr. Trent found the APS IEPs deficient and not specifically "geared toward meeting the needs of a student who had a learning disability."  Bell Supp. Brief at 6 (quoting Tr. at 21 (Trent)).  Bell further notes that Dr. Trent explained that "misinformation about proper special education eligibility directs the parent down the wrong road in their own understanding and advocacy on behalf of their child."  Bell Supp. Brief at 9.  Bell also notes that Dr. Trent's testimony supports his own testimony at the due-process hearing about the harmful effects of being incorrectly labeled mentally retarded.  See id. at 9-11.

Finally, Bell turns to his requested remedies.  Bell expands upon the general remedies requested in his initial IDEA Brief.  Specifically, Bell suggests three remedies:

> 1.  Requirement that APS affix a label on all APS educational records identifying or referencing Bell as a student with mental retardation, which label clearly documents that such identification was in error.
>
> 2.  Require APS to pay for a private consultant who will: 1) assist Bell in selecting and making application to post secondary education; 2) assist Bell in applying for financial aid and scholarships; and 3) assist Bell in identifying need for remediation and tutoring in his chosen post secondary educational setting.

    3.  Require APS to pay for private remediation and tutoring support for Bell to successfully transition into and sustain 2 years of post secondary education.

Bell Supp. Brief at 12.  Bell maintains that the Court has "broad authority to determine equitable relief under IDEA."  Bell Supp. Brief at 12.  Bell cites to a number of cases fashioning equitable remedies for violations of the IDEA, and urges the Court to consider his specific factual circumstances.  Bell asserts that his "inability to achieve and maintain enrolment as a post-secondary college student is a direct result of APS's failure to provide a FAPE."  Bell Supp. Brief at 15.

    APS also filed a post-evidentiary hearing supplemental brief.  APS argues that the Court should exclude all the testimony that Bell presented at the evidentiary hearing because such hearings are meant only to fill in unavoidable gaps owing to unavailability of a witness, events subsequent to the administrative hearing, and similar occurrences.  See Defendant APS' Response to Plaintiff's Supplemental IDEA Brief at 1-2, filed September 3, 2008 (Doc. 156)("APS Supp. Brief")(citing Miller v. APS, 455 F. Supp. 2d 1286, 1302 (D.N.M. 2006)(Armijo, J.)).  APS contends that none of the evidence Bell introduced at the evidentiary hearing meets this rigorous standard, largely on the grounds that the witnesses either had no knowledge of the development or implementation of Bell's IEPs, had never met Bell before the hearing, or had personal information relating only to events before the time within the statute of limitations.  See APS Supp. Brief at 1-2.

    APS also makes an evidentiary challenge to the expert testimony of Dr. Trent and asks that the Court exclude his testimony.  APS argues that Dr. Trent's conclusions are not grounded in the scientific method and are thus inadmissible under rule 702 of the Federal Rules of Evidence.  See APS Supp. Brief at 3.  APS contends that, at the hearing, Dr. Trent admitted that he did not apply any methodologies or principles in reaching his conclusions.  See id. at 3-5.  APS also maintains that Dr. Trent's testimony lacks a reliable foundation because it was based only on documents that Bell's

-26-

lawyers selected and Dr. Trent did not have facts regarding Bell's situation, including his educational needs in mathematics or the appropriateness of the services Bell received.  See id. at 5-7.

APS further argues that, even if the Court were to allow Bell's evidence into the record, the evidence would not support reversing the DPHO's decision.  APS asserts that Bell has burden of proof for showing the invalidity of his IEPs.  APS maintains that Bell cannot meet this burden because the administrative record contains no evidence indicating what was inappropriate in his educational programming and because Bell did not offer any such evidence at the evidentiary hearing.  See id. at 7-10.  APS contends that Bell's arguments ignore his own success in various regular-education classes and his graduation from high school with his class.  See id. at 10.  APS also distinguishes Bell's situation from the student's situation in Draper v. Atlanta Independent School System.  APS argues that, unlike in Draper v. Atlanta Independent School System, Bell received support services and was able to make significant academic progress.  See APS Supp. Brief at 11.

Finally, APS argues that the remedies Bell requests are inappropriate or not supported by the evidence in the record.  APS maintains that the IDEA and the case law interpreting it do not provide for post-secondary educational support and services.  See APS Supp. Brief at 12.  According to APS, there is no evidence that Bell needs help in applying for college or financial aid, or that he requires remedial instruction.  See id. at 12-13.  APS also contends that Bell's relief related to correcting or clarifying his education records is inappropriate.  APS argues that Bell failed to raise this issue before the DPHO.  See id. at 13.  APS also argues that whether the earlier evaluations Bell seeks to correct were actually wrong is an issue that is outside the statute of limitations.  See id.  Even if the relief requested was timely and exhausted, APS maintains, it would be inappropriate, because there is no evidence that it is necessary, and Bell's conduct in the "litigation is inconsistent with the relief

he ostensibly seeks." Id. at 14.

Bell then filed a reply brief challenging APS' contentions. Bell first attacks the standard that APS states is to be applied when determining whether to admit supplemental evidence. Bell argues that APS' standard is inconsistent with the IDEA's statutory language. See Plaintiff's Reply in Support of Supplemental IDEA Brief at 1-2, filed September 14, 2008 (Doc. 160)("Supp. Reply Brief"). Bell contends that expert testimony is "necessary to respond to errors of assumption and law in the decision of the DPHO." Id. at 2. Bell points out several areas in which he maintains Dr. Trent's testimony is helpful. See id. at 2-5.

Next, Bell responds to APS' rule 702 objection to Dr. Trent's testimony. Bell argues that expert testimony need not be the result of "laboratory experiments or precise formulae." Supp. Reply Brief at 6. Rule 702 does not, Bell maintains, "exclude expert testimony based on academic understanding and experience gained over the course of many years in the field of education." Supp. Reply Brief at 6. Bell states that Dr. Trent reviewed the administrative record and Bell's deposition testimony, and thus includes a review of records that APS generated and of testimony elicited on cross-examination by APS's counsel. See id. at 7. Bell maintains that, given his expertise and experience in retrospectively reviewing educational records, Dr. Trent did not need to meet with Bell to form an accurate and reliable conclusion. See id. at 8. Finally, Bell argues that equitable relief should be based on current circumstances and that APS continues to ignore the evidence indicating that Bell was erroneously labeled mentally retarded. See id. at 10-11.

After the supplemental briefing was complete, APS filed a notice of supplemental authority. APS did not make any additional substantive argument in its notice, but gave the Court notice of two recent Tenth Circuit cases dealing with the IDEA: (i) Thompson v. R2-J School Dist. v. Luke P., 540 F.3d 1143 (10th Cir. 2008); and (ii) Systema v. Academy School Dist. No. 20, 538 F.3d 1306 (10th

Cir. 2008).  See Defendant APS' Notice of Supplemental Authority, filed October 23, 2008 (Doc. 204).

## RELEVANT LAW REGARDING THE IDEA

The IDEA, 20 U.S.C. §§ 1400-1481, provides a comprehensive scheme to ensure provision of special education to students with disabilities.  IDEA's overarching purpose is to "ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services to meet their unique needs and prepare them for employment and independent living."  20 U.S.C. § 1400(d)(1)(A).  The IDEA has been through several amendments. The IDEA was amended in 2004, with an effective date of July 1, 2005. Legislation is presumptively prospective, unless Congress has evidenced a clear intent for or against retroactivity.  See DeVargas v. Mason & Hanger-Silas Mason Co., Inc., 911 F.2d 1377, 1388-89 (10th Cir. 1990)(stating that "[w]e are strongly persuaded by Justice Scalia's observation in his concurring opinion in *Kaiser* that the presumption of prospective application of statutes is supported by over 150 years of Supreme Court precedent, stretching from the early part of the nineteenth century to the middle of this century.")(citing Kaiser Aluminum & Chemical Corp. v. Bonjorno, 494 U.S. 827, 840-58 (1990)(Scalia, J., concurring)).

It has been recognized that the statutory scheme now called the IDEA embodies "a strong federal policy to provide an appropriate education for every [disabled] child."  Kruelle v. New Castle County School District, 642 F.2d 687, 690 (3d Cir. 1981).  The United States Court of Appeals for the Third Circuit in Kruelle v. New Castle County School District cites various passages of legislative history in explaining that Congress passed the Act to further three interrelated purposes.  See 642 F.2d at 690.  First, "Congress sought to secure by legislation the right to a publically supported equal educational opportunity which it perceived to be mandated by Brown v.

<u>Board of Education</u>, and explicitly guaranteed with respect to handicapped children by two seminal federal cases, <u>Pennsylvania Association for Retarded Children v. Pennsylvania</u> and <u>Mills v. Board of Education</u>." <u>Kruelle v. New Castle County School District</u>, 642 F.2d at 690-91 (citing S. Rep. No. 168, 94th Congress, 1st  Sess. 6, reprinted in U.S. CODE CONG. & AD. NEWS 1425, 1430)(legislative history of Education Act, P.L. 94-142))(footnote omitted).

Second, "Congress intended the provision of education services to increase the personal independence and enhance the productive capacities of handicapped citizens." <u>Kruelle v. New Castle County School District</u>, 642 F.2d at 691 (citation and footnote omitted). Third, Congress "acknowledged the need for an expanded federal fiscal role to aid state compliance with the court decisions and to assure protection for the rights of handicapped children." <u>Id.</u> According to the Third Circuit in <u>Kruelle v. New Castle County School District</u>, Congress employed a cost-benefit philosophy, "[i]nstead of saddling the public agencies and taxpayers with the enormous expenditures necessary to maintain the handicapped as lifelong dependents in a minimally acceptable institutionalized existence, Congress reasoned that the early injection of federal money and provision of educational services would remove this burden by creating productive citizens." <u>Id.</u> (citing S. Rep. No. 168, 94th Congress, 1st Sess., reprinted in U.S. Code Cong. & Ad. News, 1425, 1434).

### 1.    <u>The IDEA's Basic Structure.</u>

The IDEA is, on the surface, a funding statute. The Supreme Court of the United States has pointed out, however, that it "confers upon disabled students an enforceable substantive right to public education in participating States." <u>Honig v. Doe</u>, 484 U.S. 305, 310 (1988).[6] The IDEA is

---

[6] <u>Honig v. Doe</u> discusses the Education For all Handicapped Children Act, which was the predecessor to the IDEA. The Education for All Handicapped Children Act was reorganized and

administered through the Office of Special Education Programming ("OSEP") of the United States

Department of Education.  See 20 U.S.C. §§ 1406, 1417.  States decide whether to participate in the

IDEA and accept the funds that it provides.  At present, all states participate.  New Mexico was the

last state to accept federal funding under the IDEA.  See Bd. of Educ. of Hendrick Hudson Cent.

Sch. Dist. v. Rowley, 458 U.S. 176, 183-184 (1982).

> The IDEA defines the term "free appropriate public education":
>
> The terms "free and appropriate public education" means special education and related services that --
>
> (A)  have been provided at public expense, under public supervision and direction, and without charge;
>
> (B)  meet the standards of the State educational agency;
>
> (C)  include an appropriate preschool, elementary, or secondary school education in the State involved; and
>
> (D)  are provided in conformity with the individualized education programs required under section 1414(d) of [IDEA].

20 U.S.C. § 1401(8).  See 34 C.F.R. § 300.13.

### 2.    District Court Standard of Review.

"The IDEA provides the federal courts with a unique standard of review that differs from

[the] typical deferential review of administrative proceedings."  Systema v. Academy School Dist.

No. 20, 538 F.3d at 1311.  Under the IDEA, a federal court "shall hear additional evidence at the

request of a party," 20 U.S.C. 1415(i)(2)(C)(ii), and then "basing its decision on the preponderance

of the evidence, shall grant such relief as the court determines is appropriate," id. at

1415(i)(2)(C)(iii). "A district court must independently review the administrative record and apply

---

renamed as the IDEA in 1990.

a preponderance of the evidence standard to decide if the requirements of the IDEA have been met."

Systema v. Academy School Dist. No. 20, 538 F.3d at 1311 (citing L.B. v. Nebo School Dist., 379

F.3d 966, 973-74 (10th Cir. 2004)).

      "During its review of the administrative record, the district court must 'give 'due weight' to

the hearing officer's findings of fact, which are considered *prima facie* correct.'"   Systema v.

Academy School Dist. No. 20, 538 F.3d at 1311 (quoting L.B. v. Nebo School Dist., 379 F.3d at

974).  "The district court's proceedings must maintain a character of review and not rise to the level

of a *de novo* trial."   L.B. v. Nebo School Dist., 379 F.3d at 974.  Questions of law, however, are

reviewed de novo.  See O'Toole v. Olathe Dist. Schools Unified School Dist. No. 233, 144 F.3d 692,

699 (10th Cir. 1998).  The Tenth Circuit has dubbed this approach "modified de novo review."

Erickson v. APS, 199 F.3d at 1120.

      **3.**      **Supplementing the Record.**

      The IDEA states that a federal court "shall hear additional evidence at the request of a party."

20 U.S.C. 1415(i)(2)(C)(ii).   Additionally, "Congress requires parents to exhaust IDEA's

administrative procedures and remedies before filing suit in federal court."   Ellenberg v. New

Mexico Military Institute, 478 F.3d 1262, 1267 (10th Cir. 2007).  As the Court has previously noted:

> In light of this mandatory language . . . there is some tension between 20 U.S.C. §
> 1415(i)(2)(C)(ii) and the exhaustion requirement under the IDEA.  The Court
> believes, however, that the tension is resolved through the "modified de novo
> review" of the Plaintiffs' IDEA claims. Murray v. Montrose County Sch. Dist.
> RE-IJ, 51 F.3d 921, 927 (10th Cir. 1995)(explaining that "[t]he district court must
> therefore independently review the evidence contained in the administrative record,
> accept and review additional evidence, if necessary, and make a decision based on
> the preponderance of the evidence, while giving 'due weight' to the administrative
> proceedings below.").

Chavez v. Bd. of Educ. of Tularosa Municipal Schools, No. CIV 05-0380 JB/RLP, Memorandum

Opinion and Order at 23-24, entered November 17, 2008 (D.N.M.)(Browning, J.)(Doc. 219).

4.      **Evaluation and Reevaluation of Students.**

The 1997 version of IDEA ("IDEA 1997")  and the 2004 version of the IDEA ("IDEA 2004") have substantially consistent requirements for evaluation and reevaluation.  Schools have a legal obligation to identify students with disabilities.  See 20 U.S.C. § 1412(a)(3)(IDEA 2004); 20 U.S.C. § 1412(a)(3)(IDEA 1997); 34 C.F.R. § 300.111.  If a child is identified as a child who may have a disability, schools must evaluate the child in all areas of suspected need.  See 20 U.S.C. § 1414(b)(IDEA 2004); 20 U.S.C. § 1414(b)(IDEA 1997); 34 C.F.R. §§ 300.301-305 (especially 34 C.F.R. § 300.304(c)(4)(stating that "[t]he child is assessed in all areas related to the suspected disability, including, if appropriate, health, vision, hearing, social and emotional status, general intelligence, academic performance, communicative status, and motor abilities").

IDEA requires individualized planning based on the student's unique needs.  Under both the IDEA 1997 and the IDEA 2004, reevaluation is required at least every three years, when conditions warrant reevaluation or when a parent or teacher requests reevaluation.  Compare 20 U.S.C. § 1414(a)(2)(A) (IDEA 1997), with 20 U.S.C. § 1414(a)(2)(A) & (B) (IDEA 2004).  Reevaluations must be conducted in accordance with the same procedures governing evaluations.  See 20 U.S.C. § 1414(a)(2)(B)(IDEA 2004);20 U.S.C. § 1414(a)(2)(B)(IDEA 1997).  Under both the IDEA 1997 and the IDEA 2004, reevaluation must involve a variety of assessment tools, cannot rely on any single procedure as the sole criterion, and must guard against racial or cultural bias.  See 20 U.S.C. §§ 1414(b)(2)(A) & (B), 1414(b)(3)(A)(i) (IDEA 1997), with 20 U.S.C. §§ 1414(b)(2)(A) & (B), 1414(b)(3)(A)(i) (IDEA 2004).

Under IDEA 1997 and IDEA 2004, determination that a student is eligible for receipt of special education on the basis of mental retardation requires a determination that the student has significantly subaverage general intellectual functioning, existing concurrently with deficits in

adaptive behaviors and manifested during the developmental period, that adversely affects a student's educational performance.  See 34 C.F.R. § 300.7(6)(implementing IDEA 1997); 34 C.F.R. § 300.8(c)(6)(implementing IDEA 2004).  A specific learning disability is defined as

> a disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, that may manifest itself in the imperfect ability to listen, think, speak, read, write, spell, or to do mathematical calculations, including conditions such as perceptual disabilities, brain injury, minimal brain dysfunction, dyslexia, and developmental aphasia.

Id. at § 300.8(c)(10)(i).

### 5. Parental Involvement in the IEP Process.

"Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process . . . as it did upon the measurement of the resulting IEP against a substantive standard."  Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. at 205-06.  Although the IDEA 1997 does not contain any analogous provision, the IDEA 2004 makes significantly impeding "the parents' opportunity to participate in the decisonmaking process regarding the provision of a free appropriate public education to the parents' children" one of only three grounds on which a procedural violation of the IDEA can result in a denial of a FAPE.  20 U.S.C. § 1415(f)(3)(E)(ii) (IDEA 2004).

Even under the IDEA 1997, violations of the IDEA that "seriously infringe the parents' opportunity to participate in the IEP formulation process" can result in a denial of a FAPE.  Amanda J. v. Clark County School Dist., 267 F.3d 877, 892 (9th Cir. 2001).  "Substantive harm occurs when the procedural violations in question . . . seriously infringe upon the parents' opportunity to participate in the IEP process."  Nack v. Orange City School Dist., 454 F.3d 604, 612 (6th Cir. 2006).

6.    **Violations of the IDEA.**

To determine whether an IEP is appropriate, the Supreme Court of the United States has held that two questions must be addressed.  The first question is whether the school district has complied with the applicable procedures in designing the IEP.  The second question is whether the substance of the IEP is reasonably calculated to confer an educational benefit.  See Bd. of Educ. Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. at 206-07.

Not all procedural violations of the IDEA entitle a student to relief.  See Systema v. Academy School Dist. No. 20, 538 F.3d at 1313.  The procedural violation must have caused "'substantive harm to the child or his parents'; 'deprive[d] an eligible student of an individualized education program'; or 'result[ed] in the loss of [an] educational opportunity.'"  Id. (quoting Knable v. Bexley City School Dist., 238 F.3d 755, 765-66 (6th Cir. 2001))(brackets in original).

7.    **Remedies for Violations of the IDEA.**

Under the IDEA, after making its decision, a court "shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(B)(iii) (IDEA 1997).  "The ordinary meaning of these words confers broad discretion on the court."  School Committee of Town of Burlington, Massachusetts v. Dep't of Educ. of Massachusetts, 471 U.S. 359, 369 (1985).  Courts have exercised this discretion in a variety of ways.  See, e.g., J.C. v. Vacaville Unified School Dist., 2006 WL 2644897 at *9 (E.D.Cal.)(ordering cost of compensatory education to be paid into trust for providing education to student no longer in district); Susquehanna Township School Dist. v. Frances J., 823 A.2d 249, 258 (Pa. 2003)(affirming an award of one year's tuition and fees at a college prep program).

"A court fashioning 'appropriate' relief, as the [IDEA] allows, may order compensatory education, i.e., replacement of educational services the child should have received in the first place.

. . . [C]ompensatory awards should aim to place disabled children in the same position they would have occupied but for the school district's violations of IDEA." Reid v. District of Columbia, 401 F.3d 516, 518 (D.C. Cir. 2005). Compensatory education is appropriate when a student has been denied a FAPE. See Garcia v. Bd. of Educ. of Albuquerque Public Schools, 520 F.3d 1116, 1125 (10th Cir. 2008)(noting "an award of compensatory education vindicates the student's substantive right to receive a FAPE and compensates for a past deprivation of educational opportunity rather than a deprivation of purely procedural rights"). While compensatory education remedies a substantive wrong, the substantive wrong can result from a "procedural defect . . . amount[ing] to a substantive failure to 'provid[e] personalized instruction with sufficient support services to permit the child to benefit educationally from [the school].'" Id. at 1126 (quoting Bd. of Educ. Hudson Cent. School Dist. v. Rowley, 458 U.S. at 203).

## ANALYSIS

Bell contends that APS committed a number of violations of the IDEA that rose to the level of depriving him of a FAPE, contrary to the DPHO's decision. The Court concludes that Bell is correct. APS' actions deprived Bell of a FAPE, and the Court will reverse the DPHO's decision and award Bell compensatory education. APS' failure to timely reevaluate Bell, to provide him and his parents with accurate information, and to develop an IEP with a mathematics goal all constituted denials of a FAPE. Moreover, Bell's graduation does not moot his claim for compensatory education. The subjective effect that Bell's mislabeling as mentally retarded had on him, however, is not remediable under the IDEA.

## I.    ADDITIONS TO THE ADMINISTRATIVE RECORD.

The Court must "independently review the evidence contained in the administrative record, accept and review additional evidence, if necessary, and make a decision based on the

preponderance of the evidence, while giving 'due weight' to the administrative proceedings below." Murray v. Montrose County Sch. Dist. RE-IJ, 51 F.3d at 927.  While the Court has received, heard, and reviewed additional evidence, it explicitly refrained from ruling on which evidence would become part of the record and which evidence would be disregarded.  See Order, entered May 19, 2008 (Doc. 130).[7]  APS raised objections to the evidence that Bell presented at the evidentiary hearing and, specifically, to Dr. Trent's testimony.  The Court will overrule those objections to the extent that it incorporates supplemental evidence into the record.  APS' remaining objections are overruled as moot.

### A.   THE COURT WILL OVERRULE APS' OBJECTIONS TO DR. TRENT'S EXPERT TESTIMONY.

APS objects to Dr. Trent's testimony and argues that the Court should exclude his testimony under rule 702 and under Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993).  APS makes two specific challenges to the admissibility of Dr. Trent's testimony: (i) that his conclusions are not grounded in the scientific method; and (ii) that his conclusions lack a reliable foundation.  See APS Supp. Brief at 3-7.  Neither of these contentions is persuasive.

APS contends that Dr. Trent identified no "criteria, objective measures, or other standards, methods, or principles that he applied to Bell's circumstances."  Id. at 4.  APS characterizes Dr. Trent's use of the "retrospective evaluation" as being "a fancy way of saying that he looked at records."  Id.  Retrospective evaluation may be a fancy way of saying that Dr. Trent looked at records, but looking at records can be an appropriate and reliable form of expert evidence.

---

[7] As the Court has held before, the IDEA's seemingly contradictory mandates are resolved by the unique standard of review employed in IDEA cases.  Additionally, the Court notes that the exhaustion requirement might be construed to bar only claims not raised at the administrative level and not to bar additional evidence on exhausted claims.

Daubert v. Merrell Dow Pharm., Inc. requires a court to focus on the methodology of an expert, rather than on the expert's conclusions, but does not require that an expert conduct independent studies for every conclusion he or she gives.  As Goebel v. Denver and Rio Grande Western R. Co., 346 F.3d 987 (10th Cir. 2003), notes, expert testimony "must be based on scientific knowledge, which 'implies a grounding in the methods and procedures of science' based on actual knowledge."  346 F.3d at 991 (quoting Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 590)).  APS has not challenged that the expertise and knowledge Dr. Trent has acquired through his education and experience is not knowledge that was developed using appropriate methodologies.  Indeed, Dr. Trent's document-intensive analysis was similar to the largely documentary review that APS' diagnosticians conduct when evaluating or reevaluating students' eligibility statuses.  Dr. Trent also commented on the significance and interpretation of Bell's IEPs.  These approaches seem particularly helpful to the Court in analyzing the conduct of school officials in their evaluations of Bell and development of his IEPs and APS has not pointed the Court to anything indicating that this methodology is not appropriate in these circumstances.

Dr. Trent applied his expertise, based upon his past research and experience.  APS has not argued that Dr. Trent's approach and underlying theories are not generally accepted in the community of special education experts or were not subjected to peer review.  See Bitler v. A.O. Smith Corp., 400 F.3d 1227, 1233 (10th Cir. 2004)(noting that "whether the theory or technique has been subject to peer review and publication . . . [and] whether the theory or approach has general acceptance" are relevant factors in considering expert evidence)(internal quotation marks omitted).  Contrary to APS' assertion, Dr. Trent testified that his retrospective research was similar to what he did in a case in Alabama.  See Tr. at 77:8-13 (Trent).  In this case, Dr. Trent applied his expertise in special education to a static, discrete, undisputed set of documentary facts.  He was not attempting

to conduct systemic research or to engage in a detailed factual analysis to pinpoint a difficult-to-discern cause.  Given what Dr. Trent was doing and to what he was testifying, the Court concludes that his methodology was sound and reliable.

Dr. Trent's testimony also has a reliable foundation.  Although APS criticizes Dr. Trent for relying solely on documents that Bell's counsel provided, Dr. Trent testified that he had reviewed many documents that were part of the administrative record, including Bell's IEPs and Bell's deposition testimony.  See id. at 20:14-21:3 (Stewart & Trent).  In other words, Dr. Trent reviewed much of the evidence that the Court is reviewing to decide this appeal.  Additionally, Tenth Circuit case law directs a court to focus on the text of the IEPs that are developed, to avoid "troublesome factual disputes many years later."  Systema v. Academy School Dist. No. 20, 538 F.3d at 1316 (internal quotation marks omitted).  The Court believes that Dr. Trent had an adequate factual basis for those portions of his testimony that it is adding to the administrative record and does not see any sound basis for concluding that the documents Bell's counsel provided to Dr. Trent created a skewed set of facts from which Dr. Trent was working.

### B.   THE COURT WILL INCORPORATE CERTAIN EVIDENCE FROM THE EVIDENTIARY HEARING INTO THE RECORD.

The Court has reviewed the administrative record and has relied primarily on that record.  The Court has, however, considered other argument, testimony, and exhibits that the parties have proffered since the creation of the administrative record.  Specifically, the Court considered the following in addition to what is contained in the original administrative record: (i) Dr. Trent's testimony that Bell's IEPs were "really geared toward meeting the needs of a student who had a specific learning disability," and his related discussion, Tr. at 21:16-17 (Trent); 21:18-27:17 (Stewart & Trent); (ii) Dr. Trent's testimony that Bell's 2005 IEP, after he was re-classified as

-39-

learning disabled, changed and Bell received more special-education services, see id. at 34:2-35:16; (iii) Dr. Trent's opinion that, had Bell been identified as learning disabled at the beginning of high school, more effective strategies would have been employed for his education, see id. at 38:12-39:2; and (iv) Dr. Trent's opinion that Bell's receipt of a high-school diploma did not necessarily indicate that Bell had received the services he required as a learning-disabled student and that Bell was likely to have academic difficulties in post-secondary education, see id. at 47:4-48:4. These specific items of additional evidence are hereby incorporated into the record. All other items proffered to the Court were not helpful to the Court's decision and are not made a part of the administrative record.

## II.    THE 2004 IDEA GOVERNS EVENTS OCCURRING AFTER JULY 1, 2005, WHILE THE 1997 IDEA GOVERNS EVENTS OCCURRING BEFORE JULY 1, 2005.

The parties agree that Bell's claims relating to APS' alleged failure to reevaluate him within the statutory period are governed by the IDEA 1997. See Response at 20; Reply at 2. While there are many similarities between the two version of the IDEA for the matters now before the Court, there are some differences, so it is important that the Court apply the correct statutory scheme. Legislation is presumptively prospective, unless Congress has evidenced a clear intent for or against retroactivity. See DeVargas v. Mason & Hanger-Silas Mason Co., Inc., 911 F.2d at 1388-89. The IDEA 2004 does not contain any expression of Congressional will for or against retroactivity, so the presumption against retroactivity applies. Accordingly, the Court will apply the IDEA 1997 to issues relating to events that occurred before the IDEA 2004 came into effect on July 1, 2005. The Court will therefore analyze the majority of the substantive issues in this case under the IDEA 1997.

## III.    THE DPHO ERRED IN DETERMINING THAT APS' FAILURE TO TIMELY REEVALUATE BELL WAS NOT A DENIAL OF A FAPE.

The DPHO concluded that APS failed to fulfill its responsibilities under the IDEA by not timely reevaluating Bell when there was evidence that his behavior was inconsistent with being

mentally retarded. This procedural violation, however, did not automatically result in Bell being denied a FAPE. The DPHO determined that, despite the procedural violation, Bell had failed to prove that his IEP was not reasonably calculated to confer educational benefit. See Conclusions of Law ¶ 5, at 25 (R31). The Court disagrees and concludes that this procedural violation deprived Bell of educational opportunities, resulting in a denial of a FAPE.

### A.   APS COMMITTED A PROCEDURAL VIOLATION OF THE IDEA BY FAILING TO TIMELY REEVALUATE BELL.

The DPHO found that APS failed to timely reevaluate Bell, and that in doing so, APS committed a procedural violation of the IDEA. See Conclusions of Law ¶ 5, at 25 (R31). APS does not contest this conclusion. Moreover, the Court does not see any error in the DPHO's decision on this point. Most of the evidence that was used in the March 2005 reevaluation had been available to APS for at least two years. See Findings of Fact ¶ 30, at 14 (R20). The March 2005 reevaluation did not entail any new IQ tests, but rather involved a different use of preexisting test scores that dated back to 1996 and 1999. See Findings of Fact ¶ 25, at 13 (R19). The teacher who completed Bell's Vineland Adaptive Measure test taught him freshman year but not the two years before. See Findings of Fact ¶ 26, at 13 (R19); I DPH Tr. at 61:3-62:4 (Stewart & Greene). The only new information on which APS relied was two of the four tests involved in the SLP's speech and language evaluation. See Findings of Fact ¶¶ 27, 30 at 13, 14 (R19, R20). APS was already in possession of most of the information that would ultimately result in Bell no longer being labeled mentally retarded well before APS undertook that reevaluation. The Court therefore agrees with the DPHO that APS should have reevaluated Bell sooner that it did. Because APS had a duty to reevaluate Bell when "conditions warrant a reevaluation," APS' failure to reevaluate him was a procedural violation of the IDEA. 20 U.S.C. § 1414(a)(2)(A) (IDEA 1997).

**B.   THIS PROCEDURAL VIOLATION CONSTITUTED A DENIAL OF A FAPE TO BELL.**

Not all procedural violations of the IDEA entitle a student to relief.  See Systema v. Academy School Dist. No. 20, 538 F.3d at 1313.  The procedural violation must have caused "'substantive harm to the child or his parents'; 'deprive[d] an eligible student of an individualized education program'; or 'result[ed] in the loss of [an] educational opportunity.'"  Id. (quoting Knable v. Bexley City School Dist., 238 F.3d at 765-66)(brackets in original).  The Tenth Circuit has not addressed whether a school district's failure to reevaluate a student's eligibility can rise to the level of harm the IDEA requires, nor has any other federal court of appeals or district court squarely confronted the question.

While the DPHO determined that there was no denial of a FAPE to Bell, the DPHO may have applied the wrong legal standard.  The DPHO based her conclusion on Bell failing to prove that his IEP was not reasonably calculated to provide an educational benefit.  See Conclusions of Law ¶ 5, at 25 (R31).  That standard, however, is the standard for determining whether an IEP is substantively defective despite procedural compliance.  See Systema v. Academy School Dist. No. 20, 538 F.3d at 1313 ("If a school district has complied with the procedural requirements for the IEP, the court must turn its attention to whether the IEP was 'reasonably calculated' to provide the child with 'educational benefits.'")(quoting Bd. of Educ. Hudson Cent. School Dist. v. Rowley, 458 U.S. at 206-07).[8]

---

[8] There is, however, some ambiguity in the case law, indicating that a procedural violation that amounts to a denial of a FAPE is a substantive violation and that the test for the severity of a procedural violation and for a substantive violation is essentially the same.  See, e.g., Garcia v. Bd. of Educ. of Albuquerque Public Schools, 520 F.3d at 1125 (noting that a substantive wrong can result from a "procedural defect . . . amount[ing] to a substantive failure to" provide an individualized education).

The Court concludes that APS' failure to timely reevaluate Bell was sufficiently harmful that it resulted in Bell being denied a FAPE. It is difficult to see how a student with a learning disability can be provided with an individualized program matching his needs when he has been misdiagnosed as mentally retarded. More importantly, the record does not show that the IEPs, somehow, despite the misdiagnosis, were appropriate. Contrary to APS' contentions, the record supports Bell's assertion that his IEP underwent modifications in light of his change in eligibility status. Because APS failed to reevaluate him, for two years Bell had an IEP based on the incorrect assumption that he was mentally retarded. APS' failure to reevaluate Bell therefore led to Bell not receiving the same education during his sophomore and junior years of high school that he received in his senior year. The Court believes that the gap between the education he received as a mentally-retarded student and the one he received as a student with a learning disability is so great that the Court can reasonably conclude that Bell was denied a FAPE during his sophomore and junior years.

A failure to reevaluate a student when the IDEA requires it would not necessarily be a procedural violation that denied a FAPE in all circumstances. When the reevaluation would not have any significant effect on a student's educational program and opportunities, the violation would be harmless. In Bell's situation, however, a timely reevaluation would have led to him being reclassified as a student with a specific learning disability sooner than he was. As already noted, the DPHO found, and the Court also finds, that there was evidence Bell was wrongly classified before his March 2005 reevaluation. The Court concludes that the difference between being classified mentally retarded and being classified learning disabled is significant enough that the educational plans for such classifications would be different and APS' failure to reevaluate Bell led to the denial of a FAPE. See, e.g., Tr. at 34:2-35:16, 38:12-39:2 (Stewart & Trent)(discussing Bell's IEPs and how an earlier, correct identification would have improved Bell's education). A failure

to timely reevaluate a student that results in a student continuing to be misclassified as mentally retarded is not a harmless procedural violation of the IDEA.

APS is correct in arguing that an incorrect identification will not lead to a denial of a FAPE if the student's IEP nonetheless provides for educational programming appropriately tailored to the student's unique needs.  See Response at 3-5.  The IDEA is not designed to ensure that students are appropriately labeled but that they are appropriately educated.  Nonetheless, the Court finds it unconvincing, as a general matter, that a school district would design the same IEP for a learning disabled student as it would for a mentally retarded student.  See I DPH Tr. at 194:12-22 (Stewart & Smith)(discussing effect label of mentally retarded has on educational planning).  This general finding, however, does not mean that Bell was necessarily denied a FAPE.  In addition to the likely effects of a mislabeling such as Bell endured, however, Bell has specifically demonstrated that his IEP was changed when his eligibility was changed.  Labels are not determinative.  They are, however, often important.  APS' actions in changing Bell's IEP indicate that Bell's situation was one in which the incorrect label turned out to be important.

As a general matter, mental retardation differs from a specific learning disability.  The IDEA excludes mental retardation from the definition of specific learning disability.  See 34 C.F.R. § 300.8(c)(10)(ii) (2007)("Specific learning disability does not include learning problems that are primarily the result of . . . mental retardation.").  "Mental retardation means significantly subaverage general intellectual functioning, existing concurrently with deficits in adaptive behavior and manifested during the developmental period, that adversely affects a child's educational performance."  Id. at § 300.8(c)(6).  Specific learning disability is defined as

> a disorder in one or more of the basic psychological processes involved in
> understanding or in using language, spoken or written, that may manifest itself in the
> imperfect ability to listen, think, speak, read, write, spell, or to do mathematical

> calculations, including conditions such as perceptual disabilities, brain injury, minimal brain dysfunction, dyslexia, and developmental aphasia.

Id. at § 300.8(c)(10)(i).  In Bell's March 2005 reevaluation, he was determined to have a specific learning disability in receptive and expressive language skills.  See Findings of Fact ¶ 28, at 14 (R20).  Additionally, Dr. Smith testified that mental retardation is a persistent, static disability.  See I DPH Tr. at 234:13-20 (Stewart & Smith).  Dr. Smith stated she "had never had an experience where someone has been cured of mental retardation."  Id. at 234:19-20.

While APS has cited several cases holding that a disabled child's label or classification is largely irrelevant, see, e.g., School Dist. of Wisconsin Dells v. Littlegore, 184 F. Supp. 2d 860, 876 (W.D. Wis. 2001)(noting "the correctness of [student's] label is essentially irrelevant under the IDEA"), none of those cases are from the Tenth Circuit and the Court is not aware of the Tenth Circuit having adopted such a standard.  The Tenth Circuit cases that APS cites as being "in accord" with the out-of-circuit cases do not deal with a misclassification or failure to reevaluate.  Rather, they stand for the basic principle that procedural violations of the IDEA are not automatically remediable violations.  See Erickson v. APS, 199 F.3d at 1123 (holding there is no right to compensatory education when there is a procedural violation without a denial of a FAPE); Urban v. Jefferson County School Dist. R-1, 89 F.3d 720, 726-27 (10th Cir. 1996)(holding that transition services that school district provided were appropriate where quality of services was not challenged and only argument was that student was denied transition services in his preferred location).

Although the IDEA's language makes the actual needs of the child more important than any formal designation of a particular disability, the Court disagrees with the cases APS has assembled to the extent that they hold an eligibility label to be irrelevant.  Such an interpretation makes the statute's language and the implementing regulations defining various disabilities largely superfluous.

-45-

The inclusion of different labels in the regulations, and the development of such labels within the relevant scientific fields, indicates that at least some importance can and, in the appropriate circumstances, should be attached to them.  Labels and classifications are not conclusive, but the Court does not find it reasonable to assume that they are not a factor at all.

More important than the labels here, however, is that the changes in Bell's IEP that followed his change in eligibility indicates that Bell would have had a different and more appropriate IEP sooner had APS timely reevaluated him.  Bell's IEPs before his reclassification as having a specific learning disability are different from the IEP developed in 2005, after the reclassification.  Compare 2003 IEP and Exhibit HH, Individualized Education Program (R850-61)(dated November 20, 2002)("2002 IEP"), with Exhibit EE, Individualized Education Program (R780-808)(dated November 12, 2005)("2005 IEP").  In contrast with Bell's earlier IEPs, the 2005 IEP contains a more significant number of objectives and modifications.

Dr. Trent testified that, after reviewing the administrative record and Bell's deposition testimony, he had concluded that Bell's earlier IEPs for a mentally retarded student were not "really geared toward meeting the needs of a student who had a specific learning disability," Tr. at 21:16-17 (Trent), in part because Bell's 2005 IEP, after he was re-classified as learning disabled, changed and Bell received more special-education services, see id. at 34:2-35:16 (Stewart & Trent).  Dr. Trent testified that the earlier IEPs lacked a needs assessment to determine what services Bell required. See id. at 21:18-24 (Trent).  Dr. Trent gave his opinion that, had Bell been identified as learning disabled at the beginning of high school, more effective strategies would have been employed for his education.  See id. at 38:12-39:2 (Stewart & Trent).

Based on the record before it, the Court concludes that APS' failure to timely reevaluate Bell resulted in Bell having an inappropriate IEP for nearly two years, causing a deprivation of

educational opportunity and therefore a denial of a FAPE.  The Court rests its decision largely on the application of the general standard that denying a student appropriate educational opportunities is a denial of a FAPE.  See Systema v. Academy School Dist. No. 20, 538 F.3d at 1313.  What little federal case law exists touching on the more specific issues of a failure to reevaluate a student, however, also supports this conclusion.

In a case involving a school district's failure to reevaluate a student after being requested to do so, the United States District Court for the District of Columbia held, without addressing the significance of the procedural violation, that when the defendant school district "failed to carry out the requested re-evaluations. . . . the defendant violated the IDEA requirements for [plaintiff's] education and must provide compensation for the lost educational opportunity."  Argueta v. Government of District of Columbia, 355 F.Supp.2d 408, 413 (D.D.C. 2005).  In Draper v. Atlanta Independent School System, 480 F.Supp.2d 1331 (N.D.Ga. 2007), the United States District Court for the Northern District of Georgia upheld a finding that a school district deprived a student of a FAPE in part on the basis that the student's IEPs "were based on inaccurate and outdated information," because the district had not timely and accurately assessed the student.  480 F.Supp.2d at 1346.  In sum, the Court concludes that the better reasoned cases, and the record in this case, support the conclusion that APS' failure to timely reevaluate Bell resulted in Bell having an inappropriate IEP for nearly two years and therefore denied him a FAPE.

## IV.   APS' FAILURE TO PROVIDE ACCURATE INFORMATION ABOUT BELL'S NEEDS TO BELL AND HIS FAMILY DEPRIVED THEM OF MEANINGFUL PARTICIPATION IN THE IEP PROCESS, AND CONSTITUTES A DENIAL OF A FAPE.

Parental involvement in the development of a student's IEP is a central feature of the IDEA. See Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. at 205-06 ("Congress

placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process . . . as it did upon the measurement of the resulting IEP against a substantive standard.").  APS failed to provide Bell and his family with accurate information about Bell's academic capabilities and needs.  Because of this lack of good information, Bell and his family were unable to meaningfully participate in Bell's IEP meetings.  The DPHO found that APS failed to convey accurate information to Bell and his family, but determined that the violation did not deny a FAPE to Bell.  See Findings of Fact ¶ 61, at 18 (R24).  The Court disagrees with that determination.

### A.   APS FAILED TO PROVIDE ACCURATE INFORMATION ABOUT BELL AND HIS NEEDS TO BELL AND HIS FAMILY.

The DPHO found "a rational basis to believe that [Bell] and [Ms. Bell], as well as the entire IEP team, were deprived of cogent information concerning the nature and characteristics of [Bell's specific learning disability] by virtue of the delay in evaluation and the failure to assess [Bell] in all areas of suspected disability." Id.  The DPHO went on, however, to find that Bell "failed to prove by a preponderance of the evidence that the program delivered by [APS] was not reasonably calculated to deliver educational benefit in light of [Bell's] unique needs." Id.  Although not discussed under the DPHO's Conclusions of Law, and not couched in such terms, the Court interprets the DPHO to be finding a procedural violation of the IDEA but concluding that the violation did not deny Bell a FAPE.

The Court agrees with the DPHO's finding of a procedural violation, which neither party appears to be challenging and which the record well supports.  Because APS should have reevaluated and reclassified Bell sooner than March 2005, Bell and his family were relying on incorrect information about Bell's disability and needs when they participated in IEP meetings

occurring before the reevaluation.  APS' failure to provide accurate information to the Bells was a procedural defect.

**B.      APS' FAILURE TO PROVIDE ACCURATE INFORMATION PREVENTED HIS PARENTS FROM MEANINGFULLY PARTICIPATING IN THE IEP PROCESS, THUS DENYING BELL A FAPE.**

A significant enough procedural violation preventing parents and students from meaningfully participating in the IEP process can result in a denial of a FAPE.  The misinformation that Bell and Ms. Bell were relying on was such a violation.  While, as Bell later admits, his briefing incorrectly relies on the IDEA 2004's language that a procedural violation that "significantly impeded the parents' opportunity to participate in the decisionmaking progress" can be a denial of a FAPE, 20 U.S.C. § 1415(f)(3)(E)(ii)(II) (IDEA 2004), impediments to parental participation can be denials of a FAPE under the IDEA 1997 as well.

First, the statutory language that the IDEA 2004 added restricts rather than expands the grounds on which a court or hearing officer may find a denial of a FAPE from procedural violations. Under the IDEA 2004, impeding parental opportunity is one of only three reasons that a procedural violation may constitute a denial of a FAPE.  See 20 U.S.C. § 1415(f)(3)(E)(ii) (IDEA 2004)(stating "a hearing officer may find that a child did not receive a [FAPE] only if the procedural inadequacies" cause one of three results)(emphasis added).  The IDEA 1997 did not have any analogous section limiting when procedural violations could be found to be a denial of a FAPE.  The decision to make impeding parental opportunity an explicit ground for denial of a FAPE in the IDEA 2004 does not mean that it was not grounds for a denial of a FAPE under the IDEA 1997; rather, it implies the opposite -- that Congress thought impeding parental participation was one of the few situations that could deny a student a FAPE developed under the more open structure in the IDEA 1997 that was significant enough to retain in the IDEA 2004.

Second, there is case law -- predating the IDEA 2004 amendments -- that supports the conclusion that procedural violations which interfere with a parent's ability to participate in the IED process can be denials of a student's right to a FAPE.  Various courts have held that procedural deficiencies that "seriously infringe the parents' opportunity to participate in the IEP formulation process" can result in a denial of a FAPE.  Amanda J. v. Clark County School Dist., 267 F.3d 877, 892 (9th Cir. 2001)(citing cases from the United States Courts of Appeals for the First and Fourth Circuits).

In Amanda J. v. Clark County School Dist., the United States Court of Appeals for the Ninth Circuit held that a school district's failure to disclose requested documents to a student's parents denied the student a FAPE.  See 267 F.3d at 894.  The Ninth Circuit noted that the student's "parents were not informed of the possibility that their daughter suffered from autism . . . despite the fact that the district's records contained test results indicating as much."  Id.  Because of the district's failure, the parents were "prevented from participating fully, effectively, and in an informed manner in the development" of the student's IEP.  Id.

The situation here is similar to the situation in Amanda J. v. Clark County School Dist. Instead of failing to present relevant documents, APS presented the Bells with incorrect information about Bell's status.  The end result is the same, however – a lack of reliable information on which to rely in advocating for Bell and meaningfully participating in the IEP process.  Such an impediment to the full participation of Bell's parents in the IEP process amounts to a denial of a FAPE.  See Nack v. Orange City School Dist., 454 F.3d at 612 ("Substantive harm occurs when the procedural violations in question . . . seriously infringe upon the parents' opportunity to participate in the IEP process.").

Dr. Smith testified that a label of mental retardation affects the expectations that family

members have of the student.  See I DPH Tr. at 233:6-11 (Stewart & Smith).  Dr. Smith's conclusion is borne out in Ms. Bell's testimony.  Ms. Bell thought that the term mentally retarded signified a permanent condition that would limit Bell's achievement.  See III DPH Tr. at 888:2-889:15 (Ford & Ms. Bell).  As a result, she had lower expectations for Bell.  See id. at 894:10-895:5.  Based on the label of mental retardation, Ms. Bell thought that Bell's intellect was far below normal intellect and that he had a limited capacity to learn.  See IV DPH Tr. at 1054:9-1055:1.  After Bell's eligibility changed, however, Ms. Bell began raising questions about his IQ .  See id. at 1011:8-13.  Thus, Ms. Bell's perception of Bell's abilities began to change when she was informed of his new diagnosis.  Had she possessed the information earlier, it is almost certain that she would have approached the IEP process differently.

## V.  THE DPHO DID NOT ERR IN FINDING THAT THE EFFECT OF AN INCORRECT LABEL OF MENTAL RETARDATION DID NOT RESULT IN A DENIAL OF A FAPE.

Bell seems to be raising both a procedural and a substantive challenge on the issue of incorrect labeling.  As with all procedural violations, for the effect that incorrect labeling had on Bell to be a remediable violation, it must fit within one of the categories that results in a deprivation of a FAPE: (i) "substantive harm to the child or his parents"; (ii) depriving "an eligible student of an individualized education program"; or (iii) "loss of [an] educational opportunity."  Systema v. Academy School Dist. No. 20, 538 F.3d at 1313 (internal quotation marks omitted, brackets in original).  The latter two categories, depriving a student of an individualized education and denying educational opportunity, are focused on what the school district does for the student.  The personal, subjective effect mislabeling had on Bell is not directly relevant to these categories.  The effect must therefore, if it is a denial of a FAPE at all, fall into the first category.

Neither party has pointed the Court to any case law dealing with this subject, and the Court

has not located any such case law in its own research.  Later cases from the United States Court of Appeals for the Sixth Circuit, however, clarify the holding of <u>Knable v. Bexley City School Dist.</u>, the case pronouncing the standard for assessing procedural violations that the Tenth Circuit adopted in <u>Systema v. Academy School Dist. No. 20.</u>  <u>Nack v. Orange City School Dist.</u> clarifies that the substantive-harm prong of the test is essentially a term that encompasses the other two prongs of the test but does not have any independent force of its own.  <u>See id.</u> at 612 ("Substantive harm occurs when the procedural violations in question either seriously infringe upon the parents' opportunity to participate in the IEP process or deprive an eligible student of an individualized education program or result in the loss of educational opportunity.")(internal quotation marks omitted).  The Sixth Circuit thus views the test as having two prongs.  The Tenth Circuit, however, views the test as having three prongs.  <u>See</u> <u>Systema v. Academy School Dist. No. 20</u>, 538 F.3d at 1313 (listing three ways that a procedural violation can deny a FAPE).  Moreover, there may be good reasons to give independent contact to the substantive-harm prong.  Congress was concerned with the long-term, lifetime effect of deficiencies in education.  <u>See</u> <u>Kruelle v. New Castle County School District</u>, 642 F.2d at 691 (noting that, "[i]nstead of saddling the public agencies and taxpayers with the enormous expenditures necessary to maintain the handicapped as lifelong dependents in a minimally acceptable institutionalized existence, Congress reasoned that the early injection of federal money and provision of educational services would remove this burden by creating productive citizens.")(citing S. Rep. No. 168, 94th Congress, 1st Sess., reprinted in U.S. Code Cong. & Ad. News, 1425, 1434).  The impact that an incorrect label of mental retardation had on Bell is not only understandable and regrettable, but it can have long-term, lifetime consequences that can be devastating.  "Substantive harm" is what Congress wanted to avoid with the IDEA.  This Court, therefore, must give some independent content to the "substantive harm to the child or his parents"

prong.

Ultimately, the question is whether Bell was denied a FAPE.  See Garcia v. Bd. of Educ. of Albuquerque Public Schools, 520 F.3d at 1125.  If the harm that Bell suffered caused a denial of a FAPE, then it would be a remediable violation.  Bell argues that being mislabeled caused him to have lower expectations for himself and caused him to have little confidence in his ability to learn.  See IDEA Brief at 19-20.  The record supports this argument.  Bell's testimony establishes that he did not think he could learn because he was mentally retarded, see II DPH Tr. at 533:22-534:1 (Bell), but that he became was more confident in his work after his eligibility changed, see id. at 534:5-8.  Dr. Smith's testimony that Bell's lack of confidence and risk-taking stemmed, at least in part, from being labeled mentally retarded, see I DPH Tr. at 196:23-197:20 (Stewart & Smith), also supports the common-sense conclusion that individuals will view themselves differently if they are consistently labeled mentally retarded.

The question then is whether this subjective impact the mislabeling had on Bell led to a denial of a FAPE.  On the record before it, the Court cannot conclude that the effect of the mislabeling denied him a FAPE.  While the record demonstrates Bell's lack of confidence in his abilities, the record does not adequately connect this lack of confidence with a denial of a FAPE.  The record does not show how Bell's decreased confidence and diminished expectations for himself affected his educational programming or deprived him of educational opportunities.  The IDEA will hold a school district liable for the effects mislabeling has on the development and implementation of an educational plan, but not on all social and psychological effects of such mislabeling unless it can be shown that these effects impeded a student's access to a FAPE.  In this case, the record does not prove by a preponderance of the evidence that Bell's lack of confidence deprived him of a FAPE.

**VI.     THE DPHO ERRED IN NOT FINDING THAT BELL'S STUDENT EDUCATIONAL PROGRAM DEPRIVED HIM OF A FAPE.**

Bell argues that the DPHO should have found that APS' failure to provide mathematics goals in his IEPs deprived him of a FAPE.[9]   The Court agrees.   Bell's argument here seems to be substantive rather than procedural, thus the correct standard is whether Bell's IEP is reasonably calculated to provide educational benefits.   See Bd. of Educ. Hudson Cent. School Dist. v. Rowley, 458 U.S. at 206-07.   Despite Bell's deficiencies in mathematics, his IEPs did not include any mathematics-related goals.   See I DPH Tr. at 120:10-12 (Rowe).   While APS contends that, regardless of what was in the IEPs, it provided appropriate mathematics instruction to Bell, courts must focus on the text of the IEPs that are developed, to avoid "troublesome factual disputes many years later."  Systema v. Academy School Dist. No. 20, 538 F.3d at 1316 (internal quotation marks omitted).   Moreover, as late as February 2006, Bell was testing at an elementary level in mathematics.   See I DPH Tr. at 179:15-19 (Smith).   Both Dr. Trent and Dr. Smith testified that Bell was likely to require remediation in post-secondary education.   See Tr. at 47:4-48:4 (Stewart & Trent); I DPH Tr. at 198:7-18 (Stewart & Smith); id. at 217:10-21.

While Bell received passing grades in some math classes, see Grades at 1-3, 5-6 (R767-69, 771-72), and passed the New Mexico High School Competency Examination, the Court does not believe that it is therefore required to find that Bell received a FAPE.   Just as the IDEA is concerned with a student's needs and not with the label assigned to the student, the IDEA is concerned with a student's academic development and not with the letters on his report card.   A successful

_____

[9] Bell also argues that APS' failure to include an expressive language goal in his IEP until his 2005 IEP, when his eligibility status was changed, also amounts to a denial of a FAPE.  This argument, however, only emphasizes that APS' failure to reevaluate Bell led to a denial of a FAPE, an argument with which the Court has already agreed.

graduation and passing grades would generally be evidence of satisfactory academic progress, but it is not conclusive evidence.

The Court, like APS, is unable to find -- in either the most recent version of the Code of Federal Regulations or earlier versions -- the regulation that Bell cites for the proposition that the "IDEA 2004 specifically rejects reliance on passing grades as sufficient evidence of ability to progress such that no additional special education service is necessary." IDEA Brief at 21 (citing 34 C.F.R. § 300.311(c)(1)).[10]   Nonetheless, the Court does not believe that passing grades are conclusive of a FAPE.  Board of Educ. of Hendrick Hudson Central School Dist., Westchester County v. Rowley noted that passing grades are important but not determinative factors.  See 458 U.S. at 207 n. 28 (noting that "the achievement of passing marks and advancement from grade to grade will be one important factor in determining educational benefit"). Given the formal focus on the IEP that the Court should employ, coupled with the persistent lack of mathematics goals, and reinforced with the contradictory evidence of Bell's testing at an elementary level in 2006, the Court concludes that Bell's IEP was not reasonably calculated to provide him educational benefits in mathematics.

## VII.   APS' PROVISION OF A HIGH-SCHOOL DIPLOMA TO BELL DOES NOT RELIEVE APS OF LIABILITY.

Bell "contests the provision of a diploma to him when APS failed to provide him with a FAPE and when he continues to require significant remediation prior to pursuit of college level course work."  IDEA Brief at 21.  He does not, however, "seek to nullify his diploma."  Id.  APS contends that Bell's challenge is not genuine and that he failed to raise this argument before the

---

[10] Nor is the Court aware of any similar regulation under the IDEA 1997, which would be the governing version of the IDEA.

DPHO.  See Response at 14-15.  The Court interprets Bell to essentially be making a pre-emptive

attack on a possible defense that APS might raise, and which APS in fact raises in its briefing.

Bell's argument, as the Court understands it, is not requesting affirmative relief, but rather

contending that a particular defense does not apply and that the DPHO committed error when she

relied on that defense in finding against Bell.  Exhaustion of administrative remedies is therefore

not an issue here.  See T.S. v. Independent School Dist. No. 54, 265 F.3d at 1096 (noting that

"nowhere in the district court or on this appeal has T.S. explicitly contested his

graduation")(emphasis added).

APS contends that Bell's "graduation moots all claims for prospective relief."  Response at

15.  APS relies on T.S. v. Independent School Dist. No. 54, which held that the student's graduation

rendered an IDEA claim moot, see 265 F.3d at 1096, and on the regulations implementing the IDEA

that state "[t]he obligation to make FAPE available to all children with disabilities does not apply

with respect to . . . [s]tudents with disabilities who have graduated from high school with a regular

high school diploma," 34 C.F.R. § 300.122(a)(3)(i) (IDEA 1997).  APS' interpretation of the

regulations and T.S. v. Independent School Dist. No. 54 is overly broad and inapplicable in this case.

First, in T.S. v. Independent School Dist. No. 54, the issue was whether the plaintiff had filed

a request for a due-process hearing before his graduation.  The Court interprets the regulations and

case law to require that a student invoke the protections of the IDEA before his graduation, but that

his or her subsequent graduation will not abruptly divest a hearing officer or court of jurisdiction

if the claim is timely brought.  Given the possibility of a lengthy administrative hearing process,

potential administrative appeals, district court review, court of appeals review, and even certiorari

to the Supreme Court in the rare case, the full protection of the IDEA would not apply to the last

years of high school, perhaps not even to high school at all, if the Court were to adopt APS'

construction of the regulations.  APS' interpretation would also create an incentive for school districts to provide diplomas simply as a way of washing their hands of any possible liability.  Here, Bell timely requested a due-process hearing before his graduation.

Moreover, the rule that graduation moots an IDEA case "applies, of course, only where a student does not contest his graduation, and where he is seeking only prospective -- rather than compensatory -- relief." T.S. v. Independent School Dist. No. 54, 265 F.3d at 1092.  While Bell contests his graduation and has presented evidence that cast some doubt on his examination, the Court, like the DPHO, see Findings of Fact ¶ 84, at 21 (R27), does not find sufficient evidence that Bell's test was improperly administered.[11]  Bell, however, is not seeking prospective relief; he is seeking compensatory relief.  Compensatory education can still be ordered subsequent to graduation. Bell's claims are therefore not moot and the Court may hear them.

## VIII.  THE COURT NEED NOT AGGREGATE VIOLATIONS TO DETERMINE WHETHER BELL WAS DENIED A FAPE.

Bell contends that it is the aggregate of his claims -- not each individual claim in a vacuum -- and the consideration of both the procedural and substantive elements of an IEP claim that the Court must consider in determining whether APS denied Bell a FAPE.  See IDEA Brief at 12-13.  The Court agrees with Bell that APS' conduct must meet both procedural and substantive standards.  See Bd. of Educ. Hudson Cent. School Dist. v. Rowley, 458 U.S. at 206-207 (holding that first a court must determine if the IDEA's procedural requirements are met and then whether the "individualized educational program developed through the [IDEA's] procedures [is] reasonably calculated to

---

[11] In this regard the modified de novo standard is particularly important.  The Court must give due weight to the DPHO's findings.  The DPHO, unlike the Court, heard the direct testimony of Bell's mathematics teacher and was in a better position to gauge his credibility when he testified that he gave Bell encouragement during the examination, but did not remember ever telling Bell when one of his answers was good.  See IV DPH Tr. at 967:1-5 (Shaffer).

enable the child to receive educational benefits").  Bd. of Educ. Hudson Cent. School Dist. v. Rowley, however, does not support Bell's argument that a court should aggregate violations to determine whether Bell was denied a FAPE.  Bd. of Educ. Hudson Cent. School Dist. v. Rowley makes no mention of such an approach.  Nor has the Court's own research turned up any cases applying such a standard.  In considering whether an IEP is substantively valid, that is, whether it is calculated to provide educational benefits, the Court would of course be analyzing the IEP as a whole, but the Court cannot find any legal support for aggregating procedural violations.  Because, however, the Court determines that three separate violations each independently would support a finding that Bell was denied a FAPE, the Court does not need to aggregate violations here to find a denial of a FAPE or determine whether such an approach would be appropriate under the IDEA.

## IX.    THE COURT WILL ORDER APS TO PROVIDE BELL WITH COMPENSATORY EDUCATION.

Compensatory education is an appropriate remedy when a student has been denied a FAPE. See Garcia v. Bd. of Educ. of Albuquerque Public Schools, 520 F.3d at 1125.  Bell was denied a FAPE for three separate reasons: (i) APS failed to reevaluate him sooner than it did; (ii) APS failed to provide accurate information to Bell and to his parents; and (iii) APS failed to construct an IEP that was reasonably calculated to provide Bell with educational benefits in mathematics. Compensatory education should be fashioned to provide "replacement of educational services the child should have received in the first place."  Reid v. District of Columbia, 401 F.3d at 518. Because Bell was denied a FAPE through APS' failure to comply with the IDEA, the Court will award compensatory education to Bell pursuant to 20 U.S.C. § 1415(i)(2)(B)(iii) (IDEA 1997).

Bell was reevaluated in March 2005, but APS had available to it the relevant information from the start of the statutory limitations period in December 27, 2003.  While it also appears that

APS had the information earlier than December 27, 2003, APS cannot be held liable for conduct earlier than the start of the limitations period.  See March 26 Memo. at 29-30.  Bell was thus deprived of a FAPE for a period of one year and three months.

The question then becomes what compensatory education to make up for that period would look like.  Bell's experts have testified that Bell suffered in particular a lack of specific attention to his language and mathematics skills.  In addition to being denied a FAPE, Bell was also denied the resources of an IEP team operating with correct information for over a year.  While Bell is apparently not completely satisfied with his final IEP, he has not demonstrated a better plan.

Accordingly, APS must pay for a consultant or consultants to figure out an appropriate scheme to remedy that fifteen-month deficiency, and then tutor him or secure education services that implement that remedial plan.  The Court will order APS to pay for outside tutoring and educational assistance that is consistent with Bell's final IEP, focusing on language and mathematics skills to prepare him for post-secondary education, for fifteen hours per week -- the amount of special-education time provided under Bell's IEP, see 2005 IEP at 5 (R795).  The assistance shall continue for fifteen months, the amount of time between the beginning of the statutory period and the March 2005 reevaluation.  Alternatively, the Court will order APS to pay for an outside consultant to formulate a plan to provide remedial education for Bell that would last for approximately fifteen months, the amount of time between the beginning of the statutory period and the March 2005 reevaluation.  APS will then pay for fifteen months of remedial tutoring that is consistent with the plan.  The plan should endeavor, as much as possible, to put Bell in a situation similar to where he would be if he had received fifteen months of educational services from APS that was focused on his mathematics needs and needs as a student with a specific learning disability in receptive and expressive language skills.

APS may choose which alternative to take, with an eye toward providing Bell with a remedial education that makes Bell able to start college on a level with other high school graduates. APS should work with the Bells to arrive at the most efficacious remedy.  If APS and Bell cannot agree on what alternative to use, however, then APS must use the first alternative.

The Court will not order the other relief that Bell seeks.  Bell has not adequately shown that he has a need for a consultant to assist him in applying to college and looking for scholarships and financial aid.  The Court believes that the other relief it has ordered puts him in a good position to get into college, and he is not entitled to other relief that other students do not get from public schools.  In other words, this requested relief is not truly remedial, but seeks something above and beyond what is needed to provide a FAPE.

The Court also does not see a need for ordering APS to affix labels to old education documents of Bell's.  While the Court does not agree with APS that the conduct of Bell's counsel is inconsistent with the requested relief -- Bell is requesting correction of records to note his later eligibility change, not seeking to bury those records -- the Court also does not see a need for the requested relief.  This Court's opinion makes it clear that, during the statutory period, Bell was mislabeled for over a year.  No one has sought access to Bell's records.  The relief Bell seeks is equitable and the Court concludes that equity does not require that relief.

**IT IS ORDERED** that the Due Process Hearing Officer's Final Decision is affirmed in part and reversed in part.  The Court finds that Plaintiff Chanselor Bell was denied a free and appropriate public education and will order Defendant Albuquerque Public Schools to provide compensatory education to remedy the deprivation.

UNITED STATES DISTRICT JUDGE

Counsel:

Tara Ford
Pegasus Legal Services
Albuquerque, New Mexico

 -- and --

Gail S. Stewart
Steven Granberg Attorney at Law, P.A.
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

Michael L. Carrico
Samantha M. Adams
Modrall Sperling Roehl Harris & Sisk, P.A.
Albuquerque, New Mexico

     *Attorneys for the Defendant*